# THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JAMES SLAMON,** | : |
| | : |
| **Plaintiff,** | : |
| **v.** | : **3:16-CV-2187** |
| | : **(JUDGE MARIANI)** |
| **CARRIZO (MARCELLUS) LLC, et al.,** | : |
| | : |
| **Defendants.** | : |

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

Presently before the Court is a class action concerning royalty payments made on oil
and gas leases. Specifically, Plaintiff, James Slamon, claims that he and others similarly
situated[1] were paid royalties on their oil and gas leases that were improperly calculated by
Defendants, Reliance Marcellus II, LLC, Reliance Holdings USA, Inc., (collectively
"Reliance"), and Carrizo (Marcellus) LLC ("Carrizo"). On October 3, 2016, Plaintiff filed a
five count Complaint in the Court of Common Pleas of Susquehanna County, Pennsylvania,
(Doc. 1 at 10-30), seeking declaratory relief for breach of contract (Count I), damages for
breach of contract, (Count II), damages for breach of contract through a breach of the
implied duty of good faith and fair dealing (Count III), damages for breach of fiduciary duty,
(Count IV), and an accounting (Count V). Defendants removed the case to this Court on

---

[1] Because the class has yet to be certified, and because the class is based on those who have
similar leases with Defendants as the lease Plaintiff entered into, the Court will generally refer only to
Plaintiff's lease when analyzing the present Motions to Dismiss.

October 31, 2016. (Doc. 1 at 1-6). Thereafter, Carrizo and Reliance filed separate motions to dismiss, (Docs. 15 & 17), which are now ripe for decision. For the reasons that follow, the Court will grant in part and deny in part Defendants' Motions.

## II. FACTUAL ALLEGATIONS

Plaintiff's Complaint alleges the following facts which this Court accepts as true for the purposes of this Motion:

On April 7, 2009, Plaintiff and Carrizo entered into a lease agreement (hereinafter "the lease" or "the contract"), where Carrizo, the Lessee, was given exclusive rights to the oil and gas under Plaintiff's, the Lessor, land in exchange for, among other things, royalty payments on all gas production. (Doc. 1 at 13, ¶¶ 14-15). In August of 2010, with Plaintiff's approval, Carrizo assigned Reliance an undivided sixty percent interest in the contract. (Id. at 13, ¶ 18). This assignment, however, did not modify any other terms of the lease. (Id. at 14, ¶ 18).

With respect to the calculation of the royalty payments, the lease provides, in part:

4.      ROYALTY PAYMENTS. . . .

. . .

(b)      Production Royalty. Lessee shall pay Lessor the following royalty (the "Royalty"), free of all costs, whether pre-production or post-production, as follows:

. . .

(ii)      GAS: Lessee shall deliver to the credit of Lessor, free of all costs (whether pre-production or post-production), a monthly Royalty equal

2

to eighteen percent (18%) of the greater of (i) the market value, measured at the point of take, of all gas and any constituents produced from the Leasehold or lands pooled or unitized therewith, or (ii) the gross amount of revenue paid to Lessee for all gas and any constituents produced from the Leasehold or lands pooled or unitized therewith, measured at the point of take; provided, however, that when gas production is sold in an arms-length sale transaction with an unaffiliated third party, the value of such gas production shall be the price paid to Lessee.

. . .

(f)  Valuation. The value of oil, gas, or other hydrocarbon production shall be determined on the basis of the greater of (i) the prevailing local market price at the time of sale or use, or, NYMEX spot price as published at the time of sale, whichever is greater, or (ii) the price paid to Lessee from the sale or use of the gas, including proceeds and any other thing of value received by Lessee; provided, however, that when gas production is sold in an arms-length sale transaction with an unaffiliated third party, the value of such gas production shall be the price paid to Lessee.

(*Id.* at 34, 35).

Defendants began gas production on Plaintiff's land in late 2011 and Plaintiff began receiving two royalty checks—one from Carrizo and one from Reliance—in March of 2012. (*Id.* at 14, ¶¶ 21-22). The royalty payments Plaintiff received, however, were based on gas prices that were consistently below both the NYMEX spot price and the prices paid by other gas producers in the area. (*Id.* at 14, ¶ 23). Upon inquiry, Carrizo informed Plaintiff that it was basing Plaintiff's royalty payments on the net amount Carrizo received from selling the gas to DTE Energy Trading, Inc. ("DTE"). (*Id.* at 17, ¶¶ 29, 31). DTE, in turn, paid Carrizo the price DTE received from reselling the gas to a third party, minus DTE's production costs and fees. (*Id.* at 18, ¶ 37). As a result, the price Carrizo received for the gas—on which

3

Plaintiff's royalty payments were based—had DTE's production costs and fees built into it. (*Id.* at 19, ¶ 40). Reliance based its royalty payments to Plaintiff on the sale prices derived from a similar agreement with DTE. (*Id.* at 21, ¶ 44).

