THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JANIE SLAMON, as Executrix of the   :
Estate of James Slamon, and          :
ERIC LEWIS, on behalf of themselves   :
and all others similarly situated,      :
                                   :
         Plaintiffs,      :
     v.                  :   3:16-CV-2187
                                   :   (JUDGE MARIANI)
CARRIZO (MARCELLUS) LLC,      :
RELIANCE MARCELLUS II, LLC,    :
RELIANCE HOLDINGS USA, INC.,   :
BKV OPERATING LLC, and       :
BKV CHELSEA LLC,           :
                                   :
        Defendants.    :

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

Presently before the Court is Plaintiffs' Motion for Class Certification (Doc. 96). The underlying complaint concerns a breach of contract claim regarding the royalty terms in the Defendants' oil and gas leases. (*See generally* Am. Compl., Doc. 107).

On October 3, 2016, Plaintiff James Slamon filed a Complaint against Defendants Carrizo (Marcellus), LLC ("Carrizo"); Reliance Marcellus II, LLC and Reliance Holdings USA, Inc. (collectively "Reliance") in the Susquehanna County Court of Common Pleas. (Doc. 1, 9-31). Plaintiff alleges Defendants underpaid royalties on oil and gas leases to him and a class exceeding one hundred members (*See, e.g., id.* at 10-11). Defendants thereafter removed the case to federal Court on October 31, 2016. (*See* Doc. 1).

In late-2016, Defendants Carrizo and Reliance moved to dismiss Plaintiff's Complaint under Federal Rule of Civil Procedure 12(b)(6). (Defs. Mot. Dismiss, Docs. 15, 17). On September 5, 2017, this Court dismissed Plaintiff's breach of fiduciary duty claim in Count IV of the Complaint with prejudice and denied the motions to dismiss in all other respects. (*See* Doc. 31).

On June 15, 2018, Plaintiff joined BKV Operating LLC and BKV Chelsea LLC (collectively "BKV") as Defendants. (Doc. 46). On June 18, 2018, Plaintiff filed a First Amended Complaint against all of the Defendants. (Doc. 47).

On August 19, 2019, Plaintiff moved to Substitute a Proper Party following the death of James Slamon. (Doc. 100). The Executrix of James Slamon's Estate, Janie Slamon, was substituted as a proper party on August 22, 2019. (Doc. 103). On September 9, 2019, Plaintiffs filed a Second Amended Complaint against all Defendants (Doc. 107) which named Eric Lewis as an additional plaintiff and proposed class representative.  Defendants Carrizo and Reliance filed Answers to the Second Amended Complaint (Docs. 109, 110) and Defendant BKV filed an Answer as well as Crossclaims against Defendants Carrizo and Reliance. (Doc. 111).

Plaintiffs' Second Amended Complaint seeks declaratory relief with respect to the proper interpretation of the Leases and the royalty provisions therein (Count I), damages for breach of contract, (Count II), damages for breach of contract through a breach of the implied duty of good faith and fair dealing (Count III), and an accounting (Count IV).

On July 15, 2019, Plaintiff moved to certify a class of plaintiffs. (Pls.' Mot. Certify Class, Doc. 96). Defendants Carrizo and Reliance filed briefs in opposition to Plaintiffs' motion.  Although BKV did not file a brief in opposition, during a telephonic conference call with the Court on April 17, 2020, BKV stated it would "follow the lead of the other Defendants."

The Motion for Class Certification (Doc. 96) is now before the Court. The issues have been fully briefed and Plaintiffs' Motion is ripe for disposition.[1] For the reasons set forth below, the Court will grant in part and deny in part Plaintiffs' Motion for Class Certification.

## II. FACTUAL ALLEGATIONS

Plaintiff James Slamon was a Pennsylvania resident who owned real property in Susquehanna County, Pennsylvania. (Am. Compl., Doc. 107, at ¶ 7). On July 16, 2019, James Slamon passed away and Janie Slamon was substituted as a proper party as Executrix of the Estate of James Slamon. (*Id.*; Doc. 103). Plaintiff Eric Lewis is a Pennsylvania resident who owns real property in Susquehanna County, Pennsylvania. (Am. Compl., at ¶ 8). Defendant Carrizo is a Delaware limited liability company; Defendant Reliance is a Delaware limited liability company wholly owned by Reliance Holding USA,

---

[1] On April 17, 2020, the Court conducted a conference call with counsel for the parties to inquire as to whether any party wished to have an evidentiary hearing regarding Plaintiffs' Motion for Class Certification. Counsel for all parties agreed that no evidentiary hearing was necessary and all parties stated that they were "comfortable" with the Court relying upon the evidentiary submissions each had filed in making its determination on Plaintiffs' Motion.

Inc., a Texas corporation; and Defendant BKV is a Delaware limited liability company. (*Id.* at ¶¶ 12-14).

On or about April 7, 2009, Slamon entered into a Paid Up Oil and Gas Lease Agreement and Addendum ("Slamon Lease") with Defendant Carrizo. (*Id.* at ¶ 7). On or about April 25, 2009, Lewis and his wife, as tenants by the entireties, entered into a Paid Up Oil and Gas Lease Agreement and Addendum with Defendant Carrizo. (*Id.* at ¶ 8). Plaintiffs allege these leases are "substantively identical." (*Id.* at ¶ 24).

In August 2010, with Slamon's approval, Carrizo assigned Reliance an undivided sixty percent working interest in the lease. (*Id.* at ¶ 28).

As of April 1, 2017, Defendant BKV acquired certain leasehold interests from Carrizo and Reliance, including all Leases with putative Class Members to this action. (*Id.* at ¶ 15). From April 1, 2017 through May 31, 2018, Plaintiffs assert that Carrizo and Reliance continued to act as operators under the class leases and continued to be responsible for calculating and remitting royalty payments under the class leases. (*Id.*). As of June 1, 2018, BKV "took over all operations of gas production and operation under the class Leases, including the responsibility for calculating and remitting royalty payments to lessors." (*Id.* at ¶ 16; *see also, id.* at ¶ 46).

Plaintiffs allege that in exchange for granting Carrizo exclusive rights to the oil and gas underlying their land, Plaintiffs became entitled to a "production royalty" on all gas

production.  (Am. Comp., at ¶ 25).  The Slamon Lease contains two provisions at issue in

this case. First, the Production Royalty term ("No Deductions Provision") states:

> [4](b) Production Royalty: Lessee shall pay Lessor the following royalty (the
> "Royalty"), free of all costs, whether pre-production or post-production as
> follows:
>> . . . (ii) GAS: Lessee shall deliver to the credit of Lessor, free of all costs
>> (whether pre-production or post-production), a monthly Royalty equal to
>> eighteen percent (18%) of the greater of (i) the market value, measured at
>> the point of take, of all gas and any constituents produced from the
>> Leasehold or lands pooled or unitized therewith, or (ii) the gross amount of
>> revenue paid to Lessee for all gas and any constituents produced from the
>> Leasehold or lands pooled or unitized therewith, measured at the point of
>> take; provided, however, that when gas production is sold in an arms-length
>> sale transaction with an unaffiliated third party, the  value of such gas
>> production shall be the price paid to Lessee.

(*Id.* at ¶ 26; *see also,* Slamon Lease, Doc. 96-3, at 2).  Second, the Valuation term ("Highest

Price Provision") provides:

> [4](f) Valuation: The value of oil, gas, or other hydrocarbon production shall be
> determined on the basis of the greater of (i) the prevailing local market price at
> the time of sale or use, or, NYMEX spot price as published at the time of sale,
> whichever is greater, or (ii) the price paid to Lessee from the sale or use of the
> gas, including proceeds and any other thing of value received by Lessee;
> provided, however, that when gas production is sold in an arms-length sale
> transaction with an unaffiliated third party, the value of such gas production
> shall be the price paid to Lessee.

(*Id.* at ¶ 27; Slamon Lease, Doc. 96-3, at 3).

Plaintiffs allege that their royalty payments from Reliance and Carrizo "have been

based on prices that are consistently below both the NYMEX spot price for natural gas and

prices paid by other comparable gas producers in the same area . . ." (Am. Compl., Doc.

107, at ¶ 32).  Plaintiffs further assert that Carrizo has represented "that it is paying

Royalties based on the net amount it receives from selling the gas produced from Plaintiff's and Class Members' land to DTE Energy Trading, Inc. ('DTE'), which Carrizo characterizes as an 'unaffiliated third party'" (*id.* at ¶ 39), but that the payment of royalties "based on the net amount it receives from DTE after all pre-production and postproduction expenses have been deducted is improper under the terms of the Lease" (*id.* at ¶ 40).  Plaintiffs allege that Reliance and BKV also engaged in the same type of behavior in calculating the royalty payments owed to Plaintiffs and the Classes, and that BKV continues to do so.[2]  (*Id.* at ¶¶ 58, 59).

Plaintiffs allege that each proposed class is "reasonably estimated to exceed one hundred participants" (Am. Compl., at ¶ 66) and that "[t]he objective facts are the same for all Class members in that: (a) each entered into a Paid Up Oil and Gas Lease with Carrizo and/or Reliance, which was later assigned to BKV; and (b) each received Royalty payments that were based on improperly deducted post-production costs or improperly calculated rates, or were otherwise improper under the terms of the Lease" (*id.* at ¶ 67).[3]

_____

[2] In their motion for class certification, Plaintiffs now concede that BKV does not deduct post production expenses from the price it receives for gas sold in determining the royalty to be paid to Plaintiffs unless authorized to do so by the terms of the lease.  (*See* Pls.' Br., Doc. 96-2, at 15 (admitting that BKV "only deducts Post-Production Expenses from those lessors whose leases authorize those deductions.")).

