THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JANIE SLAMON, as Executrix of the    :
Estate of James Slamon, and    :
ERIC LEWIS, on behalf of themselves    :
and all others similarly situated,    :
   :
       Plaintiffs,    :
   v.    :    3:16-CV-2187
   :    (JUDGE MARIANI)
CARRIZO (MARCELLUS) LLC,    :
RELIANCE MARCELLUS II, LLC,    :
RELIANCE HOLDINGS USA, INC.,    :
BKV OPERATING LLC, and    :
BKV CHELSEA LLC,    :
   :
       Defendants.    :

## MEMORANDUM OPINION

### I. INTRODUCTION

Presently before the Court are four motions for summary judgment. Plaintiffs, Janie Slamon as Executrix of James Slamon's Estate, Eric Lewis, and two certified classes of others similarly situated, have filed a Motion for Partial Summary Judgment. (Doc. 191.) The three Defendants in this case have filed motions for summary judgment: Defendant Callon (Marcellus) LLC, f/k/a Carrizo (Marcellus) LLC ("Carrizo") (Doc. 192),[1] Defendants Reliance Marcellus II, LLC and Reliance Holdings USA, Inc. (collectively "Reliance") (Doc. 188), and Defendants BKV Operating LLC and BKV Chelsea LLC (collectively "BKV") (Doc. 196).

---

[1] For the sake of clarity and because this defendant was known as Carrizo at the time of the relevant events, the Court refers to Callon (Marcellus) LLC as "Carrizo" throughout this opinion.

The case concerns a breach of contract claim regarding the calculation of royalties under the oil and gas leases between Defendants, as lessees, and Plaintiffs, as lessors. (*See generally* Second Am. Compl., Doc. 107.) Despite the complexity of the relevant transactions, the material facts are not genuinely disputed, and Defendants are entitled to summary judgment.

## II. UNDISPUTED FACTS

The following facts are undisputed unless otherwise noted.

### A. *Lease Terms*

In 2009, James Slamon entered into a Paid Up Oil and Gas Lease with Carrizo ("Slamon Lease").[2] (Pls. Stmt. of Facts, Doc. 195 at ¶ 1.) Around the same time, Plaintiff Eric Lewis entered into multiple leases with Carrizo ("Lewis Lease"). (Doc. 195 at ¶ 2.) Carrizo also entered into or purchased substantially similar leases with many other landowners in Northeastern Pennsylvania (the "NEPA Leases"). (Doc. 195 at ¶ 3.) The "Class Leases" accordingly consist of the NEPA Leases, the Slamon Lease, and the Lewis Lease.

Two lease provisions, substantially the same in all of the relevant leases, are at issue. First, the Production Royalty term ("No Deductions Provision") states:

> [4](b) Production Royalty: Lessee shall pay Lessor the following royalty (the "Royalty"), free of all costs, whether pre-production or post-production as follows:
> . . . (ii) GAS: Lessee shall deliver to the credit of Lessor, free of all costs (whether pre-production or post-production), a monthly Royalty equal to

---

[2] In 2019, upon James Slamon's death, Janie Slamon took his place as Executrix of his estate. (*See* Doc. 103.)

> eighteen percent (18%) of the greater of (i) the market value, measured at the point of take, of all gas and any constituents produced from the Leasehold or lands pooled or unitized therewith, or (ii) the gross amount of revenue paid to Lessee for all gas and any constituents produced from the Leasehold or lands pooled or unitized therewith, measured at the point of take; provided, however, that when gas production is sold in an arms-length sale transaction with an unaffiliated third party, the value of such gas production shall be the price paid to Lessee.

(Slamon Lease, Doc. 193-4, at 2.) Second, the Valuation term ("Highest Price Provision") provides:

> [4](f) Valuation: The value of oil, gas, or other hydrocarbon production shall be determined on the basis of the greater of (i) the prevailing local market price at the time of sale or use, or, NYMEX spot price as published at the time of sale, whichever is greater, or (ii) the price paid to Lessee from the sale or use of the gas, including proceeds and any other thing of value received by Lessee; provided, however, that when gas production is sold in an arms-length sale transaction with an unaffiliated third party, the value of such gas production shall be the price paid to Lessee.

(*Id.* at 3.)

The Class Leases do not provide for the location at which the Lessee must sell the gas, nor do they expressly restrict the Lessee's right to choose that location.

## B.  Carrizo and Reliance Operations

In August 2010—before gas production began—Carrizo assigned Reliance an undivided 60% interest in the Class Leases. (Carrizo Stmt. of Facts, Doc. 194 at ¶ 3; Doc. 195 at ¶ 4.) Reliance took its gas in-kind and separately marketed its share of the gas. (Doc. 195 at ¶ 5.) Once production began, Plaintiffs received two monthly royalty checks: one from Carrizo and one from Reliance. (Doc. 194 at ¶ 4.)

Carrizo sold its entire share of the gas produced to DTE Energy Trading, Inc. ("DTE"). DTE is "an active physical and financial gas, power and environmental marketing company." (Doc. 195 at ¶ 9 (quoting *DTE Energy Trading*, https://newlook.dteenergy.com/wps/wcm/-connect/dte-web/home/about-dte/common/dte-energy-trading (last accessed Jan. 31, 2023)).) Carrizo and DTE do not have common ownership and are not parents, subsidiaries, or corporate sisters with each other. (Doc. 194 at ¶ 9; Pls. Counterstatement of Facts in Response to Carrizo, Doc. 218 at ¶ 9.)

Carrizo and DTE operated pursuant to a "Base Contract for Sale and Purchase of Natural Gas," dated February 12, 2010, and periodic "Transaction Confirmations" thereafter. (Doc. 194 at ¶ 5; Doc. 201-1, Ex. 4.) The Base Contract for Sale and Purchase of Natural Gas is an industry standard form contract created by the North American Energy Standards Board, Inc. and is referred to as an "NAESB." (*See* Doc. 200-1, Ex. 4; T. Neu 30(b)(6) 1/8/19 Dep. Tr. at 37:21–38:22.) The NAESB lists Carrizo as the seller and DTE as the buyer. (Doc. 201-1, Ex. 4 at 4.) Transaction Confirmations, defined in the NAESB, are documents "setting forth the terms of a transaction" for a "particular Delivery Period." (*Id.*)

Reliance also sold its entire share of the gas to DTE, excepting a period of approximately one year during which it sold some of its gas to Twin Eagle Resource Management, LLC ("Twin Eagle"). (Reliance Stmt. of Facts, Doc. 190 at ¶¶ 7–8.) Reliance and DTE are separate business entities with no parent or subsidiary relationship or common

ownership. (Doc. 190 at ¶ 10; Pls. Counterstatement of Facts in Response to Reliance, Doc. 219 at ¶ 10.)

Reliance and DTE also operated pursuant to an NAESB standard form base contract and Transaction Confirmations. (Doc. 190 at ¶ 11.) DTE refers to its agreements with Carrizo and Reliance as "asset management agreements" that are "executed through NAESBs." (T. Neu 30(b)(6) 1/8/19 Dep. Tr. at 29:7–10.)

All sales of gas by Carrizo and Reliance to DTE were made in contemplation of future gas resales by DTE. (Doc. 195 at ¶¶ 10, 19.) DTE took title to the gas from Carrizo and Reliance at "Delivery Point[s]," defined by the respective NAESB agreements as "point(s) as are agreed to by the parties in a transaction." (*See, e.g.,* DTE/Reliance NAESB, Doc. 202-12, Ex. Q.) DTE, Carrizo, and Reliance determined the location of Delivery Points in their respective Transaction Confirmations. (*See, e.g.,* DTE/Reliance Transaction Confirmation dated March 29, 2017, Doc. 202-13, Ex. R (Delivery Point would be at "all of the wellhead meters").) Plaintiffs and Defendants agree that the agreed-upon Delivery Points were generally at or near "the wellhead" or at "the inlet to the gathering system," and that DTE took title to the gas there. (*See, e.g.,* T. Neu 30(b)(6) 1/8/19 Dep. Tr. at 43:3–7 ("title was transferring from—at the wellhead into the gathering agreement"), 53:14–54:11 ("DTE always [took] title at the inlet to the gathering system"); Doc. 219 at ¶ 13 ("DTE acquired title at various Delivery Points . . . which was usually at or near the inlet to the local gathering system"); Reliance/DTE Transaction Confirmation dated December 1, 2011, Doc. 200-3, at 4 ("Contract

Summary" stating that Reliance "sells all production to DTE at the wellhead"); Doc. 201-1 at 18 (DTE/Carrizo Transaction Confirmation stating the Delivery Point would be at the meters into various gas gathering systems).)[3]

Per the terms of the NAESBs, DTE bore the full risk of loss when title transferred. (*See, e.g.*, Doc. 200-1, Ex. 4, at 6.) Plaintiffs contend this was not the case in practice, pointing to deposition testimony from DTE's 30(b)(6) representative explaining that DTE does not pay Carrizo or Reliance for gas that is "lost-and-unaccounted-for" and therefore not ultimately resold by DTE.[4]

After taking title, DTE "moved the gas downstream, and paid costs, if any, associated with transportation, gathering, dehydration, compression, and processing of the gas." (Doc. 194 at ¶ 12.) Because of the disputed characterization of these costs, the Court will refer to them as "TGDCP costs." DTE paid the TGDCP costs pursuant to contracts, at least some of

---

[3] The Court understands "at the wellhead" and "at the inlet to the gathering system" to be two sides of the same coin, as in, the gas exits the wellhead and enters the inlet to the gathering system. (*See* T. Neu 30(b)(6) 1/8/19 Dep. Tr. at 43:3–7.) Neither party has contended there is a meaningful difference between the two locations. The Court refers to the sale and transfer of title "at the wellhead" for convenience but acknowledges that it may be more accurately described as "at *or near* the wellhead."

[4] Thomas Neu of DTE testified,

Q. So if DTE takes title to 100 MMBtu's of gas at the inlet to the gathering system, and through either fuel or what's called lost-and-unaccounted-for gas, sells 90 MMBtu's in the market at $2 per MMBtu, how much is credited back to a producer like Carrizo or Reliance?
A. In your example, 90.
Q. The 90 units at $2?
A. Uh-huh.
Q. Not 100 units at $2?
A. Correct.

(T. Neu 30(b)(6) 1/8/19 Dep. Tr. at 56:13–22.)

which were negotiated directly by Carrizo and Reliance and thereafter assigned or released to DTE. (Doc. 195 at ¶¶ 14, 23.) The contracts were assigned or released to DTE on a "pre-arranged, non-biddable basis." (*See, e.g.,* DTE/Reliance Transaction Confirmation dated 12/1/11, Doc. 200-3, Ex. 6 at 2.)

DTE ultimately sold the gas to customers downstream. (Doc. 194 at ¶¶ 12–15.) Both Carrizo and Reliance communicated regularly with DTE about DTE's gas resales. Carrizo and Reliance discussed with DTE the quantities of gas DTE would sell, the locations at which DTE would sell, the price at which DTE would sell, and the timing of such sales. (*See* Doc. 216 at 24 n.19 (collecting examples of email communications between Carrizo, Reliance, and DTE).) DTE often sought, and Carrizo and Reliance provided, input on these topics. (*See id.*)

Plaintiffs and Defendants point to conflicting evidence regarding the extent to which DTE was required to act in accordance with Carrizo and Reliance's input. For example, the Transaction Confirmations provide that DTE would use "its sole discretion and judgment in determining the location, price and under what conditions it will resell Gas under this transaction on any Day, and such decisions shall be final and not subject to challenge" by Carrizo or Reliance. (*See, e.g.,* Reliance/DTE Transaction Confirmation dated December 1, 2011, Doc. 200-3, at 3.) But several Transaction Confirmations in the Record include a contradictory provision: A DTE/Carrizo Transaction Confirmation dated January 20, 2017, (Doc. 202-7) includes the "sole discretion" provision but also provides, "Buyer will only enter into resale gas transactions (including Term Gas Sales) *with the prior written consent of Seller*

which may be in the form of an Instant Message, email or fax transmission." (*Id.* at 2 (emphasis added).)[5] A DTE/Reliance Transaction Confirmation dated March 29, 2017, states the same. (Doc. 202-13, Ex. R.)

The Record indicates that the parties' course of dealing fell somewhere in between the obligations prescribed by the contradictory terms; Carrizo and Reliance exerted some degree of influence over some aspects of DTE's resales. Plaintiffs point to evidence suggesting Carrizo and Reliance controlled DTE's gas resales,[6] while Defendants proffer

---

[5] DTE's representative testified that this Transaction Confirmation represented an "exception" and "ordinarily . . . DTE did not, in fact, have to seek any sort of written consent with respect to a resale of gas that it had purchased from Carrizo or Reliance." (T. Neu 30(b)(6) 1/8/19 Dep. Tr. at 149:5–13.) He elaborated: "[Carrizo and Reliance] didn't ask us who to sell to. They were interested in the price, which I think it's their product so they're interested in hedging at times, but they did not dictate who we sold to and did not . . . ask us to determine who that was." (*Id.* at 150:4–9.)