## III. STANDARD OF REVIEW

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 555 (internal citations and alterations omitted). In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* A court "take[s] as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, but . . . disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v. Abbott Laboratories*, 707 F.3d 223, 231 n.14 (3d Cir. 2013) (internal citations and quotation marks omitted).

*Twombly* and *Iqbal* require [a court] to take the following three steps to determine the sufficiency of a complaint: First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679, 129 S. Ct. at 1950 (internal citations and quotation marks omitted). This "plausibility" determination will be a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

## IV. ANALYSIS

Carrizo and Reliance have raised a variety of arguments, some of which overlap, as to why certain claims in Plaintiff's Complaint should be dismissed. The Court will address each argument in turn.

### A. Breach of Contract – Royalty Payment Pricing

Plaintiff has alleged that Defendants have breached the contract by paying royalties that are lower than the NYMEX spot price and/or the local market price. (Doc. 1 at 25, 26, ¶¶ 65, 73). As a result of this alleged breach, Plaintiff seeks declaratory relief in Count I and damages in Count II. (*Id.*). Defendants argue that the Complaint does not state a claim for breach of contract because it alleges that Defendants used the sale price they received

5

from DTE to calculate Plaintiff's royalty payments and the plain language of the lease allows Defendants to value the gas at its sale price when "sold in an arms-length sale transaction with an unaffiliated third party." (Doc. 16 at 6-13; Doc. 18 at 9-14).

"When interpreting a contract, a court must determine the intent of the parties and effect must be given to all provisions in the contract." *Krizovensky v. Krizovensky*, 624 A.2d 638, 642 (Pa. Super. Ct. 1993). "It is firmly settled that the intent of the parties to a written contract is contained in the writing itself." *Id.* "While unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact." *Kripp v. Kripp*, 849 A.2d 1159, 1163 (Pa. 2004). "To be 'unambiguous,' a contract clause must be reasonably capable of only one construction." *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1074 (3d Cir. 1997). However, "[a] contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (Pa. 1986). "If left undefined, the words of a contract are to be given their ordinary meaning." *Kripp*, 849 A.2d at 1163.

According to the lease, Plaintiff's royalty payments are calculated at eighteen percent of the value of the natural gas produced from his land. (Doc. 1 at 34). Section 4(f) of the lease further provides that

[t]he value of oil, gas, or other hydrocarbon production shall be determined on the basis of the greater of (i) the prevailing local market price at the time of sale or use, or, NYMEX spot price as published at the time of sale, whichever is greater, or (ii) the price paid to Lessee from the sale or use of the gas,

6

including proceeds and any other thing of value received by Lessee; provided, however, that when gas production is sold in an arms-length sale transaction with an unaffiliated third party, the value of such gas production shall be the price paid to Lessee.

(*Id.* at 35). The discrepancy in how the parties interpret this provision concerns the proviso: "provided, however, that when gas production is sold in an arms-length sale transaction with an unaffiliated third party, the value of such gas production shall be the price paid to Lessee." (*Id.*). Defendants argue that because this proviso is separated from the rest of the provision by a semicolon, according to the rules of grammar and statutory construction, the proviso modifies the entire provision. Thus, according to Defendants, if they sell gas in an arms-length transaction with an unaffiliated third party, only the proviso is controlling and the gas is valued at the sale price Defendants received from the third party.

Plaintiff argues that, according to the rules of grammar and statutory construction, the proviso only modifies the immediately preceding section, subsection (ii), of section 4(f). Thus, according to Plaintiff, if Defendants sell gas in an arms-length transaction with an unaffiliated third party, the gas is valued at "the greater of (i) the prevailing local market price at the time of sale or use, or, NYMEX spot price as published at the time of sale, whichever is greater, or (ii)" the sale price Defendants received from the third party.

At this early stage of litigation, it is sufficient to say that the provision at issue is susceptible to multiple reasonable interpretations. While it is certainly true that courts sometimes apply rules of statutory construction to aid their interpretations of contracts, *see, e.g., J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 365-66 (3d Cir. 2004), "the

7

touchstone of contract interpretation is the intent of the parties." *Dardovitch v. Haltzman*, 190 F.3d 125, 139 (3d Cir. 1999). Here, the contract language is not so clear that the parties' intent as embodied in the written instrument can be deciphered as a matter of law on a motion to dismiss. The fact that both sides have cited rules of grammar and canons of statutory construction that support their interpretation of the provision demonstrates that both parties have proffered reasonable readings of the contract's language. While discovery may shed light on the parties' intent, it is not discernible at the pleading stage in the litigation. Accordingly, because Plaintiff's claim is based on a reasonable reading of the contract's language, he has stated a cause of action against Defendants for breach of contract under the plausibility standard of *Iqbal/Twombly*.