[3] The allegations set forth in this section of the Court's Opinion only cite the factual allegations pleaded by Plaintiffs in their Amended Complaint (Doc. 107).  However, Plaintiffs' motion for class certification and accompanying brief provide more specificity as to the basis for Plaintiffs' claims.  Plaintiffs assert that from 2011 through May 2018 Carrizo and Reliance sold almost all gas produced under the putative class members' leases to DTE Energy Trading, Inc. ("DTE"). (Pls.' Br., Doc. 96-2, at 8-12).  Plaintiffs assert that the only exception was from November 2, 2012 to October 31, 2013 when Reliance sold gas produced in Wyoming County to Twin Eagles Resource Management, LLC. (*Id.* at 11). Plaintiffs

## III. ANALYSIS

Plaintiffs move to certify three classes pursuant to Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure: (1) No Deductions Class; (2) Highest Price Class; and (3) Implied Duty Class. (Pls.' Mot. Certify Class, Doc. 96).  Plaintiffs define the classes as follows:

1. No Deductions Class: All persons or entities within the Commonwealth who are, or have been, a royalty owner under a Paid Up Oil and Gas Lease with or assigned to one or more of Defendants where that lease expressly prohibits the deduction of post-production expenses when calculating royalty amounts due, and where (a) natural gas has been produced under the lease, (b) the person or entity has received one or more royalty payments under the lease, and (c) the person or entity has not released their claims in this matter.

2. Highest Price Class: All persons or entities within the Commonwealth who are, or have been, a royalty owner under a Paid Up Oil and Gas Lease with or assigned to one or more of Defendants where that lease expressly provides that the value of natural gas on which lessee owes a royalty percentage is, absent application of a contractual proviso, the greater of the NYMEX spot price and/or the prevailing local market price, or the price at which the gas is sold, and where (a) natural gas has been produced under the lease, (b) the person or entity has received one or more royalty payments under the lease, and (c) the person or entity has not released their claims in this matter.

3. Implied Duty Class: All persons or entities within the Commonwealth who are, or have been, a royalty owner under a Paid Up Oil and Gas Lease with or assigned to one or more of Defendants where (a) natural gas has been produced under the lease, (b) the person or entity has received one or more

---

further state that, in June 2018, BKV took over operations, terminated the contracts with DTE, and retained Concord Energy, LLC instead. (*Id.* at 12).

In addition, Plaintiffs assert that when calculating royalty payments, Carrizo and Reliance each based its payments "solely on the Net Proceeds they received (which had been reduced by marketing fees and Post-Production Expenses) – not on the gross Resale Proceeds generated through gas sales." (*Id.* at 13). Plaintiffs claim this methodology was used for all lessors, regardless of language in the lease that prohibited or authorized deductions and regardless of language in the lease that mandated the valuation of gas at the higher of the NYMEX spot price, local market price, or actual sale price. (*Id.* at 13-14).

> royalty payments under the lease, and (c) the person or entity has not released
> their claims in this matter.

(*Id.* at 1-2).

To certify a class, the Court must proceed in two steps under Rule 23. First, Rule 23(a) states:

> One or more members of a class may sue or be sued as representative parties
> on behalf of all members only if:
>> (1) the class is so numerous that joinder of all members is impracticable;
>> (2) there are questions of law or fact common to the class;
>> (3) the claims or defenses of the representative parties are typical of the
>> claims or defenses of the class; and
>> (4) the representative parties will fairly and adequately protect the interests
>> of the class.

Fed. R. Civ. P. 23(a).

If all of the requirements under Rule 23(a) are satisfied, the Court will proceed to Rule 23(b), which provides, in relevant part:

> A class action may be maintained if Rule 23(a) is satisfied and if:
> . . . .
>> (2) the party opposing the class has acted or refused to act on grounds that
>> apply generally to the class, so that final injunctive relief or corresponding
>> declaratory relief is appropriate respecting the class as a whole; or
>> (3) the court finds that the questions of law or fact common to class members
>> predominate over any questions affecting only individual members, and that
>> a class action is superior to other available methods for fairly and efficiently
>> adjudicating the controversy. The matters pertinent to these findings include:
>>> (A) the class members' interests in individually controlling the
>>> prosecution or defense of separate actions;
>>> (B) the extent and nature of any litigation concerning the controversy
>>> already begun by or against class members;
>>> (C) the desirability or undesirability of concentrating the litigation of the
>>> claims in the particular forum; and
>>> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(2)-(3).

The burden to prove compliance with Rule 23 is upon the party seeking class certification, who "must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011). The burden is "not merely a threshold showing." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2008), *as amended* (Jan. 16, 2009); *see also Dukes*, 564 U.S. at 350 ("Rule 23 does not set forth a mere pleading standard."). Factual determinations in this context "must be made by a preponderance of the evidence." *In re Hydrogen Peroxide*, 552 F.3d at 305.

All cases involving class certification questions necessitate a "thorough examination of the factual and legal allegations." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 166 (3d Cir. 2001), *as amended* (Oct. 16, 2001). In some cases, "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982).

## A. Ascertainability

If a class is seeking certification under Rule 23, "an essential prerequisite…is that the class must be currently and readily ascertainable based on objective criteria." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 592–93 (3d Cir. 2012). This requirement allows

potential members to receive notice and opt out of the class action, protects defendants' rights, and ensures the parties can identify class members efficiently. *Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013); *see also Byrd v. Aaron's Inc.*, 784 F.3d 154, 162 (3d Cir. 2015), *as amended* (Apr. 28, 2015)("[T]he independent ascertainability inquiry ensures that a proposed class will actually function as a class.").

A class is currently and readily ascertainable if (1) it is "defined with reference to objective criteria" and (2) there is "a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013)(citing *Marcus*, 687 F.3d at 592-93). If class members cannot be identified "without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Id.* at 593.

Carrizo and Reliance challenge the ascertainability of the putative classes, arguing the classes are not defined by objective criteria. (*See* Carrizo Br. Opp'n., at 11-12; Reliance Br. Opp'n., at 7-11). Reliance cites a number of cases which denied class certification on ascertainability grounds due to the need to review land and title records because the defendants could not track changes in royalty ownership. (Reliance Br. Opp'n., at 7-8).

As to the No Deductions and Highest Price classes, Plaintiffs argue that they have defined an ascertainable class using objective criteria. The classes include "individuals or entities that have or had leases with Defendants" that contain No Deductions and/or Highest

Price clauses, and "those leases contain certain identical or substantively similar provisions." (Pls.' Br., at 18-19).

Plaintiffs argue the mechanism for identifying putative class members is through a combination of the members' leases and Defendants' royalty payment data. (*Id.* at 19). Plaintiffs assert, "Each Defendant used a database software system to keep track of information related to the Class Leases and has a record of the individuals or entities to whom it paid royalties." (*Id.*).

In a request for admission submitted to Carrizo, Plaintiffs requested:

> Admit that, with respect to any individual person or entity to whom or which you ever paid a royalty in connection with the gathering, production or sale of natural gas within Susquehanna or Wyoming County, Pennsylvania, you have or could obtain information to identify the specific Lease under which that person or entity claimed entitlement to, and/or pursuant to which you paid, that royalty.

(Carrizo Resp. to Pls.' Req. Admis., Doc. 135-1). Carrizo responded:

> Admitted in part; denied in part. [Carrizo] admits that it has or could obtain the information described in this request with respect to the payments it made. Carrizo denies that it necessarily has or could obtain all of the information described in this request with respect to payments made by BKV Chelsea LLC or another successor or entity (which are included in the definition of "you" set forth with these requests) after Carrizo no longer had an interest in the Leases. The reason for this partial denial is that Carrizo does not currently have an interest in the Leases, and therefore, if there have been new lessors, title disputes, assignments or changes in ownership interests after Carrizo's involvement ended, Carrizo would not have been involved in those payments and may not know or have access to the information described in the request.

(*Id.*).

Plaintiffs submitted the same request for admission to BKV, which responded as follows:

> BKV admits that, with respect to any individual person or entity to whom or which BKV paid a royalty in connection with the gathering, production, or sale of natural gas within Susquehanna or Wyoming County, Pennsylvania, BKV has or could obtain information to identify the specific Lease under which that person or entity claimed entitled to, and/or pursuant to which BKV paid, that royalty. BKV denies that it necessarily has or could obtain the information described in this request with respect to payments made by other parties, including but not limited to Carrizo (Marcellus) LLC and Reliance Marcellus II LLC (which are included in the definition of "you" set forth with these responses). The reason for the partial denial is that BKV did not have an interest in the Leases at certain times and, therefore, BKV was not involved in those payments and did not have access to the described information.

(BKV Resp. to Pls.' Req. Admis., Doc. 135-2).

Defendant Reliance argues that its "records are maintained in discrete databases or network files and Reliance is not able to generate a report that would identify the royalties paid at a certain time to a royalty owner under a specific lease." (Reliance Br. Opp'n., at 10). However, even though Defendant Reliance may not have one database to connect lessors to their royalty payments and to their leases, all of the data is available to do so. (Dep. of D. Perry, Doc. 135-3, at 47:25–48:10). Reliance's Senior Accounting Manager, Deane Perry, testified she was aware that Reliance produced a spreadsheet with 207,000 entries tracking "the royalty owner, the well, the month, the volume of gas produced, the value of the gas, the decimal interest." (*Id.* at 47:25-48:10). When asked if this spreadsheet could be used to determine "the historical royalty ownership at the well level for each royalty owner," Perry replied, "Yes. It's all the data lines basically contained in SAP payment records." (*Id.* at

48:16–25). Moreover, data exists to connect royalty owners to a well which corresponds to a specific lease. (*Id.* at 50:3-5 ("Q. So if we can tie the lease to the well, we can tie the lease to the royalty, correct? A. I agree.")).

Unlike in the cases Reliance cites, it would not be necessary to individually review land and title records as Reliance maintains records of change of ownership. (*Id.* at 45:17-48:25). Perry initially explained that Reliance's database, SAP, overwrites historical ownership data:

> As an example, an owner sells their property. A new owner may or may not have to be set up. Land department, once the new owner is set up, they could initiate a request— it's a job in SAP where they would put the old owner transferring to the new owner, whether it was 100 percent of their ownership, a portion of their ownership. But that record would always exist showing what it was and now what it is. And what it now is would be reflected on the deck. What it was would no longer be reflected on the deck.

(*Id.* at 45:20-46:5). When asked, "Can Reliance determine historical ownership at the well level?", Perry responded, "It would be — yes. It would be an extremely manual process." (*Id.* at 47:17-20). Perry further explained the steps, "Basically taking all the pieces of the puzzle via the data, the check, the chain of title all the way — every production month." (*Id.* at 47:21-24). However, Perry also stated that the previously-mentioned 207,000-line Excel spreadsheet would allow Reliance to access this information:

> Q. . . . Could you determine the historical royalty ownership at the well level for each royalty owner?
> A. Yes.
> Q. So you could use that spreadsheet to do that, couldn't you?
> A. Yes. It's all the data lines basically contained in SAP payment records.