However, Carrizo employee Alex Dunn testified otherwise:

> Q. So my question is: This language that refers to the prior written consent, were the parties doing that even before November 1, 2015, or was this a new procedure that was implemented at some point in time?
> A. Our procedures didn't – as far as communicating with DTE about resale transactions didn't change, as far as I remember, on or around November 1, 2015.
> Q. Okay. So to the extent that Carrizo was providing prior written consent to resale transactions after November of 2015, it was doing the same types of things prior to that date, to the best of your recollection, as well?
> A. Yeah.  I don't remember any drastic changes in how we communicated with DTE . . . as far as sales to DTE.

(A. Dunn 12/14/18 Dep. Tr. at 88:6–25.)

[6] (*See, e.g.,* Doc. 202-18, Ex. X (email from DTE to Carrizo and Reliance providing "Estimate of Netback for July 2, 2013" and asking, "Want to reduce production?"); Doc. 216-6, Ex. 6 (email from Carrizo to DTE describing volumes Carrizo wants DTE to sell for certain dates, with price targets and floors); Doc. 216-7, Ex. 7 (email from Carrizo to DTE describing Carrizo's "preference" to sell certain quantity for July–October at $2.20 or better); Doc. 216-8, Ex. 8 (email from DTE asking Reliance for their "targets on price" for a particular transaction); Doc. 216-9, Ex. 9 (email from Carrizo providing DTE and Reliance with "approved price floor spreadsheet for November 2014"); Doc. 216-11, Ex. 12 (DTE emails Carrizo asking for "guidance on the Ramapo pricing Carrizo finds acceptable for July baseload deals." Carrizo responds,

evidence that despite their input, DTE acted independently and was free to make its own decisions regarding the gas it bought from them.[7]

The Transaction Confirmations provide a formula to calculate the price DTE had to pay Carrizo and Reliance for their initial sale of gas to DTE at the wellhead. (*See, e.g.,* Doc. 201-1, DTE/Carrizo Transaction Confirmation dated October 30, 2014, at 2.) Under that formula, the wellhead sale price was not determined until after the second, downstream sale of gas by DTE to a third party. (*See id.*) Carrizo and Reliance were paid a "netback price": the amount DTE received from its downstream sales, less the TDGCP costs, and less DTE's per-unit fee.[8] (Doc. 190 at ¶ 15; Doc. 194 at ¶ 16.) The netback pricing method is common in the industry and is used to establish the value of the gas at the wellhead. (Doc. 190 at ¶ 16.)

---

"Please enter into the following baseload deals on behalf of Carrizo if available."); N. Kapoor 12/13/18 Dep. Tr. at 196:7–197:17, Doc. 216-14, Ex. 15 (In response to question asking whether DTE was asking for direction from Carrizo and Reliance in a specific email chain, Reliance executive explained that DTE was "asking our opinion that we want to get that crappy contract price or not, yes.").)

[7] For example, a Reliance executive testified,

A. . . . I will actively monitor what DTE is doing. That is my role, because my contract price is determined by what DTE sells ultimately in the market. So my contract price—to keep—keep my contract price as high as possible, I have to monitor what they are doing, and that is what my—I have been doing with DTE.
Q. Did you have the right to tell DTE not to sell gas below a certain price . . . to a third party?
A. I would suggest them, but *ultimate decision is theirs.* I would—I would tell them "This is my desire" because when somebody tells me—I am also active in the market. I know what the price is in the market. I will tell them "This is my desire, and this is the price." But ultimately, if they're not able to achieve it, it will be sold as per—per this day on the market, what they can do in the market.

(N. Kapoor 12/13/18 Dep. Tr. at 88:8–25 (emphasis added).)

[8] Plaintiffs and Reliance refer to this fee as "DTE's marketing fee," (Doc. 190 at ¶ 15; Doc. 195 at ¶ 23), while Carrizo describes the fee as "a set fee of a few cents per unit of gas." (Doc 194 at ¶ 15.)

DTE's per-unit fee represents the value that DTE adds to the gas between the point it takes title at the wellhead and the point it resells the gas to a third-party after transporting it downstream. (T. Neu 30(b)(6) 1/8/19 Dep. Tr. at 33:16–34:13.) The value of the fee "changed over time" and "depend[ed] on the [Transaction Confirmation.]" (*Id.* at 34:3–16.)

Carrizo and Reliance paid royalties to Plaintiffs, based on their respective shares of gas, as a percentage of the netback price, *i.e.,* the price DTE paid them. (Doc. 190 at ¶ 18; Doc. 194 at ¶ 19.) Carrizo and Reliance did not deduct additional costs from the netback price before calculating royalties. (D. Perry 1/31/19 Dep. Tr. at Ex. 7 at 138:24-140:8 ("Q. . . . During the time that you have been a senior accounting manager for Reliance, did you ever enter any deducts when calculating landowner royalties in Northeast PA? A. No."); M. Seewann 1/30/19 Dep. Tr. at 78:10–79:11 (explaining that lessors with and without lease provisions prohibiting post-production deductions would receive the same royalty from Carrizo "because if there's no deductions, the amount paid is the same"), 85:1–19 ("[I]f there's deductions we would have not charged the deducts. There's no deductions . . . [b]ecause the gas is sold right when it comes out at the wellhead, so there's nothing—cost to deduct, what would be an example of a cost to deduct."); Doc. 219, at ¶ 19 (Plaintiffs denying Reliance's statement that it "did not deduct any costs from royalties it paid" under the Class Leases but offering no evidence that Reliance deducted any costs); Doc. 218 at ¶ 10 (Plaintiffs denying

---

Carrizo's statement that it "paid royalties to royalty owners based on the amount it received from DTE" but offering no evidence that Carrizo deducted any costs.)

Neither Carrizo nor Reliance compared the netback price received from DTE (or Twin Eagles) to the NYMEX spot price or the local market price to determine which was highest. Rather, they always calculated royalties based on the netback price. (Doc. 195 at ¶ 34; Doc. 210 at ¶ 34; Doc. 213 at ¶ 34.)

### C. BKV Acquisition

BKV acquired Carrizo's and Reliance's interests in the Class Leases (among others) effective April 1, 2017. (BKV Stmt. of Facts, Doc. 196-2 at ¶ 5.) For one year, Carrizo continued to operate the wells, and Carrizo and Reliance continued to sell the gas to DTE. They did so on BKV's behalf, pursuant to Transition Services Agreements between BKV and Carrizo and Reliance, respectively, for production from April 2017 through spring 2018 (the "Transition Period"). (BKV/Carrizo Transition Services Agreement, Doc. 199-3, Ex. 5; BKV/Reliance Transition Services Agreement, Doc. 199-4, Ex. 6.) Carrizo and Reliance also calculated and paid Plaintiffs' royalties on BKV's behalf through May 2018.[9] (Doc. 195 at ¶ 26.) Carrizo and Reliance calculated royalties in the same manner during the Transition Period as they had previously. (Doc. 196-2 at ¶ 8.) The Transition Period ended on June 1,

---

[9] Because royalty payment lagged behind gas production, Carrizo and Reliance managed gas production and sales through March 2018 but calculated and paid royalties through May 2018. (Doc. 210 at ¶ 26.)

2018, when BKV took over as operator and assumed the responsibility of selling the gas and calculating and remitting Plaintiffs' royalties. (*Id.* at ¶ 9.)

BKV terminated the agreements with DTE and arranged to sell all gas produced under the Class Leases to Concord Energy, LLC ("Concord"). (*Id.* at ¶ 10.) BKV and Concord entered into a Gas Marketing Agreement ("GMA") pursuant to which BKV's subsequent gas sales to Concord would be governed by an NAESB standard form base contract and Transaction Confirmations.[10] (*See* Doc. 202-1, Ex. B.)  BKV and Concord have no parent or subsidiary relationship or common corporate ownership. (Doc. 196-2 at ¶ 15; Doc. 217 at ¶ 15.)

The transactions between BKV and Concord mirror those between DTE, Carrizo, and Reliance. Like DTE, Concord purchased gas from BKV at or near the wellhead. (*See* BKV/Concord Gas Marketing Agreement (the "GMA"), Doc. 193-2, Ex. B. at § 3(a) ("[BKV] hereby agrees to deliver to Concord 100% of the Production at the Pipeline Receipt Points, and Concord shall accept and purchase all of the Production at the Pipeline Receipt Points, . . . [and] 'Pipeline Receipt Points' shall mean the inlet flange (or meter, as applicable) of the first segment of pipeline through which the relevant Production passes.")

The BKV/Concord NAESB also provides that the risk of loss transfers to Concord with title. (Doc. 196–3, Exs. 10–11.) Again, Plaintiffs dispute this, stating "the [GMA] renders any

---

[10] The substance of the terms of all three NAESBs in this case appear to be consistent.

such transfer illusory and of no effect [because] no money is ow[ed] by Concord to BKV unless and until a resale occurs." (Doc. 217 at ¶ 20 (citing GMA at ¶¶ 3–4).)

However, BKV calculates Plaintiffs' royalties differently than Reliance and Carrizo did. As DTE did, "Concord paid BKV the amount it received from all of Concord's downstream sales to third parties, less Concord's costs (the gathering and transportation costs Concord incurred after it purchased BKV's gas), and less Concord's marketing fee." (Doc. 196 at ¶ 22.) So just as Carrizo and Reliance were paid a price reflecting DTE's deductions, BKV is paid a price reflecting Concord's deductions. But BKV adds back Concord's deductions for purposes of calculating the royalties owed to No Deductions Class Plaintiffs. (*Id.* at ¶¶ 25–26.) In other words, for "royalty owners whose leases have a provision prohibiting the deduction of post-production costs (*i.e.*, members of the No Deductions Class)," "[t]he price BKV bases royalty payments on is not the price it receives from Concord, but equivalent to the higher prices Concord receives" from its sales downstream.[11] (*Id.* at ¶ 26; Doc. 195 at ¶ 40; Reliance Response to Pls. Stmt. of Facts, Doc. 210 at ¶ 40.)

BKV also does not deduct any of its own costs from the amount it receives from Concord and on which it bases Plaintiffs' royalties. (Doc. 196-2 at ¶ 27; Doc. 217 at ¶ 27.)

_____

[11] Plaintiffs aver that "in some instances" BKV improperly deducted costs from the price on which it based its royalty payments to No Deductions Class Plaintiffs, but do not dispute that BKV generally calculates royalties in the manner described above. (Pls. Counterstatement of Facts in Response to BKV, Doc. 217 at ¶ 26.)

Like Carrizo and Reliance, BKV does not conduct any price comparison under the Highest Price Provision and never referenced the NYMEX spot price or otherwise engaged in any valuation analysis under the Highest Price Provision when calculating royalty amounts. (Doc. 195 at ¶ 41.) BKV always bases its royalty payments to No Deductions Class Plaintiffs on the price Concord receives from its downstream sales.

### III. PROCEDURAL HISTORY

On October 3, 2016, Plaintiff James Slamon filed a Complaint against Defendants Carrizo and Reliance in the Susquehanna County Court of Common Pleas. (Doc. 1, 9–31.) Slamon alleges Carrizo and Reliance underpaid royalties on oil and gas leases to him and a class exceeding one hundred members. (*See, e.g., id*. at 10–11.) Defendants thereafter removed the case to this Court on October 31, 2016. (*See* Doc. 1.)

In late-2016, Carrizo and Reliance moved to dismiss Plaintiff's Complaint under Federal Rule of Civil Procedure 12(b)(6). (Defs. Mot. Dismiss, Docs. 15, 17.) On September 5, 2017, this Court dismissed Plaintiff's breach of fiduciary duty claim in Count IV of the Complaint with prejudice and denied the motions to dismiss in all other respects. (*See* Doc. 31.)

On June 15, 2018, Plaintiff joined BKV as a Defendant. (Doc. 46.) On June 18, 2018, Plaintiff filed a First Amended Complaint against all Defendants. (Doc. 47.)

On August 19, 2019, Plaintiff moved to substitute a proper party following the death of James Slamon. (Doc. 100.) The Executrix of James Slamon's Estate, Janie Slamon, was

substituted as a proper party on August 22, 2019. (Doc. 103.) On September 9, 2019, Plaintiffs filed a Second Amended Complaint against all Defendants (Doc. 107) which named Eric Lewis as an additional plaintiff and proposed class representative. Defendants Carrizo and Reliance filed Answers to the Second Amended Complaint (Docs. 109, 110) and Defendant BKV filed an Answer as well as crossclaims against Defendants Carrizo and Reliance. (Doc. 111.)

Plaintiffs' Second Amended Complaint seeks declaratory relief with respect to the proper interpretation of the Leases and the royalty provisions therein (Count I), damages for breach of contract, (Count II), damages for breach of contract through a breach of the implied duty of good faith and fair dealing (Count III), and an accounting (Count IV).

On July 15, 2019, Plaintiffs moved to certify three classes of plaintiffs. (Pls.' Mot. Certify Class, Doc. 96).

On May 18, 2020, this Court certified two classes of plaintiffs pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3). (*See* Doc. 158.) First, the Court certified the "Highest Price Class":

> All persons or entities within the Commonwealth who are, or have been, a royalty owner under a Paid Up Oil and Gas Lease with or assigned to one or more of Defendants where that lease expressly provides that the value of natural gas on which lessee owes a royalty percentage is, absent application of a contractual proviso, the greater of the NYMEX spot price and/or the prevailing local market price, or the price at which the gas is sold, and where (a) natural gas has been produced under the lease, (b) the person or entity has received one or more royalty payments under the lease, and (c) the person or entity has not released their claims in this matter.