One argument raised by Carrizo, however, merits some more attention. Carrizo maintains that applying the proviso only to the clause immediately preceding it would render the proviso redundant and meaningless. (Doc. 16 at 11-12). Specifically, Carrizo argues that the language immediately preceding the proviso specifies that the gas will be valued at the price paid to Carrizo and the proviso provides that, when gas is sold in an arms-length transaction with an unaffiliated third party, the gas will be valued at the price paid to Carrizo. (Id. at 11). Carrizo thus urges this Court to interpret the lease in a way as to avoid rendering the proviso meaningless.

While Carrizo's argument appears to have some merit as it pertains to section 4(f) of

the lease, this provision seems to be in conflict with another provision in the lease that

pertains to royalties. Section 4 of the lease provides as follows:

> (b) <u>Production Royalty</u>. Lessee shall pay Lessor the following
> royalty (the "<u>Royalty</u>"), free of all costs, whether pre-production or post-
> production, as follows:
>
> . . .
>
> (ii) GAS: Lessee shall deliver to the credit of Lessor, free of
> all costs (whether pre-production or post-production), a monthly Royalty equal
> to eighteen percent (18%) of the greater of (i) the market value, measured at
> the point of take, of all gas and any constituents produced from the Leasehold
> or lands pooled or unitized therewith, or (ii) the gross amount of revenue paid
> to Lessee for all gas and any constituents produced from the Leasehold or
> lands pooled or unitized therewith, measured at the point of take; provided,
> however, that when gas production is sold in an arms-length sale transaction
> with an unaffiliated third party, the value of such gas production shall be the
> price paid to Lessee.

(Doc. 1 at 34). In this provision, however, it is not clear that the proviso is redundant if read

in the way that Plaintiff advocates. Subpart (ii) of section 4(b)(ii) states that Plaintiff will

receive a monthly royalty of eighteen percent of "the gross amount of revenue paid to"

Carrizo while the proviso specifies that when gas is sold in an arms-length transaction with

an unaffiliated third party, Plaintiff will receive a monthly Royalty of eighteen percent of "the

price paid to" Carrizo.

A plausible interpretation of the above is that in a situation where Carrizo does not

sell the gas production "in an arms-length sale transaction with an unaffiliated third party,"

the "greater of" analysis is undertaken with the comparators being "the market value,

9

measured at the point of take," and the "the gross amount of revenue paid to Lessee for all gas and any constituents produced from the Leasehold or lands pooled or unitized therewith, measured at the point of take." However, in a situation where Carrizo elects to proceed in accordance with the proviso by selling gas production in an arms-length transaction with an unaffiliated third party the "greater of" analysis is undertaken with the comparators being "the market value, measured at the point of take," and the "price paid to Lessee" pursuant to the Lessee's arms-length sale transaction.

Further, even if the proviso unambiguously modified both provisions so that "when gas production [was] sold in an arms-length sale transaction with an unaffiliated third party," the gas would be valued at the sale price, (Doc. 1 at 35), Plaintiff's claim would still not be subject to dismissal. Plaintiff's Complaint notes that Carrizo sold the gas produced from Plaintiff's land to DTE, "which Carrizo characterizes as an 'unaffiliated third party.'" (Doc. 1 at 17, ¶ 29). The Complaint then describes the terms allegedly contained in Carrizo's contract with DTE and notes that "[t]hrough this unusual arrangement, DTE—not Carrizo— effectively determines the price at which gas is sold from Carrizo to DTE." (*Id.* at 18, ¶ 38). A reasonable inference from these passages is that DTE is not truly an unaffiliated third party or that Carrizo's agreement with DTE was not the product of an arms-length transaction. Thus, even if the contract language was clear, the Complaint pleads that the proviso is not applicable to the transaction between Carrizo and DTE.

Consequently, even under Defendants' reading of the contract, if the proviso is not applicable, then Plaintiff would be entitled to have his royalty payment based upon "the greater of (i) the prevailing local market price at the time of sale or use, or, NYMEX spot price as published at the time of sale, whichever is greater, or (ii) the price paid to Lessee from the sale or use of the gas." (Doc. 1 at 35). Because Plaintiff has pleaded that his royalties were based on gas valued at less than the local market price and the NYMEX spot price, Plaintiff has stated a plausible cause of action for breach of contract.

Accordingly, the Court will deny Defendants' Motions to Dismiss as they pertain to Plaintiff's breach of contract claim involving royalty payment pricing.

### B. Breach of Contract – Post-Production Costs

In Count I and II, Plaintiff has also alleged that Defendants breached the contract by deducting DTE's fees and post-production costs from Plaintiff's royalties. (Doc. 1 at 25, 26, ¶¶ 65, 72). Defendants argue that Plaintiff has not stated a claim for breach of contract because he has not alleged that Defendants deducted any post-production costs that Defendants incurred before selling the gas to a third party. (Doc. 16 at 13-15; Doc. 18 at 6-8).