(*Id.* at 48:16-25).

The identity of the putative class members can be ascertained by referring to lease documents, which have been held to be "objectively verifiable." *Walney v. SWEPI LP,* No. CIV.A. 13-102, 2015 WL 5333541, at *28 (W.D. Pa. Sept. 14, 2015). Therefore, the Plaintiffs have demonstrated ascertainability by a preponderance of the evidence for the No Deductions and Highest Price classes.

The Implied Duty Class, however, cannot satisfy ascertainability. First, there are no objective criteria to define the class. The criteria for this class are overly broad, making it impossible to ascertain objectively who is a member of the putative class. In fact, the class's definition could reasonably include every single lessor that entered a lease with the Defendants at any time anywhere in Pennsylvania regardless of the lease language.

Second, there is no administratively feasible method to determine who would be part of the class. "A plaintiff does not satisfy the ascertainability requirement if individualized fact-finding or mini-trials will be required to prove class membership." *Carrera*, 727 F.3d at 307-308. A manageable process "does not require much, if any, individual factual inquiry." *Id.* Ascertaining the members of the Implied Duty Class would require the Court to individually analyze every contract. The Court cannot presume an implied duty exists in the contract without analyzing the express language of each contract to determine if express language would preclude the implied duty. *See Jacobs v. CNG Transmission Corp.*, 772 A.2d 445, 455 (Pa. 2001)("Pennsylvania law recognizes an implied covenant but also recognizes that

the specific agreement of the parties may preclude the application of the doctrine"); *Caldwell v. Kriebel Res. Co., LLC*, 72 A.3d 611, 615 (Pa. Super. Ct. 2013).

The Implied Duty Class cannot satisfy ascertainability because it is not defined through objective criteria and would require an individual inquiry into every lease of the putative class. Without meeting this prerequisite, the Implied Duty Class cannot be certified.

## B. Rule 23(a)

The Court must next analyze whether Plaintiffs meet the four statutory requirements of Rule 23(a): numerosity, commonality, typicality, and fair and adequate representation. *See* Fed. R. Civ. P. 23(a).

### 1. Numerosity

The numerosity requirement for a putative class is satisfied if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). There is no minimum number of class members required, but "generally if…the potential number of plaintiffs exceeds forty, the first prong of Rule 23(a) has been met." *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001). In this case, Plaintiffs contend that there may be at least 193 members in the No Deductions Class, at least 139 in the Highest Price class, and at least 253 in the Implied Duty Class. (Pls.' Br., at 20). In reviewing Defendants' submissions, neither Defendant contested numerosity in their briefs. (*See generally* Reliance Br. Opp'n.; Carrizo Br. Opp'n.). Therefore, Plaintiffs have satisfied numerosity.

## 2. Adequate Representation

Rule 23(a)(4) requires plaintiffs to prove that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The requirement first "tests the qualifications  of the counsel to represent the class." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 602 (3d Cir. 2009). Second it "seeks to uncover conflicts of interest between named parties and the class they seek to represent." *Id.*

Plaintiffs argue that their interests are "directly aligned with those of the Classes because [they] sustained the same harm caused by Defendants' uniform breaches of the Class Leases and underpayment of royalties," and they are seeking "all available relief for such harm." (Pls.' Br., at 22; *see also* Suppl. Mem. of Law Supp. Pls.' Mot. Class Certification, Doc. 112, at 3). Plaintiffs further argue that Class Counsel have the necessary "experience, skill and qualifications" to pursue the class action and do not possess any "actual or potential conflicts with the Classes." (Pls.' Br., at 22).  Defendants do not contest either of these positions in their briefs in opposition to class certification. (*See generally* Reliance Br. Opp'n.; Carrizo Br. Opp'n.). The Court finds Plaintiffs have met the adequacy of representation requirement.

## 3. Commonality

The commonality requirement necessitates that a plaintiff prove "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). In order to meet the commonality requirement, the putative class must raise common contentions capable of

class wide resolution. *Dukes*, 564 U.S. at 350. The focus is not on the "raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (emphasis in original). If the issue is common to the class, the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

Commonality is satisfied if "the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir. 2013); *see also Dukes*, 564 U.S. at 359 ("[E]ven a single common question will do."). In evaluating commonality, "the bar is not a high one." *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 486 (3d Cir. 2015). The focus for the Court is "not on the strength of each class member's claims but instead on whether the defendant's conduct was common as to all of the class members." *In re Cmty. Bank of N. Virginia Mortg. Lending Practices Litig.*, 795 F.3d 380, 397 (3d Cir. 2015)(internal quotations omitted). As long as the class was subjected to the "same harmful conduct by the defendant, Rule 23(a) will endure many legal and factual differences among the putative class members." *Id.; see also Rodriguez*, 726 F.3d at 382-83 (collecting Third Circuit cases focusing the commonality inquiry on the defendant's conduct).

For the No Deductions and Highest Price Classes, the Plaintiffs have satisfied commonality. Plaintiffs assert each of the Defendants calculated royalties using the same

methodology for all of its Lessors in the No Deductions and Highest Price classes, regardless of lease language. (*See* Pls.' Br., at 12-16).

In a deposition, Reliance's Senior Accounting Manager, Deane Perry, was asked "With respect to any landowner in Northeast PA, was there ever an instance where Reliance paid a royalty on anything other than the amount remitted by either DTE or Twin Eagles for the purchase of gas?" (Dep. of D. Perry, Doc. 96-15, 38:1-4). Perry responded, "Not to my knowledge." (*Id.* at 38:5). Perry was additionally asked about the valuation clause:

> Q. Outside of counsel, was there ever a time that you were asked for input in deciding which among certain alternative valuation methodologies and different lease provisions would be appropriate for Reliance to utilize when calculating royalties for Northeast PA landowners?
> A. No.

(*Id.* at 43: 2-7). In a Declaration, Perry stated, "Reliance recorded revenues and paid royalties under the NEPA Leases based on the price it received from a third party for the volumes of gas sold." (Decl. of D. Perry, Doc. 119-2, at ¶ 11).

Carrizo's controller, Max Seewann, was asked in a deposition "[D]uring the time that you were controller, was there ever an instance where a Northeast PA landowner was paid a royalty where— on a value of gas that differed from whatever price DTE paid to Carrizo for that gas?" (Dep. of M. Seewann, Doc. 99-1, Ex. 19, 99:16-20). Seewann replied, "Not to my knowledge." (*Id.* at 99:21). Seewann also testified specifically about deficiency fees, saying all leases were treated the same:

> Q. For the entire time that you have been the controller until the BKV acquisition, would a lessor that had a deduct-free lease receive the same price

as a lessor that had expressly allowed post production expenses, all other aspects assumed even being identical?
A. Well, there are no—to the extent there's no deductions, then there's no difference in the price again. We wouldn't deduct that when—the deficiency fees from anybody. So neither deduct free or deduct paying would be charged that deficiency fee.

(*Id.* at 81:19–82:4).

Seewann additionally testified regarding the valuation of gas:

Q. We talked before about how Carrizo calculated the royalties for Northeast landowners. This is a slightly different question. In terms of how to value the gas that you were paying a royalty on, are you aware of any instance during the time that you were controller where Carrizo paid a production royalty on a value of gas that differed from the price Carrizo received from DTE?
A. No.
Q. [...] Did the methodology that Carrizo used, that we went over this morning, to calculate royalties for landowners in Northeast PA, did that methodology change during the time that you were controller?
A. I guess it depends on how you define methodology, but I think as the agreements changed, we continued to pay, you know, based on that price, if that's what you're asking, the DTE price that we received.

*Id.* at 100:14–101:12. Carrizo similarly specified in its brief, "Carrizo paid royalties to lessors based on the price it received for the arms-length sale of gas to DTE." (Carrizo Br. Opp'n., at 4).

In contrast to Reliance and Carrizo, BKV does not use the same methodology for leases that contain a No Deductions Clause as leases that expressly allow deductions. BKV's assistant controller, Brennan Paul McMullin, was asked in a deposition about BKV's royalty records:

Q. What type of royalty owner records are contained with the deck?

> A. The actual royalty owner, themselves; their address; a breakout of whether they have multiple interests in the same property; and then attributes for those royalty owners such as their lease being cost-free in nature.
> Q. And what do you mean when you say "their lease being cost-free in nature"?
> A. If their lease is cost-free, it would be indicated within the deck, which is that piece of master data, and it would prevent that owner from being charged any post-production costs in that scenario.

(Dep. of B. McMullin, Doc. 99-2, Ex. 21, at 28:21–29:9). Plaintiffs admit that BKV "only deducts Post-Production Expenses from those lessors whose leases authorize those deductions." (Pls.' Br., at 15).

However, BKV does use the same methodology regardless of the presence of a Highest Price Clause—specifically, it bases royalty calculations on prices received rather than comparing the NYMEX or local market price.

> Q. And at no time performing a royalty calculation have you ever used the NYMEX spot price as an input, correct?
> A. Correct.
> Q. For any royalty payment to any royalty owner, Correct?
> A. Correct.

(Dep. of B. McMullin, Doc. 99-2, Ex. 21, at 67:13-19).  When asked specifically about the Slamon Lease, McMullin replied that the same methodology was used:

> Q. And you also don't do any of the comparisons that are discussed in Paragraph 4B2 of the Slamon lease, correct?
> A. That's correct.
> Q. And same thing for comparisons on the basis of the greater of that are in Paragraph 4F, correct?
> A. Correct.

(*Id.* at 70:19-71:1).

Plaintiffs have, therefore, demonstrated that the Defendants use the same methodology to calculate royalties—basing the royalty on the price received—despite the various obligations required in the classes' leases. In other cases where royalties were calculated in the same way for all class members, commonality was held to be satisfied. *Naylor Farms v. Anadarko OGC Co.*, No. CIV-08-668-R, 2009 WL 8572026, at *5 (W.D. Okla. Aug. 26, 2009), *order clarified sub nom. Naylor Farms, Inc. v. Anadarko OGC Co.*, No. CIV-08-668-R, 2011 WL 7267850 (W.D. Okla. June 15, 2011)(holding commonality was satisfied because all royalty owners were "treated in the same manner with regard to the calculation of royalty payments")*; Fankhouser v. XTO Energy, Inc.*, No. CIV-07-798-L, 2010 WL 5256807, at *3 (W.D. Okla. Dec. 16, 2010)(finding common issues existed despite differences in royalty provision language where "there is no difference in how royalties are paid to members of the class based on lease language").