(*Id.* at 2.) And second, the "No Deductions Class":

> All persons or entities within the Commonwealth who are, or have been, a royalty owner under a Paid Up Oil and Gas Lease with or assigned to one or more of Defendants where that lease expressly prohibits the deduction of post-production expenses when calculating royalty amounts due, and where (a) natural gas has been produced under the lease, (b) the person or entity has received one or more royalty payments under the lease, and (c) the person or entity has not released their claims in this matter.

(*Id.* at 1–2.) The Court clarified that the claims certified for class action are "Count II for breach of contract against all Defendants brought on behalf of the 'No Deductions Class' and 'Highest Price Class'" and "Count IV requesting an accounting against all Defendants brought on behalf of the 'No Deductions Class' and 'Highest Price Class.'" (*Id.* at 3.) The Court declined to certify a class with respect to Plaintiffs' claim for breach of the implied duty of good faith and fair dealing.[12]

The Court identified the common issues and defenses subject to class treatment as follows:

a. With respect to the "No Deductions Class" the common issues are: (1) whether Defendants' royalty calculation method deducted post production costs from the royalties paid to lessors, and (2) if so, whether the deduction of post production costs violated a prohibition against such deductions in the lease.

b. With respect to the "Highest Price" Class, the common issue is whether the Defendants compared the NYMEX spot price or local market price to the price received in order to pay lessors the highest of these prices.

c. Both classes must also determine the common issue of whether the transactions between Defendants and DTE or Twin Eagle were, in fact, arms-

---

[12] The named Plaintiffs retain this claim in their individual capacities.

length sale transactions with unaffiliated third parties subject to the contractual
proviso pursuant to which the royalty the lessor receives for the gas production
is a percentage of the price paid to the lessee.

(*Id.* at 3–4.)

The issues have been fully briefed and all motions are ripe for disposition.

## IV. STANDARD OF REVIEW

Summary judgment is appropriate "only where there is no genuine issue of material
fact and the moving party is entitled to judgment as a matter of law." *Gonzalez v. AMR*, 549
F.3d 219, 223 (3d Cir. 2008). "An issue is genuine only if there is a sufficient evidentiary basis
on which a reasonable jury could find for the non-moving party, and a factual dispute is
material only if it might affect the outcome of the suit under governing law." *Kaucher v. Cnty
of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S.
242, 248 (1986)). Thus, through summary adjudication, the court may dispose of those claims
that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).

The party moving for summary judgment bears the burden of showing the absence of
a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.
Ct. 2548, 91 L. Ed.2d 265 (1986). Once such a showing has been made, the non-moving
party must offer specific facts contradicting those averred by the movant to establish a
genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct.
3177, 111 L. Ed.2d 695 (1990). Therefore, the non-moving party may not oppose summary
judgment simply on the basis of the pleadings, or on conclusory statements that a factual

issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot product admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied,* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed.2d 659 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable juror could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.
>
> *Id.* (internal quotations, citations, and alterations omitted).

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of evidence." *Anderson*, 477 U.S. at 255. Therefore, when evidentiary facts are in dispute, when the credibility of witnesses may be in issue, or when conflicting evidence must be weighed, a full trial is usually necessary.

A district court "should consider cross-motions for summary judgment separately and apply the burden of production to each motion."[13] *Beenick v. LeFebvre*, 684 F. App'x 200, 205 (3d Cir. 2017) (not precedential) (citing *Lawrence*, 527 F.3d at 310). "If upon review of cross motions for summary judgment [the court] find[s] no genuine dispute over material facts, then [the court] will order judgment to be entered in favor of the party deserving judgment in light of the law and undisputed facts." *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302 (3d Cir. 1998) (citing *Ciarlante v. Brown & Williamson Tobacco Corp.*, 143 F.3d 139, 145–46 (3d Cir. 1998)).

## V. ANALYSIS

---

[13] *Beenick* further explains,

[the plaintiff] argues that the District Court failed to apply the correct standard on cross-motions for summary judgment because it did not fully consider his motion for partial summary judgment. Beenick is correct that a District Court should consider cross-motions for summary judgment separately and apply the appropriate burden of production to each motion. *See Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008). The District Court did not violate this rule because it did not consider the cross-motions simultaneously. Rather, it addressed Defendants' motion for summary judgment first. By proceeding with Defendants' motion first, the District Court viewed the evidence in the light most favorable to Beenick and concluded that Defendants were entitled to summary judgment on all of his claims. That conclusion ended the case and mooted any need to consider Beenick's cross-motion for partial summary judgment.

*Beenick v. LeFebvre*, 684 F. App'x 200, 205–06 (3d Cir. 2017).

Because Defendants Carrizo and Reliance present summary judgment arguments that are substantively the same, and because the Court identifies no meaningful differences in their performance under the Class Leases, the Court first considers their motions together. The Record reflects that BKV's performance differed from that of Carrizo and Reliance in some respects, and so the Court considers its motion separately. Finally, the Court considers Plaintiffs' partial motion.

### A. Motions for Summary Judgment: Carrizo and Reliance

Carrizo and Reliance each seek summary judgment on all claims asserted against them: a breach of contract claim by the Highest Price Class, a breach of contract claim by the No Deductions Class, a breach of the implied duty of good faith and fair dealing claim by the named Plaintiffs in their individual capacities, and a demand for an accounting.[14]

Complex though it may be, this is a case of contract interpretation. Under Pennsylvania law, the general principles of contract interpretation govern oil and gas leases. *T.W. Phillips Gas & Oil Co. v. Jedlicka*, 615 Pa. 199, 42 A.3d 261, 267 (2012) (citation omitted). "When interpreting a contract, a court must determine the intent of the parties and effect must be given to all provisions in the contract." *Krizovensky v. Krizovensky*, 624 A.2d 638, 642 (Pa. Super. Ct. 1993). "It is firmly settled that the intent of the parties to a written contract is contained in the writing itself." *Id.* "While unambiguous contracts are interpreted by the court

---

[14] In this Section, references to "Defendants" refer only to Carrizo and Reliance, not to BKV, unless otherwise noted.

as a matter of law, ambiguous writings are interpreted by the finder of fact." *Kripp v. Kripp*,

849 A.2d 1159, 1163 (Pa. 2004).

## 1. Highest Price

With these principles in mind, the Court turns to the first terms at issue, in the "Highest

Price" provision. The crux of the matter is the proper value on which Defendants must base

Plaintiffs' percentage-based royalties, or stated differently, the proper method for determining

that value. The Slamon Lease, substantively representative of all the Class Leases, has a

Valuation term that provides:

> [4](f) Valuation: The value of oil, gas, or other hydrocarbon production shall be
> determined on the basis of the greater of (i) the prevailing local market price at
> the time of sale or use, or, NYMEX spot price as published at the time of sale,
> whichever is greater, or (ii) the price paid to Lessee from the sale or use of the
> gas, including proceeds and any other thing of value received by Lessee;
> provided, however, that when gas production is sold in an arms-length sale
> transaction with an unaffiliated third party, the value of such gas production
> shall be the price paid to Lessee.

(Doc. 193-4, at 3.)

The difference in how the parties interpret this provision concerns the clause:

"provided, however, that when gas production is sold in an arms-length sale transaction with

an unaffiliated third party, the value of such gas production shall be the price paid to Lessee"

(the "Provided Clause").[15] (*Id.*) At earlier stages in this litigation, Plaintiffs cited the "last

antecedent rule" and argued the Provided Clause was properly read to modify only the

---

[15] Although the parties and the Court have previously referred to this clause as the "proviso," the
Court avoids that label in this opinion because of the parties' dispute as to whether the label carries legal
implications. *See infra* at 24–25.

"immediately preceding section, subsection (ii), of section 4(f)." (Doc. 30 at 7.) Read that way, they argued, the gas must be "valued at 'the greater of (i) the prevailing local market price at the time of sale or use, or, NYMEX spot price as published at the time of sale, whichever is greater, or (ii)' the sale price Defendants received from the third party." (Doc. 30 at 4.) In other words, under Plaintiffs' interpretation, Defendants always had to compare three values and pay royalties based on the highest.

Carrizo and Reliance contended, and still contend, that the valuation option in the Provided Clause is not subject to the "greater of" comparison. They argue that

> because th[e] proviso is separated from the rest of the provision by a semicolon, according to the rules of grammar and statutory construction, the proviso modifies the entire provision. Thus, according to Defendants, if they sell gas in an arms-length transaction with an unaffiliated third party, only the proviso is controlling and the gas is valued at the sale price Defendants received from the third party.

(*Id.*)

Faced with these arguments at the motion to dismiss stage, this Court held that "the provision at issue [was] susceptible to multiple reasonable interpretations." (Doc. 30 at 7.) At the present stage, however, Plaintiffs do not make the same argument. They argue solely that the Provided Clause does not apply and do not address how the Highest Price Provision should be read if it does.[16] As such, the Court adopts Defendants' interpretation because it is

---

[16] Plaintiffs devote no space in their brief to challenge Defendants' proposed construction. In response to Defendants' attacks on their previously-asserted "last antecedent" argument, Plaintiffs aver,

Nothing in Plaintiffs' and the Classes' summary judgment motion, or in their opposition to Defendants' motions, is dependent upon (or even affected by) the "last antecedent rule."

faithful to the words of the governing text, and "what these words convey, in their context, is what the text means." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*, 56 (1st ed. 2011).

The question, therefore, is whether the Provided Clause applies, thereby relieving Defendants of the obligation to choose between the higher of the local market price, the NYMEX spot price, and the sale price, to determine the value on which to base royalties. If the Provided Clause does not apply, Defendants breached the Class Leases if they failed to base royalties on the highest of the three prices. If it does apply, Defendants properly valued the gas using the actual price received.

### a. Burden to Establish Breach

Each side argues the other bears the burden of establishing whether the Provided Clause applies. The court in *Tennant v. Range Resources – Appalachia, LLC* outlined the burden for proving breach of a royalty term in a lease:

> [A] plaintiff asserting a breach of contract claim bears the burden of proof concerning the elements of his claim and must establish them by a preponderance of evidence. *Bohler–Uddeholm Am., Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 102 (3d Cir. 2001) (applying Pennsylvania law); *see In re Estate of Dixon*, 426 Pa. 561, 233 A.2d 242, 244 (1967) ("In any contract action,

_____

Regardless of whether the Proviso limits a portion of the preceding language in Paragraphs 4(b) (ii) and 4(f) or their entirety, the Proviso creates an exception to the requirements for royalty payments and valuation. Therefore, Defendants bear the burden of proving the necessary conditions for application of the Proviso and they are unable to satisfy that burden[.]

(Doc. 216 at 10.) But no matter who bears the burden of proving its application, Plaintiffs' position is accurate only if the Court determines the Provided Clause does not apply. As such, the Court reads their brief as abandoning the "last antecedent" argument in the event that the Provided Clause does apply.

. . . the claimant bears the burden of proving the terms of the contract."); *Snyder v. Gravell*, 446 Pa. Super. 124, 666 A.2d 341, 343 (1995) ("[T]he party having the burden of proof in a contract matter must sustain it by a preponderance of the evidence."); 23 Williston on Contracts § 63:14 (4th ed.) ("The plaintiff or party alleging the breach has the burden of proof on all of its breach of contract claims."). A leading gas and oil treatise confirms that the burden remains the same in disputes involving royalty payments:

> In the event of dispute between a royalty owner or other nonoperator and an operator concerning payments due the nonoperator, information pertaining to "price," "value," or "proceeds" of the nonoperator's share of production may be more readily available to the operator than to the nonoperator. Nevertheless, by the weight of authority, the lessor or other nonoperating owner has the burden of proof as to such matter.

3 Williams & Meyers, Oil and Gas Law § 650.3 (2020) (citations omitted).

561 F. Supp. 3d 522, 533 (W.D. Pa. 2021), *reconsideration denied*, No. CV 18-1533, 2021 WL 5040421 (W.D. Pa. Oct. 29, 2021).

Notwithstanding the general rule, Plaintiffs argue that because "Defendants attempt to justify their material breaches of the Class Leases by relying on an exculpatory proviso," its application is akin to an "affirmative defense or condition subsequent on which the defendant bears the burden of proof." (*See* Doc. 193 at 24–25 (first citing *Ebbert v. DaimlerChrysler Corp.*, 319 F.3d 103, 108 (3d Cir. 2003); and then citing *Williams v. Runyon*, 130 F.3d 568, 573 (3d Cir. 1997)).) Plaintiffs cite *Meacham v. Knolls Atomic Power Laboratory* for the "familiar principle that '[w]hen a proviso . . . carves an exception out of the body of a statute or contract those who set up such exception must prove it.'" 554 U.S. 84, 91, 128 S. Ct. 2395,

2400, 171 L. Ed. 2d 283 (2008) (quoting *Javierre v. Central Altagracia*, 217 U.S. 502, 508, 30 S. Ct. 598, 54 L. Ed. 859 (1910)).