The relevant provision of the lease provides that "Lessee shall pay Lessor the following royalty (the 'Royalty'), free of all costs, whether pre-production or post-production." (Doc. 1 at 34). Defendants agree that this provision prohibits them from deducting post-production costs from the royalties they pay Plaintiff. Defendants, however, argue that the

11

Complaint does not allege that *Defendants* deducted any post-production costs from Plaintiff's royalties, but instead that a third party, DTE, deducted its own costs *after* Defendants had already sold the gas to DTE. Defendants contend that the costs incurred by a third party after the initial sale do not fall within the definition of "post-production costs" as that term has been defined by the Pennsylvania Supreme Court.

Here, the contract does not define the term "post-production costs," and it is not immediately clear from the context of the lease that this term does not include those post-production expenses Defendants incur indirectly through a third party. Defendants, however, rely on *Kilmer v. Elexco Land Services, Inc.*, 990 A.2d 1147 (Pa. 2010), to argue that Pennsylvania law gives a fixed meaning to the term "post-production costs". *Kilmer* concerned whether the "net-back" method of calculating gas royalties violated Pennsylvania's Guaranteed Minimum Royalty Act , 58 P.S. § 33. *Kilmer*, 990 A.2d at 1149. In a footnote, the court noted that "[i]n industry parlance . . . 'post-production costs' refer to expenditures from when the gas exits the ground until it is sold. We will adhere to these definitions throughout this opinion." *Id*. at 1149 n.2. The Court also stated that "[i]n the industry, as referenced above, the 'expenses of production' relate to the costs of drilling the well and getting the product to the surface, but do not encompass the costs of getting the product from the wellhead to the point of sale, as those costs are termed 'post-production costs.'" *Id*. at 1157.

Defendants argue that the definition of "post-production costs" in *Kilmer* excludes those costs that occur after the initial point of sale to DTE. *Kilmer*, however, did not concern how courts should interpret the term "post-production costs" under Pennsylvania law when it appeared undefined in a contract.[2] Instead, the court simply defined the term for use in the opinion. Thus, nothing in *Kilmer* compels the conclusion that the term "post-production costs" as used in the contract at issue here has a fixed meaning under Pennsylvania law.

Turning to the Complaint, Plaintiff has pleaded that, because post-production costs were built into the sale price Defendants received from DTE, and because Plaintiff's royalties were calculated from this sale price, Plaintiff's royalties were improperly reduced by "post-production costs." (Doc. 1 at 18-19, ¶¶ 38-40). As the lease does not clearly limit "post-production costs" to only those production expenses incurred directly by Defendants— as opposed to those incurred directly to third parties and passed onto Defendants—Plaintiff has adequately pleaded a cause of action for breach of contract.

_____

[2] In fact, the contract at issue in *Kilmer* defined post-production costs as the parties used the term in their contract:

As used in this provision, Post Production Costs shall mean (i) all losses of produced volumes (whether by use as fuel, line loss, flaring, venting or otherwise) and (ii) all costs actually incurred by Lessee from and after the wellhead to the point of sale, including, without limitation, all gathering, dehydration, compression, treatment, processing, marketing and transportation costs incurred in connection with the sale of such production. For royalty calculation purposes, Lessee shall never be required to adjust the sales proceeds to account for the purchaser's costs or charges downstream from the point of sale.

*Kilmer*, 990 A.2d at 1150.

13

Accordingly, the Court will deny Defendants' Motions to Dismiss as they pertain to Plaintiff's breach of contract claim involving post-production costs.

### C. Breach of Contract – Implied Duty of Good Faith and Fair Dealing

Count III of Plaintiff's Complaint alleges that Defendants breached the implied duty of good faith and fair dealing by accepting sale prices from DTE that were well below market value for natural gas. (Doc. 1 at 27, ¶¶ 79-83). Reliance argues that this claim should be dismissed because a breach of the duty of good faith and fair dealing is not an independent cause of action and instead should be merged with Plaintiff's other breach of contract claims. (Doc. 18 at 16-17). Carrizo raises the separate argument that Plaintiff's claim should be dismissed because Plaintiff is attempting to impermissibly use the implied duty of good faith and fair dealing to impose duties at odds with the express provisions of the contract. (Doc. 16 at 15-18).