Because of the common methodology, questions regarding these practices will generate common answers for each of the classes and drive resolution of the litigation. In a similar case concerning the propriety of deducting post-production costs, the district court identified common issues despite varying contract language: "[W]hether Defendants breached their obligations under the various leases by incorrectly calculating royalties is an issue that undergirds every claim. While determining damages will require individual calculations, this does not preclude a finding of commonality," *Naylor Farms v. Anadarko*, 2009 WL 8572026, at *5. Here, determining whether the Defendants in fact compared the

NYMEX spot price or local market price to the price received would present a common

answer for the entire Highest Price Class. Likewise, determining whether Defendants in fact

deducted post-production costs from the royalties paid to lessors, and did so in violation of a

prohibition on the deduction of such costs in the lease, would present common answers for

the entire No Deductions Class. If the transactions between the Defendants and DTE or

Twin Eagle were in fact arms-length sale transactions with unaffiliated third parties as

Defendants contend, this would resolve a common question regarding the contractual

proviso for both the No Deductions and Highest Price Classes in one stroke.

Defendant Carrizo further argues that Plaintiffs cannot demonstrate commonality

within the No Deductions Class due to the number of variations in lease language. (*See*

Carrizo Br. Opp'n., at 11–14). However, the variations in lease language do not destroy

commonality under Rule 23(a). *See Anderson Living Tr. v. Energen Res. Corp.,* No. 13-CV-

00909 WJ/CG, 2019 WL 6618168, at *4 (D.N.M. Dec. 5, 2019), *reconsideration denied,* No.

13-CV-00909 WJ/CG, 2020 WL 406365 (D.N.M. Jan. 24, 2020)("Thus, any language

differences among lease provisions concerning post-production deductions do not defeat

commonality."); *Riedel v. XTO Energy, Inc.,* 257 F.R.D. 494, 509 (E.D. Ark. 2009)(holding

commonality was met despite differences in lease language); *Rhea v. Apache Corp.,* No.

CIV-14-0433-JH, 2019 WL 1548909, at *8 (Feb. 15, 2019)(certifying a class where leases

were not identical but there was "extensive uniformity between leases"); *Fankhouser,* 2010

WL 5256807, at *3 (holding identical royalty provisions were not needed to prove commonality).

Courts have denied certification in cases only where the plaintiffs failed to examine all or a majority of the class leases and were unable to demonstrate common language. *See EQT Prod. Co. v. Adair*, 764 F.3d 347, 363 (4th Cir. 2014)("Neither we nor the district court knows the number of deed variations or the materiality of the discrepant language."); *see also Naylor Farms, Inc. v. Chaparral Energy, LLC*, 923 F.3d 779, 790 (10th Cir. 2019)(collecting cases where plaintiffs failed to review and categorize class leases).

Here, Plaintiffs have reviewed and categorized 312 non-duplicate leases that could be included in each putative class. (*See* List of Reviewed Carrizo-Produced Leases ["Leases Chart"], Doc. 141). Plaintiffs have indicated in which class each member would be included and whether the language is identical to the named plaintiffs' leases. (*See id.*). Plaintiffs also submitted a copy of each of the leases reviewed. (Docs. 141-Doc. 147). Therefore, unlike *Adair* upon which Carrizo relies, the Plaintiffs have met their burden to produce evidence that commonality exists despite some variations in lease language for the Highest Price and No Deductions Classes.

In contrast, just as the Implied Duty Class fails to satisfy the ascertainability prerequisite, it also fails to satisfy the commonality requirements under Rule 23(a). Plaintiffs contend the common issue for this class is "whether Defendants breached the duty of good faith and fair dealing for the Implied Duty Class by failing to obtain a reasonable price for the

gas sold and/or for paying vastly different prices for the same gas produced from the same well at the same time." (Pls.' Br., at 27). The answer to this question would not provide a common answer for the entire class. Under Pennsylvania law, express language in a contract will displace any implied duty within that contract. *See Jacobs*, 772 A.2d at 455; *Caldwell*, 72 A.3d at 615. This Court would need to analyze every contract to determine whether there is any express language that would displace the implied duty of good faith and fair dealing. The Plaintiffs have failed to prove that the implied duty of good faith and fair dealing exists class wide. *Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1218 (10th Cir. 2013)("But given known variations in lease language, we think it was the [plaintiff's] burden to affirmatively demonstrate commonality on the implied duty…"). While Plaintiffs submitted a chart summarizing which contracts contained No Deductions clauses and which contained Highest Price clauses, there was no indication of which contracts contained express language that would negate an implied duty. (*See* Leases Chart, Doc. 141).

Even if they had provided the Court with this information, every contract would still need to be analyzed individually to determine if implied duties were waived or limited, what conduct would constitute a breach, and if there was a breach. The Court would not only need to undertake an individual assessment of every well and the competitive market price each month to determine what is a fair price, but would also need to individually assess

every contract to determine whether there was a violation of the implied duty of good faith and fair dealing. No common answers could be generated for the entire class.

### 4. Typicality

The typicality element requires Plaintiffs to prove that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Even though commonality and typicality "tend to merge… they are distinct requirements under Rule 23." *Baby Neal for & by Kanter v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994). Commonality evaluates the sufficiency of the class itself while typicality evaluates the sufficiency of the named plaintiff. *Id.* Typicality allows the Court to "screen out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present." *Marcus,* 687 F.3d at 598.  In order to satisfy typicality:

> (1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class.

*In re Schering Plough,* 589 F.3d at 599.

Defendant Reliance argues that Plaintiffs have not satisfied the first prong of typicality as the language in their leases varies from the language of the other members of the "No Deductions" and "Implied Duty" classes. (Reliance Br. Opp'n., at 25-26). "As a result, these

class members will not share with Plaintiffs the same analysis on lease interpretation, breach of contract liability, damages, or defenses." (Reliance Br. Opp'n., at 25).

However, the Third Circuit has held that even if there are variations, they "will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the [absent] class members, and if it is based on the same legal theory." *Stewart*, 275 F.3d at 227-28 (quoting *Hoxworth v. Blinder, Robinson & Co., Inc.,* 980 F.2d 912, 923 (3d Cir. 1992)). Here, within the No Deductions and Highest Price Classes, Plaintiffs and all putative class members are asserting the same breach of contract claim—they were underpaid gas royalties in breach of their lease. The factual circumstances underlying the named plaintiffs' claims are generally the same as the putative class members in the No Deductions and Highest Price Classes: each Plaintiff entered a contract with the Defendants, each received royalty payments from Defendants, and those payments were allegedly improperly determined. (Pls.' Br., at 20-21).

Reliance contends the royalty and valuation clauses, specifically the "arms-length sale" language, are not the same in the leases of all putative class members, destroying typicality. (Reliance Br. Opp'n., at 25). The Court finds the language variation is not sufficient to challenge typicality. First, as explained in the commonality analysis, Defendants calculated royalties using the same methodology for all of its Lessors, regardless of lease language. Therefore, despite a difference in lease language, the claims of all putative class members still arise from the same course of conduct.

Second, the differences in lease language do not impact typicality because the class and its representatives are still asserting the same legal theory. *See Anderson v. Merit Energy Co.*, No. 07-CV-01025-LTB-BNB, 2008 WL 2484187, at *5 (D. Colo. June 19, 2008)(finding typicality was satisfied despite differences in lease language). The class representatives are asserting the same breach of contract claims as the rest of the class. These claims rest on the same underlying facts; namely, the Defendants' methodology used to calculate and pay royalties to lessors as well as form leases.

A defendant can challenge typicality by proving the plaintiff or a small subclass is "subject to a unique defense that is likely to become a major focus of the litigation." *Beck v. Maximus, Inc.*, 457 F.3d 291, 301 (3d Cir. 2006). The Third Circuit explained if a defense only applicable to the class representative became the focus of the litigation, it would divert attention and resources from the class as a whole and leave the class members "severely disadvantaged." *Id.* at 300 (quoting *Zenith Laboratories, Inc. v. Carter-Wallace, Inc.*, 530 F.2d 508 (3d Cir.1976)).

Regarding the Implied Duty Class, Reliance argues that Plaintiffs' leases contain a disclaimer of implied obligations that a majority of the putative class' leases do not contain and that this issue is likely to become the focus of the litigation. (Reliance Br., at 26 (citing Ex. 1 Decl. of Howe, at ¶¶ 55–58)). The Court agrees. Based on the Court's own analysis of the leases which Plaintiffs represented were not "fully or partially released" and based on the report submitted by Reliance's Land Manager, Brandon Keith Howe, the implied duty waiver

is only present in some lease forms written by Carrizo and one lease form written by Magnum Land. (*See, e.g.* Doc. 141-7, Lease C366 (Carrizo form lease)("...no implied covenant, agreement or obligation shall be read into this agreement or imposed upon the parties or either of them."); Doc. 141-20, Lease C1152 (Carrizo form lease)(same language); Doc. 144-37, Lease C10333 (Magnum Land form lease)(same language); *see also* Decl. of Howe, Doc. 119-1, at ¶¶ 53-58). This means that only two out of the at least fifteen different lease forms included in the Implied Duty Class would be subject to this unique defense. (*See* Decl. of Howe, Doc. 119-1, at ¶ 53–58). Out of the 253 individual leases submitted to the Court, an estimated 130 individual leases utilize the lease form that contains an implied duty waiver; while the remaining 123 leases do not have a waiver. (*See* Leases Chart, Doc. 141). In a claim alleging only a violation of an implied duty, under Pennsylvania law, a waiver of implied duties is likely to become a major focus of the litigation. *See Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 389-90 (Pa. 1986); *Jacobs*, 772 A.2d at 455. This would severely disadvantage about half of the Implied Duty class whose leases do not contain the waiver as the class representatives may be required to devote greater time and resources to advance the claims of those class members whose leases contain a waiver of the implied duty, to the detriment of the claims of those class members whose leases do not contain such an implied duty waiver.  Plaintiffs have, therefore, failed to demonstrate typicality for the Implied Duty Class. Failing to prove typicality further demonstrates the Implied Duty Class cannot be certified.