Defendants counter that the Provided Clause is not in fact exculpatory and therefore Plaintiffs bear the burden of proving it does not apply. Defendants concede that they would bear the burden of proving the application of a term that acted as an affirmative defense to liability, or excused them of the obligation to perform. (*See* Doc. 224 at 3–4.) But that is not the case here. Indeed, if the Provided Clause applies, it does not relieve Defendants of the duty to perform. Defendants still must calculate and pay royalties, just based on a different (though perhaps lesser) value. As Defendants note, Plaintiffs cite nothing putting the burden on a defendant in that scenario. (*See* Doc. 214 at 11–13.) Instead, Plaintiffs' authority establishes only the general rule that a plaintiff bears the burden of proving an affirmative defense. *See, e.g., Meacham*, 554 U.S. at 91; *Ebbert*, 319 F.3d at 108.

Because a defendant bears the burden of proof only when he seeks excusal of the obligation to perform and the Provided Clause does not excuse performance, it is Plaintiffs' ultimate burden to prove it does not apply. *Cf. Walney v. SWEPI LP*, 596 F. Supp. 3d 544, 556 (W.D. Pa. 2022) (party seeking to be "excused from payment" has the burden of proof); *Sentry Paint Techs., Inc. v. Topth, Inc.*, No. CIV.A.08-1064, 2008 WL 4787579, at *8 (E.D. Pa. Oct. 31, 2008) ("Under Pennsylvania law, the 'existence of the condition subsequent which can be invoked as justifying the *termination of a contract* must be proved by the terminating party.'" (emphasis added)). Plaintiffs bear the burden of proving the terms of the

contract (in other words, which terms apply) and the breach of those terms.[17] This is confirmed by the general rule in the oil and gas industry: that a lessor bears the burden of proof in a royalty dispute. *See Tennant,* 561 F. Supp. 3d at 533 (citing 3 Williams & Meyers, Oil and Gas Law § 650.3).

### b. Interpretation of Unambiguous Terms

Turning to the interpretation of the Highest Price Provision, the first question is whether the terms at issue are ambiguous or unambiguous. "To be 'unambiguous,' a contract clause must be reasonably capable of only one construction." *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.,* 119 F.3d 1070, 1074 (3d Cir. 1997). On the other hand, "[a] contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Hutchison v. Sunbeam Coal Corp.,* 519 A.2d 385, 390 (Pa. 1986). When— and only when—a court determines as a matter of law that an ambiguity exists, "parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is patent, created by the language of the instrument, or latent, created by extrinsic or collateral circumstances." *Kripp,* 849 A.2d at 1163.

The Provided Clause reads: "provided, however, that when gas production is sold in an arms-length sale transaction with an unaffiliated third party, the value of such gas production shall be the price paid to Lessee." (Doc. 96-3, at 3.) Neither of the key terms,

---

[17] It is Plaintiffs' ultimate burden, to be considered through the lens of the summary judgment burden, which is on the moving party. *See Celotex Corp.,* 477 U.S. at 323.

"arms-length sale transaction" nor "unaffiliated," are defined by the Class Leases. Carrizo, Reliance, and Plaintiffs all argue the terms are unambiguous, but each side urges the Court to define the terms differently. Such disagreement is not dispositive; a contract is not rendered ambiguous merely because the parties dispute its proper construction. *Teffeteller v. Teffeteller*, 258 A.3d 508 (Pa. Super. Ct. 2021) (quoting *Metzger v. Clifford Realty Corp.*, 476 A.2d 1, 5 (Pa. Super. 1984)), *rearg. denied,* (Aug. 16, 2021).

The Court finds the terms are indeed unambiguous as a matter of law. Though undefined, each term is a "legal concept ubiquitous in business transactions." *Fed. Deposit Ins. Corp. v. Murex LLC*, 500 F. Supp. 3d 76, 106 (S.D.N.Y. 2020); *see also U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 200 L. Ed. 2d 218, 138 S. Ct. 960, 967–68 (2018) (citing Black's Law Dictionary and describing an "arm's length transaction" as having a "widely (universally?) understood definition"). No party presents evidence that the terms should be understood outside of their ordinary meanings because of circumstances not clear from the face of the Leases. Instead, Plaintiffs proffer definitions courts have applied in different legal and factual contexts, while Defendants consult dictionary definitions.

Defendants' position is better supported by Pennsylvania law. "If left undefined, the words of a contract are to be given their ordinary meaning." *Kripp*, 849 A.2d at 1163. Pennsylvania courts may consult dictionary definitions to determine the "ordinary meaning" of a term. *True R.R. Assocs., L.P. v. Ames True Temper, Inc.*, 152 A.3d 324, 339 (Pa. Super.

2016) (quoting *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 557 Pa. 595, 608 (1999)) (a court "may inform [its] understanding of [contractual] terms by considering their dictionary definitions"). Moreover, a term's regular use in a given industry is relevant:

> [C]ustom in the industry or usage in the trade is always relevant and admissible in construing commercial contracts and does not depend on any obvious ambiguity in the words of the contract. If words have a special meaning or usage in a particular industry, then members of that industry are presumed to use the words in that special way, whatever the words mean in common usage and regardless of whether there appears to be any ambiguity in the words.

*Dressler Fam., LP v. PennEnergy Res., LLC*, 276 A.3d 729, 736 (Pa. Super. Ct. 2022), *rearg. denied* (July 6, 2022).

With this in mind, the Court applies several similar dictionary definitions of "arm's length" and "affiliate," while also considering how the terms are used in the trade. Black's Law Dictionary defines "arm's length":  "Of, relating to, or involving dealings between two parties who are not related or not on close terms and who are presumed to have roughly equal bargaining power; not involving a confidential relationship." *Arm's-Length*, Black's Law Dictionary (11th ed. 2019). It also defines "arm's-length transaction": "1. A transaction between two unrelated and unaffiliated parties. 2. A transaction between two parties, however closely related they may be, conducted as if the parties were strangers, so that no conflict of interest arises." *Transaction*, Black's Law Dictionary (11th ed. 2019).

The Court also considers a definition used in regulations promulgated pursuant to the Federal Oil and Gas Royalty Management Act, 30 U.S.C. § 1701(a)(2), by a predecessor agency to what is now the Office of Natural Resources Revenue ("ONRR"). The ONRR

regulations govern oil and gas leases to which the United States is subject as the lessor of federal lands. The regulations provide: "Arm's-length contract means a contract or agreement between independent persons who are not affiliates and who have opposing economic interests regarding that contract." 30 C.F.R. § 206.151. While the ONRR regulations do not govern this dispute, they inform the Court's understanding of the term's usage in the trade.

The concept of "unaffiliated" is incorporated in most of the aforementioned "arms-length" definitions and also separately required by the Provided Clause. Black's Law Dictionary defines "affiliate": "A corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation." *Affiliate*, Black's Law Dictionary (11th ed. 2019). The ONRR regulations define "affiliate" in pertinent part: "a person who controls, is controlled by, or is under common control with another person." 30 C.F.R. § 206.151.

The DTE/Reliance and BKV/Concord NAESBs also defines "affiliate" as

in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person." For this purpose, "control" of any entity or person means ownership of at least 50 percent of the voting power of the entity or person.

(Doc. 202-12 at 3; Doc. 199-5 at 4; Doc. 199-6 at 4.) While this definition does not govern the Class Leases, it is useful evidence of the term's understanding in the industry.

### c. Application of Terms

Defendants have shown they are entitled to summary judgment on this claim because "Plaintiffs have not and cannot adduce any evidence that Carrizo [and Reliance] did not sell gas to DTE in arm's-length transactions." (Doc. 197 at 17.) The parties expressly agree on many of the material facts. For one, all parties acknowledge that Carrizo and DTE, and Reliance and DTE, respectively, are separate business entities with no parent or subsidiary relationship or common ownership. (*See* Doc. 190 at ¶ 10; Doc. 194 at ¶ 9; Doc. 206 at ¶ 10; Doc. 218 at ¶ 9.) They are not "related . . . by shareholdings." *See Affiliate*, Black's Law Dictionary. And they are not "under common control," 30 C.F.R. § 206.151, nor does one party own any "voting power" in another. (Doc. 202-12 at 3.) There is no question they are not corporate affiliates in the traditional sense and meaning of the term.

Because of the extent to which the "arm's-length" definitions overlap with the concept of "unaffiliated" and hinge on a relationship with an "unaffiliated" party, this undisputed fact might appear to resolve the "arm's-length" question, too. But Plaintiffs seem to argue that despite the absence of any formal corporate affiliation, Defendants exercised control over DTE so as to render their transaction less than arm's-length. Inexplicably, Plaintiffs offered no interpretation of how they believe the aforementioned dictionary definitions should apply to the facts at hand, nor any argument as to why (or even whether) they are entitled to a ruling in their favor under these definitions. Nonetheless, the Court acknowledges that several of the definitions leave room for a non-arm's-length transaction to exist between parties without a formal parent/subsidiary relationship. For example, Carrizo and Reliance could have

established an affiliation by exerting "other means of control" over DTE. *Affiliate*, Black's Law Dictionary. Or, they could have established a relation by controlling DTE, thereby rendering each transaction one not "between two unrelated and unaffiliated parties," *Transaction*, Black's Law Dictionary, or one not "between two parties who are not related or not on close terms." *Arm's-Length*, Black's Law Dictionary.

To be clear, Plaintiffs offer no relevant authority recognizing an affiliate relationship formed by "other means of control," nor any case finding a non-arm's-length transaction between two parties who are without some formal corporate relation. Still, the Court considers their argument that "Defendants continued to control the gas post-sale," and relatedly that "the parties internally used language inconsistent with arm's length transactions." (Doc. 205 at 12.)

### *i. Post-Sale Control*

Plaintiffs identify two means by which Defendants exerted control over DTE after the gas was sold.[18] First, Plaintiffs emphasize the undisputed fact that Carrizo and Reliance, not DTE, negotiated the midstream gathering and transportation contracts pursuant to which DTE

---

[18] Plaintiffs contend generally that an "arm's length sale transaction between unaffiliated parties" requires "the seller [to] relinquish[] control over the asset." (*See* Doc. 216 at 20 (citing *Northwest Hospital, Inc. v. Hospital Service Corp.*, 500 F. Supp. 1294, 1297 (N.D. Ill. 1980)).) They suggest the evidence discussed in this section proves that control was not relinquished. But Plaintiffs' evidence does not create a dispute of fact under the governing law. That "a bona fide 'arm's length' sale for *Medicare regulatory purposes* requires 'bargaining between distinct and unrelated buyer and seller entities' that 'result[s] in a change in the actual control of the assets'" has little bearing on the oil and gas leases at issue. (Doc. 216 at 20 (quoting *Northwest Hospital, Inc.*, 500 F. Supp. at 1297) (emphasis added).) The term's use in the Medicare regulatory context sheds little light on its ordinary meaning or its usage in the oil and gas trade.

   Instead, the Court considers this evidence under the dictionary definitions discussed *supra*, at 27–29.

paid the TGDCP costs. (*See* Doc. 216 at 20–21.) But Plaintiffs cite no authority suggesting that Defendants' assignment of TDGCP contracts to DTE is evidence of Defendants' control over DTE. As Carrizo notes, "by the time any gas was flowing to those pipelines, the rights and duties were DTE's, not Carrizo's." (Doc. 224 at 7 n.12 (citing J. Pritts 1/23/19 Dep. Tr. at 70–72, Doc. 224-17, Ex. 17).) Plaintiffs note further that Transaction Confirmations provided the TDGCP costs incurred pursuant to those contracts were "to be for the account of seller." (Docs. 202-7, 202-13.) But again, Plaintiffs cite no authority stating that such language indicates control; rather, the assignment of specific costs to a particular gas producer for accounting and pricing purposes is presumably necessary to determine the netback price,[19] an element of the transaction that Plaintiffs do not challenge. (*See* Doc. 226 at 8 ("Plaintiffs are not advancing any 'collateral challenge to the net-back pricing formula.'").)

Second, Plaintiffs argue that "Defendants directly participated in and effectively controlled Concord's and DTE's daily decisions over gas resales, including the location, price, and quantity of such sales." (Doc. 216 at 22.) Plaintiffs point to numerous emails and deposition testimony indicating that employees of Carrizo and Reliance regularly provided input regarding these aspects of DTE's downstream resales, after DTE had taken title to the

---

[19] *See Anderson Living Tr. v. Energen Res. Corp.*, 886 F.3d 826, 832–33 (10th Cir. 2018) ("Properly understood, the netback method is not a means of cost-shifting; it is a means of determining the net profit on the oil and gas by 'netting' the gross profit. The post-production expenses are not subtracted from the sales amount because the royalty owners are responsible for post-production expenses; they are subtracted as an accounting mechanism to determine the market value at the wellhead.")

gas.[20] Defendants counter with testimony that DTE was not obligated to follow their direction.[21]

Further, Plaintiffs point to two Transaction Confirmations that expressly provide DTE "will only enter into resale gas transactions . . . *with the prior written consent of Seller.*" (Doc. 216 at 23 (emphasis in brief) (citing Carrizo/DTE Transaction Confirmation dated 1/20/17, Doc. 193-11, Ex. K, and Reliance/DTE Transaction Confirmation dated 3/29/17, Doc. 202-13, Ex. R.) Defendants counter that the same Transaction Confirmations provide DTE with the "sole discretion" to carry out the resales. (*See id.*)

While the parties characterize the relationships differently, the Record is clear that DTE and Defendants consulted each other regarding factors affecting the price at which DTE resold the gas but did not dictate to whom the gas was resold. As DTE Vice President Thomas Neu testified on behalf of DTE,

> Q. Okay. Carrizo would not dictate to DTE the counterparty—
> A. Correct.
> Q. —of the resale transaction, correct?
> A. Correct.
> Q. Could Carrizo, however, through hedging targets or otherwise, dictate to DTE the price at which a resale transaction took place?
> A. We would not—if you want to call it hedge or term sale—we wouldn't—we wouldn't do it unless they were okay with the price.
> Q. And was that true for the entire relationship with Carrizo . . . , including prior to January of 2017?
> A. Yes.