"Pennsylvania courts have cited Restatement (Second) of Contracts § 205 for the proposition that every contract has an implied term that the parties will perform their duties in good faith." *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 91 (3d Cir. 2000). "In practice, however, the courts have recognized an independent cause of action for breach of a duty of good faith and fair dealing only in very limited circumstances." *Id.* Indeed, "[t]he precise extent to which Pennsylvania law extends the duty of good faith and fair dealing . . . is the subject of a degree of uncertainty." *Fremont v. E.I. DuPont DeNemours & Co.*, 988 F. Supp. 870, 874 (E.D. Pa. 1997). "One reason for this confusion

14

is that Pennsylvania courts have been less than clear on whether the covenant applies to all contracts or only certain types of contracts." *Cessna v. REA Energy Coop., Inc.,* ___ F. Supp. 3d ___, 2017 WL 2799325, at *12 (W.D. Pa. 2017). In *Ash v. Continental Insurance Co.,* 932 A.2d 877 (Pa. 2007), the Pennsylvania Supreme Court "note[d] that it had not yet in a precedential opinion addressed the conflicting cases or adopted § 205," and then declined to resolve the conflict "because the issue was not before the court." *Cessna,* ___ F. Supp. 3d at ___, 2017 WL 2799325, at *12. Here, neither party has argued that the lease at issue does not contain an implied duty of good faith and fair dealing. Thus, the Court will assume for the purposes of these motions that the duty does apply to the lease.

"The covenant of good faith and fair dealing involves an implied duty to bring about a condition or to exercise discretion in a reasonable way." *USX Corp. v. Prime Leasing Inc.,* 988 F.2d 433, 438 (3d Cir. 1993) (quotation marks, alterations and emphasis omitted). As such, "[c]ourts have utilized the good faith duty as an interpretive tool to determine the parties' justifiable expectations in the context of a breach of contract action." *Northview Motors, Inc.,* 227 F.3d at 91. "Examples of bad faith can include 'evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.'" *Benchmark Grp., Inc. v. Penn Tank Lines, Inc.,* 612 F. Supp. 2d 562, 583 (E.D. Pa. 2009) (quoting *Somers v. Somers,* 613 A.2d 1211, 1213 (Pa. Super. Ct. 1992)).

The "implied covenant[ ] and any express terms of a contract are necessarily mutually exclusive—one can invoke 'implied' terms only when there are no express terms in the contract relating to the particular issue." *Id.* at 584; *see also Northview Motors, Inc.*, 227 F.3d at 91 (noting that the "duty is not divorced from the specific clauses of the contract and cannot be used to override an express contractual term."). Further, "a party is not entitled to maintain an implied duty of good faith claim where the allegations of bad faith are 'identical to' a claim for 'relief under an established cause of action.'" *Northview Motors, Inc.*, 227 F.3d at 91-92 (quoting *Parkway Garage, Inc. v. City of Phila.*, 5 F.3d 685, 701-02 (3d Cir. 1993), *overruled on other grounds by United Artists Theatre Circuit, Inc. v. Twp. of Warrington*, 316 F.3d 392, 400 (3d Cir. 2003)).

Turning to the parties' arguments, Reliance contends that Plaintiff's bad faith claim should be dismissed because it is not an independent cause of action and should be merged with Plaintiff's other breach of contract claims. This argument misunderstands the relevant law. "[A] claim for breach of the implied covenant of good faith and fair dealing is a breach of contract action, not an independent action for breach of a duty of good faith and fair dealing." *Cummings v. Allstate Ins. Co.*, 832 F. Supp. 2d 469, 473 (E.D. Pa. 2011) (citing *LSI Title Agency, Inc. v. Evaluation Servs., Inc.*, 951 A.2d 384 (Pa. Super. Ct. 2008)). Thus, "Pennsylvania law does not recognize a separate breach of contractual duty of good faith and fair dealing where said claim is subsumed by a separately pled breach of contract

claim." *Simmons v. Nationwide Mut. Fire Ins. Co.*, 788 F. Supp. 2d 404, 409 (W.D. Pa. 2011).

Nothing in the case law, however, bars a plaintiff from bringing a cause of action for breach of contract and a cause of action for breach of the duty of good faith and fair dealing when those two actions are based on separate conduct. *See Clunie-Haskins v. State Farm Fire & Cas. Co.*, 855 F. Supp. 2d 380, 388 (E.D. Pa. 2012) ("Here, however, the conduct forming the basis of Plaintiffs' breach of contract claim—the failure to defend or indemnify— is not the same conduct as their claim for breach of the duty of good faith and fair dealing . . . Consequently, Plaintiffs' two claims do not merge."). Instead, because a good faith and fair dealing claim is a breach of contract claim, Pennsylvania law simply bars a plaintiff from bringing both a breach of contract claim and a bad faith claim based on the same conduct. *See King of Prussia Equip. Corp. v. Power Curbers, Inc.,* 158 F. Supp. 2d 463, 467 (E.D. Pa. 2001) ("Because the actions forming the basis of [the plaintiff's] breach of contract claim and its good faith and fair dealing claim are essentially the same, [the plaintiff] cannot pursue both causes of action."); *Smith v. Allstate Ins. Co.*, 904 F. Supp. 2d 515, 522 (W.D. Pa. 2012) (noting that "claims for breach of the contractual duty of good faith and fair dealing have been dismissed where Plaintiff also asserts a claim for breach of contract and Plaintiff's claim for breach of the duty of good faith and fair dealing is redundant."). Similarly, a party cannot bring a bad faith claim when the acts or omissions underlying the

17

claim can be brought under another established cause of action. *See Northview Motors, Inc.*, 227 F.3d at 91-92.