With respect to all three proposed classes, Defendant Carrizo also generally asserts that "[a] number of the leases contain arbitration clauses requiring disputes under the lease agreements, including claims for breach of the agreement, to be resolved through arbitration" and that the absence of an arbitration clause in the named Plaintiffs' leases thus "presents questions about whether their claims are typical and the adequacy of their representation with respect to those class members who have such clauses." (Carrizo Br. Opp'n., at 18). Carrizo relies upon *Jensen v. Cablevision* to support its argument, but the facts of that case are inapplicable to the present facts. *Jensen v. Cablevision Sys. Corp.*, 372 F. Supp. 3d 95, 124 (E.D.N.Y. 2019), *appeal dismissed, leave to appeal denied,* No. 19-628, 2019 WL 4296129 (2d Cir. Aug. 28, 2019). In *Jensen,* the plaintiff was held to be atypical because he opted out of an arbitration agreement, while 99 percent of the proposed class did not opt out. *Id.* Here, Reliance's Land Manager, Howe, declared that seven out of the fifteen unique lease forms he identified contain arbitration clauses. (Decl. of Howe, Doc. 119-1, at ¶¶ 44-50). Based on the Court's analysis of the 253 non-duplicative, fully non-released leases submitted by Plaintiffs, an estimated 72 of these leases may contain an arbitration provision. (*See* Docs. 141-147). This is not sufficient to defeat typicality as it is not likely to become a major focus of the litigation in the same way an implied duty would for the Implied Duty class.

The Plaintiffs have demonstrated that their claims set forth in the No Deductions and Highest Prices Classes rely on the same legal theories and underlying factual

circumstances as the remaining class members. Further, there are no defenses unique to the class representatives that would severely disadvantage those classes. Therefore, Plaintiffs have demonstrated typicality as to those two classes.

As a result, the No Deductions and Highest Price Classes have met the prerequisites and requirements of Rule 23(a) and the Court will proceed to analyze their sufficiency as a class under Rule 23(b). However, the Implied Duty Class has not met the commonality, typicality, or ascertainability requirements and cannot satisfy Rule 23(a) and certification will therefore be denied for this class without further analysis. *See* Fed. R. Civ. P. 23(b)("A class action may be maintained *if Rule 23(a) is satisfied and if…* ")(emphasis added).

### C.  Rule 23(b)

### 1. Rule 23(b)(2)

In relevant part, under Rule 23(b), if the putative class has satisfied all of the elements under Rule 23(a), the class may be certified as a 23(b)(2) class and/or a 23(b)(3) class. Fed. R. Civ. P. 23(b). In order to certify a class under Rule 23(b)(2), the party opposing the class must have "acted or refused to act on grounds that apply generally to the class." Fed. R. Civ. P. 23(b)(2). The final injunctive relief or corresponding declaratory relief must be "appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

> The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them. In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class

member would be entitled to a *different* injunction or declaratory judgment against the defendant. Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.

*Dukes*, 564 U.S. at 360-361 (internal citations and quotation marks omitted)(emphasis in original).  Unlike Rule 23(b)(3), Rule 23(b)(2) "provides no opportunity for . . . class members to opt out, and does not even oblige the District Court to afford them notice of the action." *Dukes*, 564 U.S. at 362.  Thus,

> The procedural protections attending the (b)(3) class—predominance, superiority, mandatory notice, and the right to opt out—are missing from (b)(2) not because the Rule considers them unnecessary, but because it considers them unnecessary *to a (b)(2) class.* When a class seeks an indivisible injunction benefiting all its members at once, there is no reason to undertake a case-specific inquiry into whether class issues predominate or whether class action is a superior method of adjudicating the dispute. Predominance and superiority are self-evident. But with respect to each class member's individualized claim for money, that is not so—which is precisely why (b)(3) requires the judge to make findings about predominance and superiority before allowing the class. Similarly, (b)(2) does not require that class members be given notice and opt out rights, presumably because it is thought (rightly or wrongly) that notice has no purpose when the class is mandatory, and that depriving people of their right to sue in this manner complies with the Due Process Clause. In the context of a class action predominantly for money damages we have held that absence of notice and opt out violates due process. See *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 812, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985).

*Dukes*, 564 U.S. at 362-363.

Nonetheless, "[a]lthough Rule 23(b)(2) classes need not meet the additional predominance or superiority requirements of Rule 23(b)(3), 'it is well established that the class claims must be cohesive'" and "'[i]ndeed, a (b)(2) class may require more

cohesiveness than a (b)(3) class." *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 263-64 (3d Cir. 2011)(quoting *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 142-43 (3d Cir. 1998)).  *See also*, *id.* at 264 n. 12 (noting that "Commentators have noted that certification requirements under Rule 23(b)(2) are more stringent than under (b)(3).").

As the Advisory Committee explained when addressing Rule 23(b)(2),

> This subdivision is intended to reach situations where a party has taken action or refused to take action with respect to a class, and final relief of an injunctive nature or of a corresponding declaratory nature, settling the legality of the behavior with respect to the class as a whole, is appropriate. Declaratory relief "corresponds" to injunctive relief when as a practical matter it affords injunctive relief or serves as a basis for later injunctive relief. *The subdivision does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages.* Action or inaction is directed to a class within the meaning of this subdivision even if it has taken effect or is threatened only as to one or a few members of the class, provided it is based on grounds which have general application to the class.

Fed. R. Civ. P. 23(b)(2) advisory committee note to 1966 Amendment (italics added).[4]

In this case, Plaintiffs "seek[] certification of . . . [the] Classes under Rule 23(b)(2) for injunctive relief in the form of declaratory judgment against BKV concerning the Plaintiff's [*sic*] and the Classes' rights under the Class Leases." (Pls.' Br., Doc. 96-2, at 27). Plaintiffs explain that "[i]njunctive relief is not sought against Carrizo and Reliance given that,

---

[4] Conversely, although Rule 23(b)(2) "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages," Fed. R. Civ. P. 23(b)(2) advisory committee note to 1966 Amendment, Rule 23(b)(2) should not "be read to nullify [Rule 23(b)(3)] protections whenever a plaintiff class, at its option, combines its monetary claims with a request — even a 'predominating request' — for an injunction", *Dukes*, 564 U.S. at 364.

following BKV's acquisition, they are no longer involved in the calculation or payment of royalties under the Class Leases." (*Id.* at 28 n. 15).

The Court will deny Plaintiffs' request for certification of injunctive and/or declaratory relief pursuant to Rule 23(b)(2) for the No Deductions Class. Preliminarily, in requesting injunctive relief, Plaintiffs only set forth, in brief fashion, assertions in support of the need for such relief with respect to the Highest Price Class and Implied Duty Class, raising a serious question as to whether Plaintiffs are even seeking injunctive relief as to the No Deductions Class. (*See* Pls.' Br., Doc. 96-2, at 28). With respect to declaratory relief for the No Deductions Class, Plaintiffs state only that they "are entitled to a declaration from the Court regarding the proper interpretation of the Class Leases to pay the royalty based upon . . . the deduction-free gross sale proceeds. . . ." (*Id.* at 29). However, neither injunctive nor declaratory relief may be certified under Rule 23(b)(2) for the No Deductions Class. As previously stated, Plaintiffs only seek "injunctive relief in the form of declaratory judgment against BKV . . ." (*id.* at 27), as Carrizo and Reliance have fully assigned their interests in the class leases to BKV. Further, Plaintiffs have admitted that BKV does not deduct post-production costs from its royalty payments. (*Id.* at 15). Therefore, issuing an injunction will not redress any harm the No Deductions Class may have suffered; only monetary damages will suffice. Further, declaratory relief is not available where Plaintiffs have admitted that BKV does not engage in the purported wrong for which they seek redress.

With respect to the Highest Price Class, Plaintiffs seek injunctive relief due to BKV's "continuing" breach of the leases by "calculating royalties based solely on the sale price received rather than the higher of the sale price, the NYMEX spot price and the local market price." (Pls.' Br., Doc. 96-2, at 28).  Plaintiffs, without further argument, assert that "[i]n the absence of a judicial declaration that BKV is improperly computing and paying royalties, BKV will presumably continue to breach the Class Leases and Plaintiff and the Classes will be required to pursue additional relief in the future." (*Id.* at 28-29).  Similarly, Plaintiffs seek declaratory relief in the form of "a declaration from the Court regarding the proper interpretation of the Class Leases to pay the royalty based upon . . . the NYMEX spot price or the local market price if that amount is greater than the price received by BKV. . . ." (*Id.* at 29). Although Plaintiffs generally assert that "[a]bsent a judicial declaration, money damages alone are insufficient to redress the irreparable harm", Plaintiffs fail to further explain how the requested relief for this Class is appropriate or meets the requirements of Rule 23(b)(2).

As previously stated, Rule 23(b)(2) "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages," Fed. R. Civ. P. 23(b)(2) advisory committee note to 1966 Amendment.  Additionally, Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." *Dukes*, 564 U.S. at 360-361.  Here, even Plaintiffs' explanations for the need for injunctive and declaratory relief for the Highest Price Class turn on the issue of money and the monetary relief to which Plaintiffs assert that they

are, and continue to be, entitled.  Nor can it be reasonably denied that the appropriate final relief, and the relief principally requested by Plaintiffs, relates predominately to money damages.  Furthermore, as addressed *infra* with respect to Plaintiffs' motion for class certification pursuant to Rule 23(b)(3), should Plaintiffs prevail in this action, each class member would necessarily be entitled to an individualized award of monetary damages, which require consideration of a number of factors including the terms of his/her lease as well as the affirmative defenses asserted by Defendants which may apply to some, but not all, of the class members.

In addition, the mandatory nature of Rule 23(b)(2) and thus the inability of class members to opt out, in addition to the lack of any need that a class member be afforded notice of the action, further mitigates in favor of denying Plaintiffs' motion for class certification of the Highest Price Class and the No Deductions Class for the requested injunctive and declaratory relief.  Here, the individual lease holders must have the right to opt-out, and the absence of the ability to do so severely prejudices their rights and also risks subjecting them, without their consent, to the doctrines of issue preclusion and collateral estoppel.  As noted by the Supreme Court, "[i]n the context of a class action predominantly for money damages we have held that absence of notice and opt out violates due process." *Dukes*, 564 U.S. at 363 (citing *Phillips Petroleum Co.*, 472 U.S. at 812). In addition, the *Dukes* Court made clear that Rule 23(b)(2) fails to ensure that a class member who may be entitled to monetary damages will not be collaterally estopped from doing so should

litigation, from which they had no power to exclude themselves, be resolved against them.[5] *See id.* at 354.