(T. Neu 30(b)(6) 1/8/19 Dep. Tr. at 129:9–23.)

---

[20] *See supra* note 6.

[21] *See supra* note 7.

Nonetheless, this control and any dispute over its extent are immaterial. Plaintiffs'

focus on post-sale control is misplaced, because the Court's "arm's-length" analysis is

properly focused on the negotiation process leading to the parties' agreement and the parties'

relationship during that process—not the outcome of the process, *i.e.* the terms under which

the parties operate. *See, e.g., Schoenbaum v. Firstbrook*, 405 F.2d 215, 219 (2d Cir. 1968)

(dismissing securities fraud claim and finding that negotiations for the purchase of stock "were

arm's length negotiations" when there was no evidence that defendant withheld information,

was in a position to influence plaintiff's judgment, or was otherwise able to pressure plaintiff

to sell stock at a price below its true value); *In re Luxottica Grp. S.p.A. Sec. Litig.,* 233 F.R.D.

306, 315–16 (E.D.N.Y. 2006) (analyzing whether settlement was achieved through "arm's

length negotiations" by considering the parties that participated, the steps taken, and the

information considered by the parties); *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d

106, 114 (Del. 2006) (finding broker-customer relationship was an arm's-length business

relationship by considering whether the parties' interests were aligned, whether one party

exerted control or domination over the other, and whether there was evidence of self-dealing);

Arms length transactions, 2 Bromberg & Lowenfels on Securities Fraud § 4:143 (2d ed.) ("In

an arms length transaction, unfair terms (or inadequate consideration) do not alone—i.e.

without misrepresentation, nondisclosure or something similar—create a violation."). For

Defendants to render the transaction less than arm's-length by the exercise of "other means

of control," the Record would have to show that Defendants exerted such control *when the agreements with DTE were negotiated*.

Plaintiffs have produced no evidence putting the negotiations themselves into question. As Defendants argue, "there is no evidence that either [Carrizo, Reliance, or DTE] were compelled to enter into their relationship[s]." (Doc. 197 at 18; Doc. 189 at 16.) Nor is there evidence of unequal bargaining power or self-dealing. The Record suggests the transactions were negotiated between willing sellers and a willing buyer, each acting with their own interests in mind. For example:

> Q. So there's a value to [DTE] when DTE sells the gas at the market; is that correct? Or are you referring to value provided by DTE to—
> A. I'm—
> Q. —the producer?
> A. No. I'm saying [DTE] doesn't do services for free, and so, when we look at transactions, there's some value to us. We're either able to buy the gas at a level that allows for some margin, or there's a component of the deal that provides us some value.

(T. Neu 30(b)(6) 1/8/19 Dep. Tr. at 33:5–18.)

Instead, Plaintiffs' argument boils down to a veiled attack on the terms that Defendants and DTE negotiated at arm's-length. The evidence they highlight, including that of Defendants' role in at least influencing, at most directing DTE regarding aspects of its resales affecting price, reflects the terms and conditions that Defendants and DTE bargained for and agreed upon, as memorialized in the NAESBs.[22] This is not evidence that puts the arm's-

---

[22] Plaintiffs fail to acknowledge that a contract, negotiated at arm's-length, may result in the relinquishment of control that a party was otherwise entitled to exercise; in fact, it is a basic principle of contract law that a party may contract away his rights. *See, e.g., Grkman v. 890 Weatherwood Lane*

length nature of the transactions themselves, nor the unaffiliated nature of the parties' relationships, in dispute.

The Court also considers that courts frequently look for the absence of a fiduciary or other confidential relationship to determine whether parties transacted at arm's-length. *See, e.g., Wal-Mart Stores, Inc.*, 901 A.2d at 114. While Plaintiffs loosely contend the transactions were not at arm's-length because DTE served as Carrizo's and Reliance's "marketing agent," Plaintiffs have not seriously attempted to establish the elements of agency. As the party asserting an agency relationship, it is their burden to do so. *See Hawthorne v. Am. Mortg., Inc.*, 489 F. Supp. 2d 480, 484 (E.D. Pa. 2007) (citing *Volunteer Fire Co. of New Buffalo v. Hilltop Oil Co.*, 602 A.2d 1348, 1351 (1992)). "The basic elements of agency are 'the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking.'" *Id.* (quoting *Scott v. Purcell*, 490 Pa. 109, 415 A.2d 56, 60 (1980)). Moreover,

> one who receives goods from another for resale to a third person is not thereby the other's agent in the transaction; whether he is an agent . . . depends upon whether the parties agree that h[e] . . . is to act primarily for the benefit of the [seller] or is to act primarily for his own benefit."

---

*Operating Co.*, LLC, 189 F. Supp. 3d 513, 520–21 (W.D. Pa. 2016); *Thomas v. R. J. Reynolds Tobacco Co.*, 350 Pa. 262, 266, 38 A.2d 61, 63 (1944) ("forbearance" constitutes adequate consideration); *see also* 2-6 Rocky Mt. Min. L. Fdn. 2016 (In the context of the oil and gas industry, acknowledging that "even under an arm's-length relationship," a party may have "the capacity to manipulate the other parties' expected contractual benefits.").

*Montgomery Cnty. v. Microvote Corp.*, No. CIV.A. 97-6331, 2000 WL 341566, at *4 (E.D. Pa.

Mar. 31, 2000) (quoting Restatement (Second) of Agency § 14J (1958)). And

> [w]hile it normally is the case that an agent will act to some degree to advance
> his own interests and that a buyer frequently will advance the interests of the
> seller in order to effectuate a resale, the primary distinction in this regard is
> between a fiduciary and a non-fiduciary.

*In re HH (US), Inc.*, 175 B.R. 188, 194–95 (Bankr. W.D. Pa. 1994) (citing Restatement

(Second) of Agency, § 14J, cmt. a).

Devoid of any evidence that Defendants and DTE had fiduciary relationships, the

Record indicates DTE acted as the buyer the Restatement imagines and not as an agent. To

distinguish between the relationships of buyer/seller and agent/principal, courts apply the

following Restatement factors, "no one of which is dispositive, [and which] tend to indicate

that the transaction is a sale rather than an agency:"

> (1) that the consignee gets legal title to and possession of the goods;
> (2) that the consignee becomes responsible for an agreed upon price, either at
> once or when the goods are sold;
> (3) that the consignee can fix the price at which he sells the goods without
> accounting to the transferor for the difference;
> (4) that the goods are incomplete or unfinished and it is understood that the
> transferee shall make additions to them or complete the process of
> manufacture;
> (5) that the risk of loss by accident is upon the transferee;
> (6) that the transferee deals, or has a right to deal, with the goods of persons
> other than the transferor; and
> (7) that the transferee deals in his own name and does not disclose that the
> goods are those of another.

*Id.* at 195 (quoting Restatement (Second) of Agency § 14J, cmt. b.)

Applying these factors to the undisputed facts, six of the seven indicate the transaction at issue is a sale and not an agency. First, DTE takes title to and possession of the gas before reselling it. Second, once it resells the gas, DTE is responsible for paying Carrizo/Reliance a price based on the pricing formula in the Transaction Confirmations. The third factor weighs in favor of a sale, because there is no difference in price for which DTE must account to Carrizo or Reliance, in that the price DTE obtains is the highest price it can achieve in the market, which in accordance with the parties' agreement, is not measured against any fixed price. (The deduction of TDGCP costs and DTE's fee do not constitute differences in price, but rather the cost of preparing the gas for sale.) The fourth factor indicates a sale because the gas is not ready for sale to the ultimate consumer when it reaches DTE; DTE facilitates the completion of the process and the transportation downstream. Fifth, viewing the disputed facts in the light most favorable to Plaintiffs, *see Scott*, 550 U.S. at 380, this factor indicates agency because DTE does not bear the risk of loss on lost-and-unaccounted-for gas. Sixth, DTE clearly deals with neither Carrizo nor Reliance exclusively, since it deals with both of them. And seventh, Plaintiffs have produced no evidence that DTE does not deal with third parties in its own name. On these facts, Plaintiffs have created no genuine dispute of material fact as to whether DTE was acting as Carrizo's and Reliance's agent. *See Hawthorne*, 489 F. Supp. 2d at 485 (granting summary judgment because plaintiff produced insufficient evidence to show mortgage broker was acting as mortgage lender's agent).

Consistent with the foregoing analysis, the Court's review of arm's-length cases also illustrates that in this industry, courts consider transactions less than arm's-length only when they are between actual corporate affiliates. In each case, a transaction is found to be either between *affiliated* parties, with common ownership, and *not* at arm's length, or between *unaffiliated* parties and *at* arm's length. Plaintiffs do not cite, and the Court has not identified, a relevant oil and gas case wherein a court found that a transaction between parties lacking common corporate ownership was conducted at less than arm's-length.

On the other hand, transactions between formal corporate affiliates conducted at less than arm's-length are plentiful.[23] *See, e.g., W.W. McDonald Land Co. v. EQT Prod. Co.*, 983 F. Supp. 2d 790, 804 (S.D.W. Va. 2013), *opinion clarified,* (Jan. 21, 2014) ("an intra-company contract is not an arm's length transaction, [and] it is not a legal basis on which [a producer] can calculate royalty payments") (quoting *Howell v. Texaco, Inc.,* 112 P.3d 1154 (Okla. 2004)); *Beer v. XTO Energy, Inc.,* No. CIV-07-798-L, 2010 WL 476715, at *3 (W.D. Okla. Feb. 5, 2010) (finding a "contract cannot be used to calculate plaintiffs' royalties as it not an arm's-length transaction and is between controlled, affiliated companies" when contract was between a company and its wholly-owned subsidiary); *Parry v. Amoco Prod. Co.,* No. 94CV105, 2003 WL 23306663, at *14 (Colo. Dist. Ct. Oct. 6, 2003) (court considers "gas that

---

[23] While "arm's-length" is not necessarily a lease requirement in these cases, each still requires an arm's length transaction, *e.g.,* to establish that a lessee satisfied its "implied duty to market", *W.W. McDonald Land Co.*, 983 F. Supp. 2d at 804, or to determine whether the royalty basis was the "best price available." *Beer*, 2010 WL 476715, at *3.

was sold to [defendant's wholly-owned subsidiary] . . . and finds that these sales were not arm's length sales").[24]

It appears that in practice, "arm's-length transactions" refer to gas sales that are not intra-company; the Court has found no case in which a transaction was deemed less than arm's-length when it did not involve a formal corporate affiliate. The Court finds Carrizo and Reliance have shown there is no genuine dispute of material fact they did not exert control over DTE so as to render their transactions non-arm's-length or between affiliated parties.

### b. "Price Sensitivity"

It is worthwhile to address Plaintiffs' "price sensitivity" argument, which is based on courts' interpretations of "arm's-length" in the Medicare regulatory context. Plaintiffs argue that DTE was "entirely price insensitive when buying gas, which negates any arm's length quality." (Doc. 216 at 12.) But Plaintiffs have not established that an arm's-length transaction requires such sensitivity. Plaintiffs take issue with the pricing formula pursuant to which DTE pays for Defendants' gas, arguing that because

> DTE could never make any more or any less than their fixed, volume-based
> fee, regardless of the price at which they bought or resold gas[,] . . . DTE

---

[24] Even in the abstract, courts look for the two concepts together. *See, e.g., Canfield v. Statoil USA Onshore Properties Inc.*, No. CV 3:16-0085, 2017 WL 1078184, at *20 (M.D. Pa. Mar. 22, 2017) ("The court has carefully reviewed the lease and can find no express provision requiring SOP to make royalties based on an arms'-length sale or a sale to a non-affiliate. Thus, SOP's actions do not amount to breach of an express obligation."); *Atl. Hydrocarbon, LLC v. SWN Prod. Co., LLC*, No. 4:17-CV-02090, 2018 WL 3007536, at *2 (M.D. Pa. June 15, 2018) (holding that sale to "third party" requirement in lease does not preclude the sale from one wholly-owned subsidiary to another of the same parent company, and that if the parties intended to prohibit such sale, they could have stated that "'third parties' needed to be 'unrelated to and unaffiliated with'" the seller, or that "any fees charged by third parties needed to be negotiated through arm's-length transactions").

> negotiated each gas purchase "in total disregard of the price" and, in economic
> substance, were providing marketing and asset management services in
> exchange for a fee.