Here, under Plaintiff's breach of contract claim, Plaintiff alleges that Defendants' breached the lease "by (i) deducting DTE's fee and post-production costs; (ii) paying Royalties that are lower than the NYMEX spot price and/or the local market price; (iii) paying Royalties based on different prices for gas taken from the same well during the same month; and (iv) paying Royalties based on an improper conversion from MMBtu to Mcf."[3] (Doc. 1 at 25, ¶ 65). In contrast, Plaintiff's claim for breach of the duty of good faith and fair dealing alleges that Defendants acted in bad faith by accepting sale prices under their contracts with DTE that were well below a competitive market price. (*Id.* at 27, ¶¶ 82-83). Thus, Plaintiff has pleaded that even if Defendants were entitled to pay him royalties based on the sale price of gas to DTE, they breached a duty, implied in the contract, to exercise their discretion in a reasonable way by obtaining a competitive market price for the natural gas. This is a distinct theory of breach and thus is not subsumed by Plaintiff's other breach of contract claims. *See Clunie-Haskins*, 855 F. Supp. 2d at 388.

Reliance, however, argues that *Zaloga v. Provident Life and Accident Insurance Company of America* provides that "[t]here is . . . no independent cause of action for a breach of the covenant of good faith and fair dealing—arising in contract—in Pennsylvania because such a breach is merely a breach of contract." 671 F. Supp. 2d 623, 631 (M.D. Pa.

---

[3] These last two theories of breach have not been challenged in either of Defendants' Motions to Dismiss.

2009). While Reliance accurately quotes *Zaloga*, Reliance misses its meaning. The above

statement of law does not bar actions for a breach of the covenant of good faith and fair

dealing, it simply provides what this Court has already stated, namely that a breach of

contract claim and a separate bad faith claim cannot be based on the same underlying

conduct. Indeed, that *Zaloga* does not bar actions for breach of the duty of good faith and

fair dealing is readily apparent from the fact that the *Zaloga* court allowed such a claim to

proceed in that case. *Id.* at 632.[4]

Carrizo takes a different approach by arguing that Plaintiff's claim is at odds with the

express terms of the lease. According to Carrizo, the parties' contract addresses how gas

would be valued for the purpose of royalty payments and they agreed "that when gas

production is sold in an arms-length sale transaction with an unaffiliated third party, the

value of such gas production shall be the price paid to" Defendants. (Doc. 1 at 35). Thus,

Carrizo contends that the contract already addresses how gas will be valued and that "[i]f

the parties had intended to include a requirement that the gas be sold or valued at, or within

a certain range of, the market price in all circumstances, they could have included that term

in the lease agreement." (Doc. 24 at 6-7).

---

[4] Reliance also misconstrues *Zaloga* statement that "[i]t has been said that a breach of the implied covenant of good faith and fair dealing merges with a breach of contract claim." *Zaloga*, 671 F. Supp. 2d at 631. *Zaloga* does not mandate that a bad faith claim be merged with any other breach of contract claim that is pleaded in a lawsuit. As discussed above, a court need merge a bad faith claim and a breach of contract claim only if they are based on the same conduct. *See Clunie-Haskins*, 855 F. Supp. 2d at 388. Here, Plaintiff's claim for breach of the duty of good faith and fair dealing cannot be merged with a breach of contract claim because there is no other breach of contract claim based on Defendants' alleged act of accepting below market prices for the gas produced from Plaintiff's land.

19

A review of the lease reveals—and Carrizo's argument implicitly acknowledges—that there is no explicit term in the contract that constrains Defendants' discretion when setting the price at which they sell gas to third parties. Nor is there any term in the contract that explicitly gives Defendants unfettered discretion in setting gas prices. Contrary to Carrizo's assertion, however, the absence of such terms does not negate Plaintiff's claim. Rather, it is the absence of any express terms that allow a court to "utilized the good faith duty as an interpretive tool to determine the parties' justifiable expectations in the context of a breach of contract action." *Northview Motors, Inc.*, 227 F.3d at 91. Here, Plaintiff's claim is predicated on the fact that the contract does not explicitly constrain Defendants' discretion to set the price at which they sell gas to third parties, but that Defendants' are nonetheless required by the implied covenant of good faith and fair dealing to exercise discretion in a reasonable way by selling gas at a commercially reasonable price. *See USX Corp.*, 988 F.2d at 438. Because there are no explicit and unambiguous terms in the contract to the contrary, Plaintiff has stated a claim for breach of the duty of good faith and fair dealing.