Finally, Plaintiffs fail to establish that sufficient cohesiveness exists as to either class, instead only vaguely asserting that "Defendants have acted (or refused to act) on grounds that apply to members of the Classes.  Therefore, the Classes are sufficiently cohesive under Rule 23(b)(2) and final injunctive and declaratory relief is appropriate." (Pls.' Br., Doc. 96-2, at 29).  Such minimal and conclusive argument is insufficient to demonstrate sufficient cohesiveness or meet the "more stringent" certification requirements of Rule 23(b)(2), *see Gates*, 655 F.3d at 264 n. 12.

For the afore-discussed reasons, Plaintiffs' motion for class certification pursuant to Rule 23(b)(2) will be denied as to all proposed Classes.

---

[5] In *Dukes*, in response to Respondents' argument that their claims for backpay were appropriately certified as part of a class under Rule 23(b)(2) because those claims did not "predominate" over their requests for injunctive and declaratory relief, the Court explained:

> In this case, for example, the named plaintiffs declined to include employees' claims for compensatory damages in their complaint. That strategy of including only backpay claims made it more likely that monetary relief would not "predominate." But it also created the possibility (if the predominance test were correct) that individual class members' compensatory-damages claims would be *precluded* by litigation they had no power to hold themselves apart from. If it were determined, for example, that a particular class member is not entitled to backpay because her denial of increased pay or a promotion was *not* the product of discrimination, that employee might be collaterally estopped from independently seeking compensatory damages based on that same denial. That possibility underscores the need for plaintiffs with individual monetary claims to decide *for themselves* whether to tie their fates to the class representatives' or go it alone—a choice Rule 23(b)(2) does not ensure that they have.

*Dukes*, 564 U.S. at 364 (emphasis in original).

2. Rule 23(b)(3)

Plaintiffs also seek to certify the classes under Rule 23(b)(3). (Pls.' Br., at 30). In order to satisfy Rule 23(b)(3), a class must have already satisfied the requirements of Rule 23(a). *See* Fed. R. Civ. P. 23(b). If a class satisfies the Rule 23(a) requirements, it can be certified under Rule 23(b)(3) if the Court finds that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In determining predominance and superiority, a Court should look to pertinent matters including:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

 Fed. R. Civ. P. 23(b)(3)(A)-(D).

a. Predominance

The Court first turns to the predominance requirement of Rule 23(b)(3).

To establish that "questions of law or fact common to class members predominate over any questions affecting only individual members," Fed. R. Civ. P. 23(b)(3), a plaintiff must identify the issues that are common to the putative class and prove that those issues are "more prevalent or important than the non-common, aggregation-defeating, individual

issues," *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045, 194 L. Ed. 2d 124

(2016). An individual issue requires "evidence that varies from member to member"

whereas a common issue is one where "the same evidence will suffice for each member."

*Ferreras v. Am. Airlines, Inc.*, 946 F.3d 178, 185 (3d Cir. 2019).

As long as "one or more of the central issues in the action are common to the class

and can be said to predominate," the requirement is satisfied, even if "other important

matters will have to be tried separately, such as damages or some affirmative defenses

peculiar to some individual class members." *Tyson Foods,* 136 S. Ct. at 1045; s*ee also

Neale v. Volvo Cars of N. Am., LLC,* 794 F.3d 353, 371 (3d Cir. 2015)("[T]he presence of

individual questions does not *per se* rule out a finding of predominance")(internal quotations

omitted). Moreover, the putative class only needs to prove that common questions

predominate, "not that those questions will be answered, on the merits, in favor of the

class." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 459, 133 S. Ct.

1184, 185 L. Ed. 2d 308 (2013).

As discussed in connection with the commonality prong, Plaintiffs have identified

common issues for each class. The No Deductions Class presents the common issues of:

(1) whether Defendants' royalty calculation method deducted post production costs from the

royalties paid to lessors,[6] and (2) if so, whether the deduction of post production costs

---

[6] The No Deduction Class solely consists of persons or entities whose leases "expressly prohibits the deduction of post-production expenses." (Pls.' Mot. Class Cert., at 1).

violated a prohibition against such deductions in the lease. The common issue for the

Highest Price Class is whether the Defendants compared the NYMEX spot price or local

market price to the price received in order to pay lessors the highest of these prices. Both

classes will need to determine the common issue of whether the transactions between

Defendants and DTE or Twin Eagle were in fact arms-length sale transactions with

unaffiliated third parties subject to the contractual proviso pursuant to which the royalty the

lessor receives for the gas production is a percentage of the price paid to the lessee.

Recognizing that the predominance requirement is "far more demanding than the

commonality requirement," *In re Hydrogen Peroxide,* 552 F.3d at 311, the question

becomes under Rule 23(b)(3) whether these afore-mentioned common issues predominate.

Defendants present a number of arguments in an attempt to show that common

issues do not predominate.

Defendant Carrizo first argues that the Highest Price Class cannot prove common

issues predominate as "what constitutes a 'reasonable price' varies from leasehold to

leasehold." (Carrizo Br. Opp'n., at 7). However, the Court does not need to determine what

the reasonable price at each leasehold would have been at this stage. *Zehentbauer Family*

*Land, LP v. Chesapeake Expl., L.L.C.,* 935 F.3d 496, 506 (6th Cir. 2019)(holding that

determining whether deducting post-production costs breached class leases "does not

require an estimation of the individual market prices of oil and gas at each well");

*Fankhouser,* 2010 WL 5256807, at *4. Instead, the liability inquiry is focused on the method

that was used by the Defendants to value the gas and to calculate royalties for all of the lessors. Similarly, determining whether transactions with DTE or Twin Eagle were arms-length sale transactions is not dependent upon finding what the reasonable price would have been for each leasehold.

If the price in fact varies depending on the leasehold or other factors, that variability would only be a factor used to calculate damages. *Id.* (holding the quality of the gas from each well "is merely a matter related to damages, not liability"). Individual calculation of damages does not destroy the predominance of common issues. *Neale*, 794 F.3d at 374-75; *see also In re Modafinil Antitrust Litig.*, 837 F.3d 238, 260 (3d Cir. 2016)(holding damages do not need to be "susceptible of measurement across the entire class for purposes of Rule 23(b)(3)"), *as amended* (Sept. 29, 2016); *Reyes*, 802 F.3d at 485 ("[A]n inability to calculate damages on a classwide basis will not, on its own, bar certification."); *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 306 (5th Cir. 2003)("Even wide disparity among class members as to the amount of damages suffered does not necessarily mean that class certification is inappropriate.").

Defendant Reliance depends on *Comcast v. Behrend* in arguing that the Plaintiffs must prove damages on a class-wide basis. (Reliance Br. Opp'n., at 15-16 (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 30, 133 S. Ct. 185 L. Ed. 2d 515 (2013)). However, the Third Circuit, along with several other circuits, held that the *Comcast* case was "specific to the antitrust claim at issue," and the "recognition that individual damage calculations do not

preclude class certification under Rule 23(b)(3) is well nigh universal." *Neale*, 794 F.3d at

374-75 (internal quotations omitted)(collecting cases); *see, e.g., In re Deepwater Horizon*,

739 F.3d 790, 815 (5th Cir. 2014)(finding where predominance is based on common issues

of liability, and not based on common issues of damages, "nothing in *Comcast* mandates a

formula for classwide measurement of damages"); *Roach v. T.L. Cannon Corp.*, 778 F.3d

401, 402 (2d Cir. 2015)("We hold that *Comcast* does not mandate that certification pursuant

to Rule 23(b)(3) requires a finding that damages are capable of measurement on a

classwide basis."); *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, No. CV 13-

6731, 2016 WL 4138613, at *14 (E.D. Pa. Aug. 4, 2016)("Subsequent to the decision

in *Comcast*, it remains the law in the Third Circuit that the need to perform individual

damages calculations does not foreclose class certification under Rule 23(b)(3)."); *Wallace

B. Roderick*, 725 F.3d at 1220 (noting *Comcast* does not prohibit the certification of a class

of natural gas royalty owners if individual damage calculations are needed). Therefore, the

alleged need for a well-by-well analysis does not impact the predominance determination.

Moreover, Plaintiffs have demonstrated that damages can be calculated for the class

utilizing Defendants' data and publicly available information. "Damages can be calculated as

the amount that should have been paid to the class members according to the terms of the

leases and subtracting the amount that was actually paid to the class members." (Reineke

Expert Report, Doc. 96-7, at 7). As to the Highest Price Class, Plaintiffs' expert stated:

> The only difference between each member of the proposed Highest Price Class
> is the amount of payment owing to each particular royalty owner for this failure

to compare prices. This difference, however, is attributable to the differing fractional interest each royalty owner has and the varying volumes produced from each particular well. The Defendants' business records contain both the fractional interest of each royalty owner by well and the volumes produced by each well every month throughout the Class Period.

(*Id.* at 7–8).[7] Therefore, the calculation of damages does not preclude a finding that common issues predominate.

Defendants next argue that individual issues predominate over common issues because of the variety of language used in the lease term prohibiting post-production cost deductions. (Carrizo Br. Opp'n., at 12-15; Reliance Br. Opp'n., at 13-14). The variations in lease language may affect a calculation of damages, but they do not affect the predominant common questions regarding Defendants' liability for breach of contract. *Naylor Farms v. Chaparral*, 923 F.3d at 795 (finding variations in leases did not defeat predominance); *Naylor Farms v. Anadarko*, 2009 WL 8572026, at *8 (variety of lease language may affect damages but is not determinative of predominance); *Anderson v. Merit Energy Co.*, 2008 WL 2484187, at *8 ("Merit's argument that individualized issues relating to varying language the Royalty Agreements will predominate over the common issues in this case must,

---

[7] The same holds true with respect to the No Deductions Class. As Plaintiffs' expert explained: The only difference between each member of the proposed No Deductions Class is the amount of underpayment owing to each particular royalty owner for this improper deduction of post-production costs and marketing fees. This difference, however, is attributable to the differing fractional interest each royalty owner has and the varying volumes produced from each particular well. The Defendants' business records contain both the fractional interest of each royalty owner by well and the volumes produced by each well every month throughout the Class Period. Since deductions are determined on a Class Well basis before being allocated to each royalty owner each month by the Defendants, the same can be done here.
(Reineke Expert Report, Doc. 96-7, at 7-8).

however, fail."); *Freebird, Inc. v. Merit Energy Co.,* No. CIV.A. 10-1154-KHV, 2011 WL

13638, at *8 n.7 (D. Kan. Jan. 4, 2011); *Zehentbauer,* 2018 WL 3496089, at *7 (finding

predominance satisfied despite differences in agreement language). In cases where the

same royalty calculation methodology was used for all royalty owners, variations in lease

language have been held to be immaterial to class certification. *See Fankhouser,* 2010 WL

5256807, at *6 ("The variations in Btu content of the wells and lease language are

immaterial given defendant's identical treatment of all class members for royalty purposes.