(*Id.* at 12–13.) Plaintiffs cite case law precluding the finding of an arm's-length transaction if

a party negotiates "in total disregard of the price." *E.g., Jeanes Hosp. v. Sec'y of Health and*

*Human Serv.*, 448 F. App'x 202, 206 (3d Cir. 2011). However, that case law is inapposite

because it concerns the interpretation of Medicare regulations and Centers for Medicare and

Medicaid Services guidance. *See id.* Plaintiffs cite nothing requiring that parties to an arm's-

length transaction be "sensitive to price" in the context of gas sale contracts or in the "ordinary

meaning" of the term.

An explicit requirement that the buyer seek the lowest price might fulfill a statutory

purpose in other settings, for example, where the stated purpose of an arm's-length

transaction requirement is to protect against artificially high pricing. *See, e.g., Midwest Gas*

*Users Ass'n v. FERC*, 833 F.2d 341, 354 (D.C. Cir. 1987).[25]

But absent extraordinary circumstances, in this industry, prohibitions of the calculation

of royalties based on non-arm's-length or affiliate transactions are used to protect against

artificially *low* pricing, and to ensure royalties are based on a fair value. *See, e.g., Chambers*

---

[25] In this case, the D.C. Circuit rejected the Federal Energy Regulatory Commission ("FERC")'s test for arm's-length bargaining under FERC Order No. 99 when FERC failed to consider whether "the economic interests of [the midstream purchaser] itself coincided with the sellers' interests in getting the highest price possible for the gas," in part because the stated purpose of the arm's-length requirement was "[to] insure that the incentive maximum lawful price is extended as an incentive for the production of additional tight formation gas rather than as a windfall to the sellers." *See Midwest Gas Users Ass'n*, 833 F.2d at 354.

*v. Chesapeake Appalachia, L.L.C.*, 359 F. Supp. 3d 268, 280 (M.D. Pa. 2019) (interpreting lease to "avoid[] the absurd and unreasonable result that [lessee] could sell gas to [its affiliate] for a nominal fee and still comply with the leases"); *see also* John Burritt McArthur, *The Restatement (First) of the Oilfield Operator's Fiduciary Duty*, 45 Nat. Resources J. 587, 681–83 (2005) ("Courts generally have rejected efforts by lessees to underpay their royalty owners by using an artificially low affiliate price as the basis for royalty settlements."). The netback pricing method is an industry tool for arriving at that fair value; it is commonly used to determine the "negotiated value of the raw gas" at the wellhead. *Zehentbauer Fam. Land LP v. Chesapeake Expl., LLC*, 450 F. Supp. 3d 790, 809 (N.D. Ohio 2020), *aff'd sub nom. Zehentbauer Fam. Land, LP v. TotalEnergies E&P USA, Inc.*, No. 20-3469, 2022 WL 294081 (6th Cir. Feb. 1, 2022) (quoting *Tana Oil and Gas Corp. v. Cernosek*, 188 S.W.3d 354, 360 (Tex. App. 2006)).

Plaintiffs argue these were not arm's-length transactions because DTE had "'no incentive of its own' to pay [Defendants] a lower price" for the gas. (*See* Pls. Br. in Support, Doc. 202 at 32 (quoting *Jeanes Hosp.*, 448 F. App'x at 206).) But this term, reasonably understood to protect Plaintiffs from artificially *low* pricing, requires no such incentive. In fact, viewing the disputed facts in the light most favorable to Plaintiffs, Defendants retained and regularly exercised the right to ensure DTE did not accept low resale prices, to Plaintiffs' benefit. *See supra* at 8–9, 32–33. The Court interprets the language of the Class Leases as protecting Plaintiffs' interest in obtaining a fair royalty price.

While Plaintiffs' "price sensitivity" case law does not govern this dispute, the Court considers the ONRR regulation defining "arm's-length" and requiring that parties "have opposing economic interests regarding [the] contract." 30 C.F.R. § 206.151. Viewing the transaction as a whole, it is consistent with this standard because the parties have opposing interests in the value of DTE's fee. DTE sought to earn more in fees, whether by negotiating a higher per-unit fee or by selling more units of gas, and Defendants sought to pay less in fees. And Defendants and DTE evidently re-negotiated DTE's fee on occasion, because the value of the fee "changed over time" and "depend[ed] on the [Transaction Confirmation.]" (T. Neu 30(b)(6) 1/8/19 Dep. Tr. at 34:3–16.) Notably, Plaintiffs do not produce any evidence creating a genuine dispute of material fact as to whether the parties negotiated DTE's per-unit fee at arm's-length. The undisputed facts demonstrate that while Defendants and DTE both benefit from a higher downstream sale price,[26] they have adverse interests with respect to DTE's fee, consistent with the ONRR standard.

As such, Plaintiffs have produced no evidence to create a triable issue of fact as to whether the Carrizo/DTE and Reliance/DTE gas sales were "arms-length sale transaction[s] with an unaffiliated third party," and therefore the Provided Clause applies as a matter of law. The motions for summary judgment filed by Carrizo and Reliance with respect to the Highest Price Class are therefore granted.

---

[26] DTE was incentivized to sell its gas downstream at the highest possible price "so that Carrizo [and Reliance] would sell more gas to DTE and not reduce [their] volume." (Doc. 194 at ¶ 17; *see also* T. Neu 30(b)(6) 1/8/19 Dep. Tr. at 146:11–17.)

## 2. No Deductions

Carrizo and Reliance also seek summary judgment on Plaintiffs' claim that they breached the No Deductions Class Leases by deducting post-production costs from the value of the gas before calculating Plaintiffs' royalties.[27] The No Deductions Provision in the Slamon Lease, substantively representative of all the Class Leases, reads:

> [4](b) Production Royalty: Lessee shall pay Lessor the following royalty (the "Royalty"), *free of all costs, whether pre-production or post-production* as follows:
>
> . . . (ii) GAS: Lessee shall deliver to the credit of Lessor, *free of all costs (whether pre-production or post-production)*, a monthly Royalty equal to eighteen percent (18%) of the greater of (i) the market value, measured at the point of take, of all gas and any constituents produced from the Leasehold or lands pooled or unitized therewith, or (ii) the gross amount of revenue paid to Lessee for all gas and any constituents produced from the Leasehold or lands pooled or unitized therewith, measured at the point of take; provided, however, that when gas production is sold in an arms-length sale transaction with an unaffiliated third party, the value of such gas production shall be the price paid to Lessee.

(Doc. 193-4 at 2 (emphasis added).) As this Court previously explained, the common issues with respect to the "No Deductions Class" are: "(1) whether Defendants' royalty calculation method deducted post production costs from the royalties paid to lessors, and (2)

---

[27] Once again, the No Deductions Class is defined as:

All persons or entities within the Commonwealth who are, or have been, a royalty owner under a Paid Up Oil and Gas Lease with or assigned to one or more of Defendants where that lease expressly prohibits the deduction of post-production expenses when calculating royalty amounts due, and where (a) natural gas has been produced under the lease, (b) the person or entity has received one or more royalty payments under the lease, and (c) the person or entity has not released their claims in this matter.

(Doc. 158 at 1–2.)

if so, whether the deduction of post production costs violated a prohibition against such deductions in the lease." (Doc. 158 at 3–4.)

Having found that Plaintiffs failed to demonstrate that the Provided Clause does not apply, it provides the royalty basis: "the value of such gas production shall be the price paid to Lessee." (*Id.*) Accordingly, Plaintiffs are owed royalties equal to 18% of "the price paid to Lessee," and the royalties must be "free of all costs, whether pre-production or post-production." (*Id.*)

The Lease does not define "post-production" or "post-production costs," but the Court need not resort to a dictionary definition. The parties appear to agree on the meaning of the term as defined by the Pennsylvania Supreme Court in *Kilmer v. Elexco Land Services, Inc.*, 990 A.2d 1147 (Pa. 2010). Each party cites *Kilmer*'s definition of the term as it is understood in the oil and gas industry. (*See* Pls. Br. in Support, Doc. 202 at 8 (quoting *Kilmer*, 990 A.2d at 1149 n.2) ("The Supreme Court of Pennsylvania has recognized that 'post-production costs' in the oil and gas industry refers to 'expenditures from when the gas exits the ground until it is sold,' including 'costs of treatment of the product to render it marketable' (*i.e.*, gathering, compression, and dehydration) and 'costs of transportation to market.'"); Carrizo's Br. in Support, Doc. 197 at 24–25 (quoting *Kilmer*, 990 A.2d at 1157) ("in the oil-and-gas industry, post-production costs are 'the costs of getting the product from the wellhead to the point of sale . . ."); Reliance Br. in Support, Doc. 189 at 21 (quoting *Kilmer*, 990 A.2d at 1149

n.2) ("In *Kilmer*, the Pennsylvania Supreme Court defined 'post-production costs' as 'expenditures from [when] the gas exits the ground until it is sold.'")

The *Kilmer* court exercised extraordinary jurisdiction to determine the proper construction of the term "royalty" as it is used in Pennsylvania's Guaranteed Minimum Royalty Act (GMRA), and relatedly, whether "the net-back method of calculating royalties violates the GMRA."[28] *See Kilmer*, 990 A.2d at 1149. Both of these questions implicated the related concept of "post-production costs." *See id.* In the course of holding that the netback method does not violate the GMRA, the *Kilmer* court states plainly: "In industry parlance, 'production costs' refer to the expenses of getting gas to the point it exits the ground, and 'post-production costs' refer to expenditures from when the gas exits the ground until it is sold." *Id.* at 1149 n.2. The court elaborates,

> In the industry, as referenced above, the "expenses of production" relate to the costs of drilling the well and getting the product to the surface, but do not encompass the costs of getting the product from the wellhead to the point of sale, as those costs are termed "post-production costs." "Although the royalty is not subject to costs of production, usually it is subject to costs incurred after production, e.g., production or gathering taxes, costs of treatment of the product to render it marketable, costs of transportation to market." [Howard R. Williams & Charles J. Meyers, Manual of Oil and Gas Terms § R (Patrick H. Martin & Bruce M. Kramer eds., 2009)]; *see also* George A. Bibikos and Jeffrey

---

[28] The *Kilmer* court described the net-back method as follows:

Although the critical term "royalty" is not defined by the statute, many leases in the Commonwealth, including the lease at issue before this Court, calculate the royalties as one-eighth of the sale price of the gas minus one-eighth of the post-production costs of bringing the gas to market. This calculation is called the "net-back method," as its goal is to determine the value of the gas when it leaves the ground (hereinafter "at the wellhead") by deducting from the sales price the costs of getting the natural gas from the wellhead to the market.

*Kilmer*, 990 A.2d at 1149.

> C. King, *A Primer on Oil and Gas Law in the Marcellus Shale States*, 4 Tex. J.
> Oil, Gas, & Energy L. 155, 168–69 (2008–2009).

*Id.* at 1157.

Although the question in *Kilmer* arose under the GMRA, courts have expressly

interpreted the case to have broad application. *See, e.g.*, *Ulmer v. Chesapeake Appalachia,*

*LLC*, No. 4:08-cv-2062, 2011 WL 1344596 (M.D. Pa. Apr. 8, 2011) ("[I]t is our view that *Kilmer*

is properly read broadly in light of the fact that the Pennsylvania Supreme Court granted

extraordinary jurisdiction to resolve the purely legal question of whether post-production costs

are proper under Pennsylvania oil and gas law."); *Aker v. Keeton Grp., LLC*, No. 3:2009-101,

2011 WL 13235036 (W.D. Pa. Mar. 15, 2011) (same). And *Kilmer*'s "post-production cost"

definition specifically has been accepted and applied in breach of contract actions. *See, e.g.*,

*Mun. Auth. of Westmoreland Cnty. v. CNX Gas Co., L.L.C.*, 380 F. Supp. 3d 464, 467 (W.D.

Pa. 2019) ("Costs associated with bringing natural gas to market after it has been removed

from the ground (i.e., from 'wellhead' to point of sale) are referred to in industry vernacular as

'post-production costs.'" (citing *Kilmer*, 990 A.2d at 1149 & n.2)).

With this context, the term is certainly unambiguous. Especially with the support of

both parties, this Court now finds no reason not to apply *Kilmer*'s definition: "the costs of

getting the product from the wellhead to the point of sale."[29] The fairly straightforward question

---

[29] At the Motion to Dismiss stage, the Court was unwilling to adopt *Kilmer*'s definition. Now, with adequate legal briefing on the widespread use of the definition in the industry, and with both parties' acknowledgement of that use, the Court applies it. *See Chambers v. Chesapeake Appalachia, L.L.C.*, 359 F. Supp. 3d 268, 281 (M.D. Pa. 2019) (ruling on a motion to dismiss and noting that "courts are better positioned to tease out ambiguities [in oil and gas leases] on summary judgment" with the benefit of

is whether, if Carrizo and Reliance incurred any costs from the wellhead to the point of sale, they deducted any of those costs from the value on which they based Plaintiffs' royalties. It is a simple question given the undisputed location of the point of sale: at the wellhead.

The Record indicates that all sales from Defendants to DTE occurred at or near the wellhead. Neither the Class Leases nor the NAESBs set the location of the point of sale. Neither restricts its location, either. The NAESBs provide only that title transfers at the Delivery Point, which Defendants and DTE defined in their respective Transaction Confirmations to be at or near the wellhead. (*See, e.g.,* Doc. 202-12, Ex. Q; Doc. 202-13, Ex. R.) Plaintiffs do not argue that the Class Leases prohibited Defendants from doing so.