Accordingly, the Court will deny Defendants' Motions to Dismiss as they pertain to Count III of Plaintiff's Complaint.

## D. Breach of Fiduciary Duty

In Count IV of his Complaint, Plaintiff alleges that Defendants' exclusive control over the production and sale of the natural gas under the lease gave rise to a fiduciary duty on the part of Defendants. (Doc. 1 at 28, ¶ 90). Plaintiff alleges that Defendants breached this

20

fiduciary duty by (1) accepting a sale price for natural gas well under both the NYMEX spot

price and local market price, (2) paying royalties at a rate lower than owed under the lease,

and (3) failing to adequately represent Plaintiff's financial interests. (*Id.* at 28, ¶ 91).

Carrizo and Reliance argue that this claim is subject to dismissal under the gist of the action

doctrine. (Doc. 16 at 18-20; Doc. 18 at 18-20). Reliance also contends that the claim is

barred because the lessor-lessee relationship does not give rise to any fiduciary duties.

(Doc. 18 at 18). The Court will only address the latter argument, as it provides a sufficient

basis to dismiss Count IV of Plaintiff's Complaint.

"To allege a breach of fiduciary duty, a plaintiff must establish that a fiduciary or

confidential relationship existed between her and the defendants." *Baker v. Family Credit*

*Counseling Corp.*, 440 F. Supp. 2d 392, 414 (E.D. Pa. 2006).

> Although no precise formula has been devised to ascertain the existence of a
> confidential relationship, it has been said that such a relationship is not
> confined to a particular association of parties but exists whenever one
> occupies toward another such a position of advisor or counselor as
> reasonably to inspire confidence that he will act in good faith for the other's
> interest.

*Silver v. Silver*, 219 A.2d 659, 662 (Pa. 1966); *see also In re Clark's Estate*, 359 A.2d 777,

635 (Pa. 1976) ("A confidential relationship exists as a matter of fact whenever one person

has reposed a special confidence in another to the extent that the parties do not deal with

each other on equal terms, either because of an overmastering dominance on one side, or

weakness, dependence or justifiable trust, on the other." (quotation marks and alteration

omitted)). "In some cases, as between trustee and cestui que trust, guardian and ward,

21

attorney and client, and principal and agent, the existence of a confidential relationship is a matter of law." *In re Estate of Mihm*, 497 A.2d 612, 615 (Pa. Super. Ct. 1985). "In other cases, where these relationships do not exist, confidential relations may still arise based on the facts and circumstances apparent on the record." *Basile v. H & R Block, Inc.*, 777 A.2d 95, 102 (Pa. Super. Ct. 2001).

With respect to parties to a contract, "'[t]here is a crucial distinction between surrendering control of one's affairs to a fiduciary or confidant or party in a position to exercise undue influence and entering an arms length commercial agreement, however important its performance may be to the success of one's business.'" *eToll, Inc. v. Elias/Savion Advert., Inc.*, 811 A.2d 10, 23 (Pa. Super. Ct. 2002) (quoting *Valley Forge Convention & Visitors Bureau v. Visitor's Servs., Inc.*, 28 F. Supp. 2d 947, 953 (E.D. Pa. 1998)). Indeed, "[m]ost commercial contracts for professional services involve one party relying on the other party's superior skill or expertise in providing that particular service." *Id.* "This does not mean, however, that a fiduciary relationship arises merely because one party relies on and pays for the specialized skill or expertise of the other party." *Id.* "Rather, the critical question is whether the relationship goes beyond mere reliance on superior skill, and into a relationship characterized by 'overmastering influence' on one side or 'weakness, dependence, or trust, justifiably reposed' on the other side." *Id.* (quoting *Basile*, 777 A.2d at 101).

Here, taking all the well pleaded factual allegations in the Complaint as true, Plaintiff

22

has failed to plead facts giving rise to a fiduciary relationship between Plaintiff and Defendants. Rather, Plaintiff has pleaded the existence of a contractual relationship in which all parties sought to act in their own interest for a mutual benefit. The mere fact that Defendants had sole control over when and if to extract gas from Plaintiff's land—and, once extracted, the price at which to sell it to third parties—does not give rise to a confidential relationship. Nor does the fact that Plaintiff unilaterally trusted Defendants to act in his financial interest give rise to a fiduciary relationship because, simply put, there is nothing in the lease which requires Defendants to subordinate their interests to Plaintiff's interests.