Those individual differences do not predominate over the common issue…"); *Beer v. XTO*

*Energy, Inc.,* No. CIV-07-798-L, 2009 WL 764500, at *7 (W.D. Okla. Mar. 20, 2009).

  Here, determining what costs were permitted to be deducted from a royalty payment

by each lease is a secondary issue related to damages. The primary issue for the No

Deductions Class is whether the royalties were calculated with or without deductions for

post-production costs. The evidence needed to answer this question will suffice for the

entire class because, as explained *supra,* Defendants Reliance and Carrizo used the same

royalty calculation method for all leases regardless of contract language. For example, if it

were found there were no post-production costs deducted by the Defendants or that all gas

sales were the result of arms-length sale transactions with an unaffiliated third party, the

issue would be resolved for the whole class using the same evidence in one stroke. If it

were found that the Defendants in fact deducted post production costs and did so in

violation of a prohibition against such deductions, then resort to the individual lease forms

would be for analysis only to determine damages, not the common issue of liability.

Carrizo and Reliance also both specifically identify the presence or absence of a

market enhancement clause as an example of a lease term that would destroy

predominance. (Carrizo Br. Opp'n., at 12-14; Reliance Br. Opp'n., at 14). Market

enhancement is a term of art which "refers to processes or treatments performed *after* the

gas is already in a marketable condition." (Reineke Rebuttal Expert Report, Doc. 135-4, at

2) (emphasis original). The market enhancement clauses do not destroy predominance

because the marketability of the gas is not determined well-by-well. As Plaintiffs' expert

explained,

> [N]o class well is treated individually. Rather, all the Class Wells are connected
> to a gathering system. On the gathering system the raw gas is commingled into
> a single stream that is compressed, dehydrated, treated and delivered to the
> high-pressure transmission pipeline market. Once the gas is commingled into
> a single stream on the gathering system it is not identifiable as coming from
> any particular well. Thus, no well-by-well analysis is necessary to determine
> what is needed on an individual well basis to place the gas into a marketable
> condition.

(*Id.*). The marketability of the gas is not determined on an individual well basis and thus is

not an individual issue that would predominate over the common issues.

The common issues also predominate over any potential need to analyze the

individual intent and understanding of the parties. Again, the predominant issue in this

matter is the Defendants' conduct when calculating royalties, including whether pre and post

production costs were properly deducted from the price of the gas sold on which the royalty

payment was then calculated. This is especially true where the Defendants have used the same royalty calculation method for all class members. In a similar case, the District Court of Kansas held:

> We align our court with those of Louisiana, North Dakota, and Oklahoma in holding that in a purported class action claiming improper calculation of royalties, there is no need to examine individual lease formation and the intent of the parties thereto for purposes of determining predominance of common issues or manageability in certification proceedings where there has been shown a systemic common course of conduct by an oil and gas lessee in calculating royalties payable.

*Hershey v. ExxonMobil Oil Corp.*, No. 07-1300-JTM, 2011 WL 1234883, at *10 (D. Kan. Mar. 31, 2011).

In the present case, for the reasons previously set forth, *supra*, Plaintiffs have demonstrated by a preponderance of the evidence that the leases are identical or substantially identical for purposes of resolving the common liability issues identified herein for the No Deductions and Highest Price Classes. Plaintiffs have carried their burden of demonstrating predominance, notwithstanding Carrizo's argument to the contrary.

Defendants further argue that the affirmative defenses applicable to subsets of the putative classes will preclude a finding of predominance. (Reliance Br. Opp'n., at 21–22; Carrizo Br. Opp'n., at 15-16, 18-19). In general, if there are issues common to the class that predominate over individual issues, the class can be certified "even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods*, 136 S. Ct. at 1045; *see also*

*Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003)(individual affirmative defenses that "pertained primarily to the issue of damages rather than liability" do not predominate over common issues), *aff'd sub nom. Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 125 S. Ct. 2611, 162 L. Ed. 2d 502 (2005). The Defendants raise three affirmative defenses as potentially defeating predominance: the statute of limitations, contract terms requiring notice and opportunity to cure, and contract terms mandating arbitration or alternative dispute resolution ("ADR").

First, Defendant Carrizo contends that determining whether each class member's claim is barred by the statute of limitations is an individual question that predominates over common questions. (Carrizo Br. Opp'n., at 15-16). Carrizo further argues the application of the discovery rule to toll the statute of limitations requires "fact-based determinations for each lessor regarding what he or she knew and when." (*Id.* at 16). However, the cases Carrizo cites in support of its argument did not hold that the statute of limitations defense defeated class certification; they merely found that the District Court below failed to evaluate the defense at all. *See Adair*, 764 F.3d at 370 (noting the court on remand may find it was "ultimately correct that the statute of limitations is no bar to class certification"); *Seeligson v. Devon Energy Prod. Co., L.P.*, 761 F. App'x 329, 339 (5th Cir. 2019)("The district court did not consider the statute of limitations and tolling questions in its predominance analysis").

The Third Circuit has held that "[a]s long as a sufficient constellation of common issues binds class members together, variations in the sources and application of statutes

of limitations will not automatically foreclose class certification under Rule 23(b)(3)." *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 162 (3d Cir. 2002)(quoting *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000)); *see also Hoxworth*, 980 F.2d at 924 ("The existence of a statute of limitations issue does not compel a finding that individual issues predominate over common ones.")(quoting *Cameron v. E.M. Adams & Co.*, 547 F.2d 473, 478 (9th Cir. 1976)); *Thomas v. SmithKline Beecham Corp.*, 201 F.R.D. 386, 395-96 (E.D. Pa. 2001)("[T]he overwhelming weight of authority in the Third Circuit has held that the question of whether the named plaintiffs' claims are time-barred is inappropriate for adjudication at the class certification stage.").

Whether and when the discovery rule tolled the statute of limitations for each putative class member is not an issue that predominates over the common issues in this case. *Abraham v. WPX Prod. Prods., LLC*, 317 F.R.D. 169, 231 (D.N.M. 2016)("Even if the question is individual—for example… if the discovery rule might delay the accrual of the statute for some class members but not others—it still typically does not defeat predominance."); *Naylor Farms v. Anadarko*, 2009 WL 8572026, at *7 ("[T]here is little to no risk that the issue of the statute of limitations will predominate."). In *Naylor Farms v. Anadarko*, the District Court reasoned "[i]f the Defendants are successful in limiting the duration of Plaintiff Naylor Farm's damages, it merely narrows the scope of the named-plaintiff's claims it does not alter the nature of the claims at issue in this case." *Id. See also In re Linerboard*, 305 F.3d at 163 (statute of limitations issues "go to the right of a class

member to recover, in contrast to underlying common issues of the defendant's liability")

(quotations omitted). Likewise, here, the statute of limitations issues do not change the

underlying substantive claim regarding Defendants' liability for breach of contract; they only

limit the damages that a class member may recover. And, as previously explained, the

individual calculation of damages does not preclude a finding of predominance. *Neale*, 794

F.3d at 374-75.  Therefore, whether an individual class member's claim is barred by the

statute of limitations will not predominate over the common issues.

Defendants next contend that the fact that some form leases contain a notice and

cure provision defeats predominance. (Reliance Br. Opp'n., at 21-22; Carrizo Br. Opp'n., at

18-19). Rule 23(b)(3) does not require that all issues are common to the class; only that

individual issues do not predominate. *In re Prudential Ins. Co. Am. Sales Practice Litig.*

*Agent Actions*, 148 F.3d 283, 315 (3d Cir. 1998). The presence of a notice and cure

provision will not predominate over the common issues in this case as these terms do not

alter the underlying claims. *Belcher v. Ocwen Loan Servicing, LLC*, No. 8:16-CV-690-T-

23AEP, 2018 WL 1701963, at *13 (M.D. Fla. Mar. 9, 2018), *report and recommendation*

*adopted in part,* No. 8:16-CV-690-T-23AEP, 2018 WL 1701964 (M.D. Fla. Apr. 2,

2018), *appeal denied,* No. 18-90011, 2018 WL 3198552 (11th Cir. June 29, 2018). *See also*

*Reardon v. ClosetMaid Corp.,* No. 2:08-CV-01730, 2013 WL 6231606, at *18 (W.D. Pa.

Dec. 2, 2013)(individual affirmative defenses did not defeat certification)(citing *Demmick v.*

*Cellco P'ship*, No. CIV.A. 06-2163 JLL, 2010 WL 3636216, at *12 (D.N.J. Sept. 8, 2010));

*Dzielak v. Whirlpool Corp.,* No. CV 2:12-89 (KM)(JBC), 2017 WL 6513347, at *17 (D.N.J. Dec. 20, 2017)(individualized affirmative defenses did not predominate).

The Defendants also argue that the presence of ADR or mandatory arbitration clauses in some of the form leases divides the class. (Reliance Br. Opp'n., at 22; Carrizo Br. Opp'n., at 18-19). Reliance's Land Manager, Howe, declared that seven out of the fifteen lease forms he identified have arbitration or alternative dispute resolution provisions. (Decl. of Howe, Doc. 119-1, at ¶¶ 44-50). Based on the Court's analysis of the unreleased contracts submitted by Plaintiffs, an estimated 72 leases may contain an ADR provision.[8] (*See* Docs. 141–147).