As Carrizo notes, Plaintiffs "offer no evidence that Carrizo in fact deducted any of its costs in moving gas from the wellhead to the custody transfer point at which Carrizo sold the gas to DTE." (Doc. 224 at 16.) The same is true with respect to Reliance. Accordingly, there is no genuine dispute of material fact as to whether Carrizo and Reliance deducted any costs "from when the gas exits the ground until it is sold" because the Record reflects that they incurred no such costs. This is no surprise, given there is no appreciable difference between the two locations. *See Canfield*, 2017 WL 1078184, at *19 ("Where the lessee is selling at the well, the lessee need not incur post-production costs.")

---

"extrinsic evidence and legal briefing" to explain the "unique 'linguistic frame of reference' of contractual parties") (quoting *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1011 n.12 (3d Cir. 1980)).

Still, Plaintiffs present several arguments that the TDGCP costs were deducted in breach of the No Deductions Class Leases, each of which lack merit. First, Plaintiffs argue that Carrizo and Reliance impermissibly "calculated royalties based solely on the Net Proceeds they received from DTE and not the Gross Proceeds." (Doc. 202 at 20.) This net vs. gross distinction distorts the ordinary meaning of the terms. As discussed *supra* at 43, because the Provided Clause applies, the language Plaintiffs seem to reference—"the *gross amount of revenue* paid to Lessee for all gas and any constituents produced from the Leasehold"—is not the proper royalty basis. (Doc. 193-4, at 2.) The proper basis is "the price paid to Lessee." (*Id.*) Even if "gross" applied, the value on which Carrizo and Reliance based their royalties *was* the gross amount of revenue *paid to them*. To be sure, that same value represents *DTE's* net proceeds, because DTE deducted TDGCP costs and its marketing fee before it paid Defendants. But the amounts Carrizo and Reliance received represents the *Lessee's* gross proceeds. Without evidence that Carrizo and Reliance made their *own* deductions before calculating royalties, Plaintiffs cannot show that royalties should have been based on the amounts DTE received, rather than the amounts Carrizo and Reliance received.[30]

---

[30] Other courts have interpreted "price paid to Lessee" language the same way. As the court in *Chambers* explained,

> Comparing the clauses at issue to those featured in other cases, it is clear that they are "proceeds" clauses because of the phrase "price paid to Lessee." A proceeds clause sets the lessor's royalty as a percentage of the proceeds received by the lessee from the sale of oil or gas. *See, e.g.*, *Tana Oil & Gas Corp. v. Cernosek*, 188 S.W.3d 354, 360 (Tex. App. 2006); *Williams & Meyers*, *Manual of Oil and Gas Terms* 849 (a "lease providing for a royalty

Plaintiffs also argue that Carrizo and Reliance "should [not] escape liability simply because *DTE* deducted Post-Production Costs rather than Carrizo and Reliance doing so directly," because "nothing in the Class Leases prohibits only *Defendants* from deducting Post-Production Costs." (Doc. 202 at 21 (emphasis in original).) In support of this point, Plaintiffs again emphasize the Transaction Confirmation language stating that "all charges . . . incurred by Buyer [DTE] required to take delivery and resell the Gas are to be for the account of Seller" and contend that "regardless of which party directly made the deductions, the relevant documentation expressly states that the charges were 'for the account of' Carrizo and Reliance'" such that basing royalties on a value that reflects those deductions constituted a breach. (Doc. 202 at 22.)

This is unconvincing. The No Deductions Provision is reasonably understood as prohibiting only the deduction of Defendants' post-production costs because it prohibits only the deduction of post-production costs incurred *before* the Lessee sells the gas. Under the *Kilmer* definition, there is no question that the only costs prohibited are those incurred between when the gas exits the wellhead up until the point of sale. *See Kilmer*, 990 A.2d at 1149 n.2. Plaintiffs do not dispute the point of sale, nor have they produced any evidence to

---

of a portion of the proceeds of the sale of oil or gas" is a proceeds lease). The phrase "price paid to Lessee" unambiguously pegs the royalty to the price Equinor actually receives for the gas it sells, as opposed to the market value of the gas sold. *See Canfield v. Statoil USA Onshore Props. Inc.*, No. CV 3:16-0085, 2017 WL 1078184, at *17-18 (M.D. Pa. Mar. 22, 2017) (distinguishing market value clauses from proceeds clauses)[.]

359 F. Supp. 3d at 279.

dispute that Carrizo and Reliance did not deduct, or even incur, any such costs before that point.

Plaintiffs' argument also ignores the reality of the industry. Logic requires that the term pertain only to the Lessee's post-production costs, *i.e.*, those costs incurred before the *first* sale of the gas. As Carrizo argues,

> any other interpretation of the term would mean that costs of moving the gas (and improving its quality and value) paid by any party all the way down the chain to the burner tip of the ultimate consumer would have to be borne by the producer, regardless of who owns the gas or pays the costs.

(Doc. 197 at 25 n.16.)

The Northern District of Ohio reached the same decision in *Zehentbauer Family Land LP v. Chesapeake Exploration, LLC*. In that case, the plaintiff/lessor argued that the defendant/lessee improperly deducted post-production costs incurred by the first purchaser of its gas (the equivalent to DTE), and based plaintiff's royalties on that value, in breach of the lease that prohibited "any deductions or expenses." 450 F. Supp. 3d at 809. Quoting the Fifth Circuit, the court rejected the plaintiff's argument, explained that "language such as 'without any deductions or expenses' in the Gross Royalty Leases 'does not change the point at which all royalty is computed, which is the mouth of the well.'" *Id.* (quoting *Warren v. Chesapeake Exploration, L.L.C.*, 759 F.3d 413, 418 (5th Cir. 2014)). The court held that the prohibition on cost deductions meant that the lessees "may not deduct the post-production costs they pay prior to the sale to [the first purchasers of the gas]," but that the lessees "follow

the 'without any deductions or expenses' Lease language by taking no deductions for their

post-production costs from the price they receive" from their sales to the first purchasers. *Id.*

Moreover, Plaintiffs do not challenge the use of the netback method, which inherently

requires the deduction of *some* party's post-production costs before calculating royalties. The

purpose of the method is "to calculate the royalty payments based on the market value at the

wellhead—the price that would have been paid at the wellhead if there were a market there."

*Anderson Living Tr. v. Energen Resources Corp.,* 886 F.3d 826, 833 n.10 (10th Cir. 2018). It

is an industry method for calculating royalties. *See id.* Inexplicably, Plaintiffs claim to accept

that the Class Leases permit the use of the netback method, but still argue Defendants must

add back the TDGCP costs before calculating royalties, thereby undoing the netback

adjustment.

Such arguments would compel results that defy industry practice. As industry

standards and definitions recognize, it is fair to compensate the landowners based on the

value of the gas when it left their land. Paying royalties on the value of the gas after it has

been treated and transported downstream would over-compensate landowners for a portion

of the gas's value they did not add.[31] As the Tenth Circuit in *Anderson Living Trust* noted, it

_____

[31] Of course, the Court's decision is based not on what is fair, but on the terms of the Lease as colored by their usage in the oil and gas industry. That the industry understands and uses these terms this way is simply further evidence of the proper construction of the No Deductions Provision. *See Dressler Fam., LP*, 276 A.3d at 736 ("custom in the industry or usage in the trade is always relevant and admissible in construing commercial contracts" and "[i]f words have a special meaning or usage in a particular industry, then members of that industry are presumed to use the words in that special way").

makes "little sense to say that the royalty owners are bearing the post-production costs" under the netback method. *Id.*

Because Plaintiffs have produced no evidence that Defendants deducted any post-production costs from the values on which they based Plaintiffs' royalties, the Court will grant Carrizo's and Reliance's motions with respect to this claim.

### 3. Individual Claims for Breach of Duty of Good Faith and Fair Dealing

Carrizo and Reliance are also entitled to summary judgment on Slamon's and Lewis's individual claims for breach of the implied duty of good faith and fair dealing. At the outset, the Third Circuit has held that "an independent cause of action for breach of a duty of good faith and fair dealing" is recognized "only in very limited circumstances" that do not apply here, such as "insurers' dealings with insureds, franchisors' dealing with franchisees and other narrow situations." *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 91 (3d Cir. 2000) (citing *Creeger Brick and Building Supply, Inc. v. Mid-State Bank and Trust Co.*, 560 A.2d 151, 153, 154 (Pa. Super. Ct.1989)). Outside of those narrow circumstances, an implied duty claim may be used as an "interpretive tool" to "color" the express contractual terms. *See id.*

Although Plaintiffs pleaded a separate, independent cause of action for breach of the implied duty of good faith and fair dealing, (Doc. 107 at 26), they now urge the Court to use this claim to "inform[] any assessment of whether [the Lease terms] were breached." (Doc. 216 at 37 (quoting *Hordis v. Cabot Oil & Gas Corp.*, No. 3:19-CV-296, 2020 WL 2128968, *5

(M.D. Pa. May 5, 2020).) They argue the claim is properly treated as a claim for "breach of Plaintiffs' Leases for failing to obtain a competitive market price." (*Id.* (citing *Chambers*, 359 F. Supp. 3d at 278).)

Defendants argue that while such a claim may provide "a lens through which to assess the parties' reasonable expectations regarding [the] terms," it can supply "no further obligations beyond those expressly articulated in the contract." (Doc. 189 at 26 (quoting *Hordis*, 2020 WL 2128968, at *5).) Defendants continue: "Because the Slamon Lease and the Lewis Lease expressly address the calculation of royalties, Plaintiffs cannot use the implied covenant of good faith and fair dealing to supply terms beyond those expressly articulated." (*Id.*)

The Court agrees with Defendants. *See Sargent v. SWEPI LP*, No. 4:19-CV-1896, 2020 WL 1503222, at *2 (M.D. Pa. Mar. 24, 2020) ("a plaintiff's claim for breach of the implied covenant of good faith and fair dealing [cannot] 'trump the express provisions of the contract' at issue"). The Highest Price Provision serves to ensure that Plaintiffs' royalties are based on a fair price, calculated one of three ways depending on the facts and circumstances. As discussed *supra* at 41–42, the Provided Clause protects against the use of an artificially low price as a royalty basis. Plaintiffs attempt to introduce a new obligation with respect to a topic their Leases already expressly and comprehensively address. The Court has determined that Carrizo and Reliance have not violated their obligations under Plaintiffs' Leases, and instead have properly applied the Provided Clause. In that circumstance, it follows that, even

assuming that an implied duty of good faith governs their transactions, Plaintiffs have shown

no evidentiary basis to support such a claim. For this reason, Plaintiffs' individual implied duty

of good faith claims fail.[32]

## 4. Accounting

Finally, Carrizo and Reliance are entitled to summary judgment with respect to

Plaintiffs' demand for an accounting. Under Pennsylvania law, an accounting claim is incident

to a breach of contract claim. *Pollock v. Energy Corp. of Am.*, No. CIV.A. 10-1553, 2011 WL

5977422, at *1 (W.D. Pa. Nov. 29, 2011) (first citing Pa. R. Civ. P. 1021(a); and then citing

*Buczek v. First Nat'l Bank of Mifflintown*, 531 A.2d 1122, 1123 (Pa. Super. Ct. 1987)); *see*

*also Canfield*, 2017 WL 1078184, at *25. To establish a right to an accounting, a plaintiff must

---

[32] The Court does not reach the question of whether Pennsylvania recognizes the disclaimer of the implied duty of good faith and fair dealing, nor whether the following provision would effectively disclaim such duty:

> It is mutually agreed that this [lease, addendum and exhibits] contains and expresses all of the agreements and understandings of the parties in regard to the subject matter thereof and no implied covenant, agreement or obligation shall be read into this agreement or imposed upon the parties or either of them.

(Slamon Lease at ¶ 17; Lewis Lease at ¶ 17.) The Court notes, however, that other federal courts have reasoned that the duty may not be disclaimed under Pennsylvania law. *See, e.g., Masciantonio v. SWEPI LP*, No. 4:13-CV-0797, 2014 WL 4441214, at *14 (M.D. Pa. Sept. 9, 2014) (observing that "Pennsylvania courts do not appear to have passed on the issue of whether, under the common law, the implied covenant of good faith and fair dealing may be waived or disclaimed by agreement, but they have equated the good faith requirements of the Uniform Commercial Code to those imposed by Pennsylvania common law" and that "[u]nder the Uniform Commercial Code, the general obligation of good faith and fair dealing in the performance of a contract may not be disclaimed by agreement" and concluding that "it is reasonable to infer that a similar rule may apply under the common law." (citing 13 Pa. Cons. Stat. § 1302(b))); *Tracy v. P.N.C. Bank, N.A.*, No. 2:20-CV-1960-NR, 2022 WL 2275493, at *3 n.4 (W.D. Pa. June 23, 2022) (citing *Masciantonio* with approval).

show, among other things, "that the defendant breached or was in dereliction of his duty under the contract." *Pollock*, 2011 WL 5977422, at *2 (citing *McGough v. Broadwing Communications, Inc.*, 177 F.Supp.2d 289, 301 (D.N.J. 2001); *Haft v. U.S. Steel Corp.*, 499 A.2d 676, 678 (1985)). Having failed to demonstrate that Carrizo and Reliance breached the Class Leases, Plaintiffs are not entitled to an accounting.