The cases Plaintiff cites in support of his position that the lease in this case gives rise to a fiduciary relationship are easily distinguishable. In *Garbish v. Malvern Federal Savings and Loan Association*, the court found a mortgagee was an implied agent of a mortgagor under a home construction loan—and thus owed the mortgagor a fiduciary like duty—because the mortgagee retained the loan proceeds, demanded an additional $16,000 contribution to the construction fund, and refused to allow the mortgagor any control over the distribution of the money for the construction. 517 A.2d 547, 552-54 (Pa. Super. Ct. 1986). Similarly, in *Baker v. Family Credit Counseling Corporation*, the court found a fiduciary relationship arose when the plaintiffs "gave [the] defendants limited power of attorney to act as their 'fiduciary' and the authority to withdraw funds from their checking accounts." 440 F. Supp. 2d at 415-16. In contrast, there is no allegation here that Defendants held any of Plaintiff's property for the benefit of Plaintiff, were acting in any other

way as Plaintiff's agent, or were acting as a counselor or advisor to Plaintiff. Instead, the lease "grant[ed] Carrizo exclusive rights to the oil and gas underlying [Plaintiff's] land" in exchange for "an initial bonus payment and, among other things, . . . a 'production royalty' on all gas production." (Doc. 1 at 13, ¶ 15). Such an arrangement does not give rise to a fiduciary relationship.

Accordingly, the Court will grant Defendants' Motions to Dismiss as they pertain to Count IV of Plaintiff's Complaint.

### E. Statute of Limitations

Lastly, Carrizo argues that, to the extent that Plaintiff's breach of contract claims seek relief for royalty payments made before October 3, 2012, the claims are barred by the statute of limitations. (Doc. 16 at 5). "[T]he law of this Circuit (the so-called 'Third Circuit Rule') permits a limitations defense to be raised by a motion under Rule 12(b)(6), but only if 'the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations.'" *Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002) (quoting *Hanna v. U.S. Veterans' Admin. Hosp.*, 514 F.2d 1092, 1094 (3d Cir. 1975)). "'If the bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6).'" *Id.* (quoting *Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 (3d Cir. 1978)).

In Pennsylvania, the statute of limitations for a breach of contract claim is four years. 42 Pa. C.S.A. § 5525(a)(8); *see also Hahnemann Univ. Hosp. v. All Shore, Inc.*, 514 F.3d

24

300, 306 (3d Cir. 2008). "[T]he statute of limitations begins to run on a claim from the time the cause of action accrues." *Cole v. Lawrence*, 701 A.2d 987, 989 (Pa. Super. Ct. 1997). "In general, an action based on contract accrues at the time of breach." *Id.* However, "[t]he discovery rule tolls the running of the statute of limitations during the time that the plaintiff did not know or could not have known that he had been injured and the defendant caused the injury." *Raucci v. Candy & Toy Factory*, 145 F. Supp. 3d 440, 448 (E.D. Pa. 2015). "The discovery rule in Pennsylvania applies to all causes of action, including breach of contract." *Morgan v. Petroleum Prods. Equip. Co.*, 92 A.3d 823, 828 (Pa. Super. Ct. 2014); *see also Creghan v. Procura Mgmt.*, Inc., 91 F. Supp. 3d 631, 649 (E.D. Pa. 2015).

Carrizo argues that Plaintiff filed the present action on October 3, 2016, and therefore cannot seek recovery for royalty payments made prior to October 3, 2012. (Doc. 16 at 5). Carrizo further contends that the discovery rule is inapplicable because Plaintiff has pleaded that (1) he started to receive royalty checks in March of 2012, and (2) his royalties were less than the NYMEX spot prices and royalties paid by other gas producers in the area. (Doc. 24 at 11-13).

Although Plaintiff pleaded that he received his first royalty check in March of 2012, (Doc. 1 at 14, ¶ 21), the Complaint does not specify whether the royalty check contained sufficient information for Plaintiff to calculate the rate at which he was being paid. Further, nothing in the Complaint details when Plaintiff learned that Defendants were valuing the gas produced from Plaintiff's land at a rate less than the NYMEX spot prices and those paid by

other gas producers in the area. Indeed, Plaintiff pleaded that "Defendants maintain[ed]
exclusive control over . . . all production data, sales data, *and pricing information.*" (*Id.* at
27, ¶ 81) (emphasis added). Consequently, although the NYMEX spot prices are public
information, it is unclear when Plaintiff could have first made a comparison between the rate
at which the gas was valued under his lease and the NYMEX spot prices.

Accordingly, the Court will deny Carrizo's Motion to the extent that it seeks to dismiss
portions of Plaintiff's breach of contract claims as untimely.

## V. CONCLUSION

For the reasons outlined above, this Court will grant in part and deny in part
Defendants' Motions to Dismiss, (Docs. 15, 17). A separate Order follows.

Robert D. Mariani
United States District Judge

26