Even though some putative class members may be subject to a mandatory arbitration clause, this individual issue does not predominate over the common issues. *Herrera v. LCS Fin. Serv. Corp.,* 274 F.R.D. 666, 681 (N.D.Cal.2011) ("The fact that some members of a putative class may have signed arbitration agreements or released claims against a defendant does not bar class certification."); *Lerner v. Haimsohn*, 126 F.R.D. 64, 66 (D. Colo. 1989)("Finally, the possible arbitration of some class member claims will not, by itself, defeat class certification.") (citing *Shankroff v. Advest, Inc.,* 112 F.R.D. 190, 194 (S.D.N.Y. 1986)); *Davis v. Four Seasons Hotel Ltd.,* No. CIV. 08-00525 HG-BMK, 2011 WL 4590393, at *4 (D. Haw. Sept. 30, 2011)("The possibility that Four Seasons may be able to

---

[8] The Court expresses no opinion regarding the enforceability of any arbitration agreement that may be included in any leases entered into by the putative class members and any Defendant.

compel unnamed members of the putative class to arbitrate in the future does not preclude class certification.").

Courts have held that issues related to arbitration agreements do not have to be resolved at the class certification stage; but can be resolved through the creation of subclasses or the elimination of some members of the class at a later stage. *Finnan v. L.F. Rothschild & Co.,* 726 F. Supp. 460, 465 (S.D.N.Y. 1989)("Defendant submits that within the potential class, some employees had signed liability releases, others had signed arbitration agreements…[These issues] may well call for the eventual creation of subclasses, or for dropping certain members from the class, but they do not defeat the merits of class certification at this juncture."); *Coleman v. Gen. Motors Acceptance Corp.,* 220 F.R.D. 64, 91 (M.D. Tenn. 2004)("[T]he court reserves the right to create a subclass, modify the class definition, or otherwise specially treat the class members subject to arbitration at a later juncture."); *Midland Funding, LLC v. Brent,* No. 3:08 CV 1434, 2010 WL 4628593, at *4 (N.D. Ohio Nov. 4, 2010)("Any arbitration-related defenses…may be dealt with pursuant to Fed.R.Civ.P. 23 at a later stage in the litigation, through the creation of subclasses, or by eliminating some members of the class."). Therefore, at the current stage, the Court does not need to resolve whether Defendants have waived their rights to enforce a mandatory arbitration clause as Plaintiffs argue. (Pls.' Reply Br., at 17-19). At this point in the litigation, the mere possibility that Defendants will seek to enforce the arbitration clauses is not sufficient to defeat predominance.

Finally, Defendant Reliance argues that determining which individual class members released their claims requires "individualized inquiry into the particular chain of title for the leased property." (Reliance Br. Opp'n., at 16). Reliance does not explain why the Court would need to examine each individual chain of title to determine which class members released their claims. (*See id.*). When asked to produce the leases they reviewed, Plaintiffs' counsel produced a chart which categorizes the leases that have been fully or partially released. (Leases Chart, Doc. 141). Even if individual inquiry was required, there is no reason that determining who released claims will predominate over the common liability issues or damages. *See Bittinger v. Tecumseh Prod. Co.*, 123 F.3d 877, 884 (6th Cir. 1997)(finding certification was proper even if some class members' claims had been released); *Herrera*, 274 F.R.D. at 681; *Coleman*, 220 F.R.D. at 90-91 (collecting cases); *Finnan,* 726 F. Supp. at 465.

### b. Superiority

The final requirement to satisfy Rule 23(b)(3) is that the "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

> The superiority requirement asks a district court "to balance, in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods' of adjudication." *Georgine v. Amchem Prods., Inc.,* 83 F.3d 610, 632 (3d Cir.1996), *aff'd,*521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). Fed.R.Civ.P. 23(b)(3) instructs that the matters pertinent to this inquiry include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; [and]

> (D) the difficulties likely to be encountered in the management of a
> class action.
>
> *Id.*

*In re Cmty. Bank*, 418 F.3d at 309.

The first factor, the class members' interests in individually controlling the action, weighs in favor of certification. For many of the class members, the class action may be the only economically feasible way to recover. *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534 (3d Cir. 2004); *In re Prudential*, 148 F.3d at 316.  Spreading litigation costs amongst class members is especially necessary in a case that will require extensive expert testimony. If there are class members with more significant claims, they can opt out of the class action and pursue an individual action. *In re Cmty. Bank*, 418 F.3d at 309.

Defendants argue that the second factor weighs against certification as a number of lawsuits have already been filed in state court. (Decl. of Howe, Doc. 119-1, at ¶¶ 71-72; Carizzo Br. Opp'n., Doc. 120-16). Reliance's Land Manager declared that there were twelve lawsuits pending in the Susquehanna County Court of Common Pleas. (Decl. of Howe, Doc. 119-1, at ¶¶ 71-72). Carrizo argues that there are nineteen lawsuits pending in state court. (Carrizo Br. Opp'n., at 19-20). However, the number of individual claims is overstated by the Defendants. For example, the Trecoske and Jarvie families have together initiated ten of the nineteen lawsuits listed by Carrizo, on behalf of several individuals, trusts, partnerships, and minors. (Lawsuits in the Court of Common Pleas of Susquehanna County, Doc. 120-16). Five of the pending claims were initiated by the Andre family on behalf of a variety of

individuals and partnerships. (*Id.*). The Giangrieco family has initiated three suits—one against Carrizo and Reliance, one against Carrizo and BKV, and one against all three defendants on behalf of a partnership. (*Id.*). The final lawsuit listed by Carrizo is brought by the Perry-Miller family. (*Id.*). Furthermore, Carrizo conceded that these cases "have not proceeded beyond writs of summons." (Carrizo Br. Opp'n., at 19-20). Five families bringing claims against the Defendants is a relatively small number of individual lawsuits in the two classes, each with over one hundred members, demonstrating little interest by members of the classes in individually controlling the prosecution or defense of separate actions. *In re Warfarin,* 391 F.3d at 534 (superiority was met despite a small number of pending individual claims).

The third factor, the desirability of this forum, weighs in favor of certification. All of the leases at issue are for properties in Northeastern Pennsylvania, specifically in Wyoming and Susquehanna Counties. Many class members also likely reside in these counties. Therefore, concentrating the litigation in this forum would be desirable for the parties. *Walney,* 2015 WL 5333541, at *26.

The final factor, the likely difficulties in managing a class action, also weighs in favor of certification. Even though there are a few individual issues, as discussed above, the predominant issues are common to the class and can be analyzed using common evidence. Reliance's arguments regarding the individual calculation of damages and the variations in lease language have already been addressed. The fact that individual damages may need

to be calculated is not a bar to certification. *Tyson Foods,* 136 S. Ct. at 1045; *Fankhouser,* 2010 WL 5256807, at *6 (manageability is not an issue where royalties need to be recalculated).

 In addition to the enumerated factors of Rule 23(b)(3), the Court also considers that the use of standard form contracts and the common course of conduct on the part of Defendants weigh in favor of certification. *See Gillis,* 677 F. App'x at 756 ("Because form contracts should be interpreted uniformly as to all signatories, Pennsylvania and federal courts have recognized that claims involving the interpretation of standard form contracts are particularly well-suited for class treatment."); *Walney,* 2015 WL 5333541, at *26 (holding class action was superior where plaintiffs possessed "materially identical form documents" and were subject to a "common course of conduct").

 Furthermore, the Court agrees with Plaintiffs that individual litigation of each class member's claims against the Defendants would strain judicial resources (Pls.' Br., at 34). Certification of the No Deductions Class and Highest Price Class allows over one hundred factually identical claims in each class to be resolved in a single case with evidence common to the classes. (*See* Leases Chart, Doc. 141). Certification would additionally decrease the risk of inconsistent judgments against the three Defendants. *See Adair,* 764 F.3d at 371.

 For the foregoing reasons, a class action is the superior method to fairly and efficiently adjudicating this matter, and, because this Court has also found that the

questions of law or fact common to class members predominate over any questions affecting only individual members, the No Deductions and Highest Price Classes satisfy the requirements of Rule 23(b)(3).

### D. Appointment of Class Counsel pursuant to Rule 23(g)

Pursuant to Rule 23(g), unless otherwise provided by statute, a court that certifies a class must appoint class counsel.  In so doing, the Court must consider:

> (i) the work counsel has done in identifying or investigating potential claims in the action;
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
> (iii) counsel's knowledge of the applicable law; and
> (iv) the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A).  A Court may further "consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." *Id.* at 23(g)(1)(B).  Class counsel also has a duty to "fairly and adequately represent the interests of the class."  *Id.* at 23(g)(4).  Thus, "[w]hen one applicant seeks appointment as class counsel, the court may appoint that applicant only if the applicant is adequate under Rule 23(g)(1) and (4). . . ."  *Id.* at 23(g)(2).

Here, the reasons set forth, *supra*, with respect to adequacy of representation under Rule 23(a)(4) also support a finding that the law firms of LeVan Law Group, LLC, and Berger Montague P.C. may properly be appointed as class counsel.  In this case, Plaintiffs' counsel have done significant work in identifying and investigating potential claims in this action and have demonstrated that they have, and will continue to, commit the necessary

resources to representing the classes.  Counsel has already conducted substantial discovery, taken a number of depositions, and researched and fully prepared all motions and accompanying briefs submitted on behalf of the classes in this matter.  Counsel's curriculum vitae (Docs. 96-26, 96-27) demonstrate that both firms have been involved in complex litigation matters, including a number of class actions, and that counsel of record has gained experience and knowledge of the applicable law through their practice of the law over many years.  In addition, as previously noted, Defendants have not opposed the appointment of LeVan Law Group, LLC, and Berger Montague P.C. as class counsel.  Thus, upon review of the record, the Court finds that LeVan Law Group, LLC, and Berger Montague P.C. are "adequate" under Rule 23(g)(1) and (4).

## IV. Conclusion

For the reasons set forth in this Memorandum Opinion, the Court will grant in part and deny in part Plaintiffs' Motion for Class Certification (Doc. 96).  The Court will grant Plaintiffs' motion to certify the No Deductions and Highest Price Classes pursuant to Rule 23(b)(3). However, the Court will deny Plaintiffs' motion for class certification of the Implied Duty Class as well as Plaintiffs' motion for class certification of all Classes pursuant to Rule 23(b)(2).  A separate Order follows.

 _s/ Robert D. Mariani_____
Robert D. Mariani
United States District Court Judge