Carrizo and Reliance are therefore entitled to summary judgment on all claims.

### B. BKV's Motion for Summary Judgment

The Court addresses BKV's motion separately to address the few ways in which BKV's performance differs from that of Carrizo and Reliance. In all other respects, the Court incorporates the above analysis herein.

### 1. Transition Period

At the outset, the Court considers whether BKV breached the Class Leases while Carrizo and Reliance continued to perform on BKV's behalf during the Transition Period pursuant to the respective Transition Services Agreements. Carrizo and Reliance have demonstrated there is no genuine dispute of material fact with respect to whether the Provided Clause covered their transactions with DTE. The same conclusion results when considering the nature of those (same) transactions during the Transition Period. Having found Carrizo and Reliance did not breach the Highest Price or No Deductions Provisions, neither did BKV while Carrizo and Reliance performed on BKV's behalf.

### 2. Post-Transition Period

The Court next considers whether BKV has demonstrated there is no genuine dispute of material fact with respect to its performance under the Class Leases after it took over operations as Lessee.

### a. Highest Price Provision

Like Carrizo and Reliance, BKV argues that it properly paid royalties based on the Provided Clause because it sold gas to Concord, an unaffiliated third party, in arm's-length transactions. (BKV's Br. in Support, Doc. 198 at 12.) Because the Record reflects few meaningful differences between BKV's relationship with Concord and those between DTE and Carrizo and Reliance, respectively, the bulk of the Court's foregoing analysis applies here and is incorporated by reference.

The Court addresses one notable difference: that BKV admits Concord acts as its "agent." While all parties acknowledge that BKV and Concord are independent companies with no common ownership, no corporate parent or subsidiary relationship, nor any other corporate affiliation, Plaintiffs contend the Record reflects an agency relationship. They point to several pieces of evidence. First, in its interrogatory responses, BKV states that "it is not directly involved in the sale of natural gas produced under any Lease. BKV retains a third party agent, Concord Energy LLC, which markets and sells the natural gas to third parties." (BKV's Answer to Interrogatory No. 3, Doc. 193-1, Ex. A.) Second, BKV's Vice President of Marketing Daniel Androphy testified at his deposition:

> Q. Did you have discussions about specific delivery point locations for the sale of gas with Concord?

A. Of course. They're my marketing agent.

(D. Androphy 4/30/19 Dep. Tr. at 139:1–5, Doc. 216-2, Ex. 2.) Plaintiffs also point to the BKV/Concord GMA and its emphasis on Concord's role as a provider of marketing services. (*See, e.g.,* Doc. 216 at 16 (quoting GMA, Doc. 193-2 at 1–2 ("BKV 'seeks asset management and natural gas marketing services to market [its] equity natural gas production and to transport that gas to buyers using transportation capacity.'").) They maintain the GMA's inclusion of an "Asset Management Agreement" is evidence of an affiliate relationship, as is the fact that their "arrangement . . . is effectuated by the NAESB and Asset Management Agreement but . . . is ultimately controlled by the GMA." (*Id.* at 16–17 (citing GMA at 1–2).)

Plaintiffs contend this evidence puts in dispute the application of the Provided Clause to the BKV/Concord transactions. They argue,

> BKV's gas sales to its agent as part of Concord's provision of marketing services do *not* qualify for the Proviso - the sales are neither "arm's length" (since Concord has no economic interest in the purchase price) nor between "unaffiliated" parties (since Concord acts as BKV's marketing agent and works on its behalf).[33]

(Doc. 216 at 17 (emphasis in original).)

Plaintiffs also point to evidence to support their argument that BKV, like Carrizo and Reliance, exercised control over the gas post-sale. As BKV's 30(b)(6) designee, Androphy testified:

---

[33] Plaintiffs' contention that Concord has "no economic interest in the purchase price" refers to the same argument they make with respect to DTE and its insensitivity to the price at which it buys gas from Carrizo and Reliance. This argument is addressed *supra*, at 40–43.

> Q. And as part of those discussions between BKV and Concord, do you also
> discuss volume and location for gas sales?
> A. Yes, we do.
> Q. Does Concord, in its role as marketing agent, have the ability to ignore BKV's
> input on price and volume and location?
> A. No.
> Q. Have you ever made a suggestion or -strike that. Have you, on behalf of
> BKV, ever had a conversation with Concord regarding price or volume or
> location for gas sales that Concord has refused to comply with?
> A. Never.

(D. Androphy 30(b)(6) 11/5/20 Dep. Tr. at 49:11–21, Doc. 193-23, Ex. W.)

BKV's arguments in defense substantially mirror those of Carrizo and Reliance, and

to the extent they are the same as those discussed *supra*, they have merit. BKV does not

directly discredit Plaintiffs' agency theory, but argues that nevertheless, the "NAESB Base

Contracts between BKV and Concord . . . unequivocally establish a purchaser-seller

relationship and that Concord took title to the gas and all counterparty risk at or near the

wellhead." (BKV's Reply Br., Doc. 225 at 9.) BKV also highlights Eric Lewis's deposition

testimony:

> Q. Do you have any information to suggest that BKV is not selling the gas at
> an arm's length transaction to a third party?
> A. We don't have any information to that whatsoever.

(E. Lewis 11/12/20 Dep. Tr. at 95:5–9, Doc. 198-3, Ex. 18.)

More fundamentally, BKV argues, like Carrizo and Reliance, that its transactions with

Concord fall under the Provided Clause because the terms of the NAESB were *negotiated* at

arm's-length, between two willing parties, absent compulsion or untoward circumstances.

(*See* Doc. 198 at 18.) Further, the terms themselves reflect a traditional buyer-seller

relationship, because "title transfers without any recourse provision, with Concord bearing the full risk of loss if it is unable to sell the volume it committed to buy." (*Id.* at 19.)

Because Plaintiffs fail to identify any authority to support their agency argument, and because the Court's analysis is properly focused on the parties' negotiations leading to the agreement reached, the Court finds BKV has met its summary judgment burden on this claim. First, Plaintiffs' agency argument requires that (1) an agency relationship either precludes an "arms-length sale transaction" or necessarily implicates an "[]affiliated third party," and (2) Concord is in fact BKV's agent as Pennsylvania law defines it. Plaintiffs have not provided, nor has the Court identified, any case law supporting Plaintiffs' position on the first question. As discussed *supra* at 39–40, cases that question the arm's-length nature of a gas sales transaction all involve sales to an affiliate with common corporate ownership. But assuming for purposes of analysis that a sale to an agent is equivalent to a sale to a corporate affiliate under the Class Leases, Plaintiffs have not produced more than a "scintilla" of evidence that Concord was in fact BKV's agent. *See Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to defeat summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff.").

The Court sees only two notable differences between the BKV/Concord relationship and the DTE/Carrizo and DTE/Reliance relationships, and they do not amount to a dispute of fact as to the existence of an agency relationship. The first—BKV's use of the label "agent"— fails to create a dispute of fact as to the existence of a principal/agent relationship. *See*

*Montgomery Cnty.*, 2000 WL 341566, at *4 (citing *L & M Beverage Co. v. Anheuser Busch, Inc.*, No. CIV.A. 85–6937, 1988 WL 85670, at *14 (E.D. Pa. Aug. 16, 1988) ("The [plaintiff's] conclusive statement that an agency was created by labeling the parties' relationship as an 'exclusive sales agency' is erroneous. The use of the term 'agency' does not automatically convert a relationship into an agency relationship; rather, it is the essence of the actual relationship which governs whether or not an agency is created.").

The second difference is the parties' use of the GMA, and relatedly, their acknowledgment that Concord provides marketing services. But these also fail to create a dispute of fact as to the existence of an agency relationship. That Concord "markets and sells the natural gas to third parties" does not, without more, render it BKV's agent. (BKV's Answer to Interrogatory No. 3, Doc. 193-1, Ex. A.) Instead, like DTE, Concord is properly considered a "non-agent independent contractor," defined by the Restatement as a "person who contracts to accomplish something for another or to deliver something to another, but who is not acting as a fiduciary for the other[.]" *Montgomery Cnty.*, 2000 WL 341566, at *6 (citing Restatement (Second) Agency § 14N, cmt. b). Or more specifically, a non-agent "buyer [that] frequently . . . advance[s] the interests of the seller in order to effectuate a resale." *In re HH (US), Inc.*, 175 B.R. at 194–95 (citing Restatement (Second) of Agency, § 14J, cmt. a).[34]

---

[34] It is unnecessary to revisit all of the buyer/seller vs. agent/principal factors here because the BKV/Concord analysis does not meaningfully differ from the DTE/Carrizo/Reliance analysis. *See supra* at 37–38. The Court need only highlight that the sixth factor ("that the transferee deals, or has a right to deal, with the goods of persons other than the transferor") applies differently but reaches the same outcome. *In re HH (US), Inc.*, 175 B.R. at 194–95 (quoting Restatement (Second) of Agency § 14J, cmt. b). While the controversy at issue involves Concord's dealings with only BKV, Plaintiffs have not offered any evidence,

In fact, the GMA expressly contemplates the nature of the relationship between BKV and Concord. The "Relationship of Parties" provision provides:

> This Agreement shall not create and it is not the purpose or intention of the Parties to create any partnership, mining partnership, joint venture, general partnership, or other partnership relationship, and none shall be inferred. Nothing in this Agreement shall be construed to establish a fiduciary relationship between the Parties for any purpose.

(GMA at § 11.) The Independent Contractor provision immediately follows:

> The Marketing Services shall be performed by Concord as an independent contractor and not as an employee of Company, and Concord's employees shall at all times be under its direction and control.

(Id. at § 12.) The GMA provides that it shall be "construed in accordance with the laws of the state of Colorado." (*Id.* at § 16.) And Colorado law recognizes the rights of parties to "expressly disclaim[] any fiduciary relationship" via contractual agreements. *See Rocky Mountain Expl., Inc. v. Davis Graham & Stubbs LLP*, 420 P.3d 223, 235 (Co. 2018). Therefore, because BKV and Concord exercised their rights to disclaim any fiduciary relationship, Plaintiffs' agency argument cannot succeed regardless of whether the underlying facts would have given rise to an agency relationship in absence of such disclaimer.

Lacking evidence that creates a dispute of fact as to the arm's-length nature of the BKV/Concord transaction or Concord's status as an "unaffiliated third party," via an agency

---

nor even argued, that Concord deals exclusively with BKV. Accordingly, this factor indicates a sale. With six out of seven factors indicating a sale, the evidence is not sufficient to create a genuine dispute of material fact.

relationship or otherwise, BKV properly applied the Provided Clause. Accordingly, BKV is entitled to summary judgment on the Highest Price claim.

### b. No Deductions Provision

BKV has demonstrated there is no dispute whatsoever that it made no deductions in violation of the No Deduction Provision. All parties agree that BKV's performance with respect to deductions differed from that of Carrizo and Reliance. Upon receiving payment from Concord that reflected Concord's TDGCP deductions and Concord's marketing fee, BKV added back those deductions before calculating No Deductions Class Plaintiffs' royalties. Thus, BKV based royalties on the price Concord received from the downstream sales to third parties—a price higher than BKV itself received. While Plaintiffs acknowledge this was BKV's general practice, they argue BKV is still not entitled to summary judgment because Plaintiffs' expert has identified numerous royalty calculations in which BKV deducted post-production costs from No Deductions Class Leases in error. (Doc. 216 at 40 n.31 (citing Supplemental Expert Report of Daniel T. Reineke, Doc. 205-16, Ex. 16).)

This argument fails, because Plaintiffs again produce no evidence that BKV deducted any of *its* post-production costs in any case. To be sure, Concord made TDGCP deductions. Those are not post-production costs under *Kilmer* because they were incurred after the initial sale of the gas. *See Kilmer*, 990 A.2d at 1149 n.2. Because Plaintiffs have failed to produce evidence of any post-production costs, BKV did not violate the No Deductions Class Leases as a matter of law.

### c. Accounting and Individual Claims for Breach of Implied Duty of Good Faith and Fair Dealing

BKV is entitled to summary judgment with respect to Plaintiffs' demand for an accounting and the named plaintiffs' individual implied duty claims for the same reasons that Carrizo and Reliance are so entitled, as discussed *supra*. Accordingly, BKV's motion will be granted in its entirety.[35]

### D. Plaintiffs' Partial Motion for Summary Judgment

Because all three defendants have shown there is no genuine dispute of material fact and they are entitled to summary judgment, Plaintiffs' Partial Motion for Summary Judgment is denied.

### V. CONCLUSION

The Court will grant each defendant's Motion for Summary Judgment in its entirety, (Docs. 188, 192, 196), and will deny Plaintiffs' Partial Motion for Summary Judgment in its entirety. (Doc. 191.) A separate order follows.

Robert D. Mariani
United States District Judge

---

[35] BKV filed several crossclaims against its co-Defendants, alleging that if found liable, BKV was entitled to indemnification and contribution from each of them. (*See* Doc. 70, 111.) Because BKV is not liable as a matter of law, those crossclaims will be dismissed.